Payam Shahian (State Bar No. 228406)
pshahian@slpattorney.com
**Strategic Legal Practices, APC**
1875 Century Park East, Suite 700
Los Angeles, CA 90067
Telephone:      (310) 277-1040
Facsimile:      (310) 943-3838

Matthew R. Mendelsohn (*pro hac vice*)
mmendelsohn@mskf.net
**Mazie Slater Katz & Freeman, LLC**
103 Eisenhower Parkway
Roseland, New Jersey 07068
Telephone:      (973) 228-9898
Facsimile:      (973) 228-0303

Dara Tabesh (SBN 230434)
dara.tabesh@ecotechlaw.com
**EcoTech Law Group, P.C.**
333 First St. Ste. C
San Francisco, CA 94105
Telephone:      (415) 503-9194
Facsimile:      (415) 651-8639

Attorneys for Plaintiff Melita Meyer

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| MELITA MEYER, individually, and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    vs.<br><br>BEBE STORES, INC.,<br><br>        Defendant. | Case No.: 14-cv-00267-YGR<br><br>**CLASS ACTION**<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO STAY LITIGATION**<br><br>Date:          March 10, 2015<br>Time:          2:00 p.m.<br>Location:      Courtroom 1<br><br>Complaint Filed:      Jan. 16, 2014 |

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.   STATEMENT OF FACTS ................................................................................2

III.  ARGUMENT ....................................................................................................3

    A.   The Doctrine of Primary Jurisdiction...................................................3

    B.   Whether Defendant's Equipment Constitutes an ATDS Is Within the
        Conventional Experience of Judges and Does Not Involve Technical or Policy
        Considerations Solely Within the FCC's Particular Field of Expertise ............4

        1.   The *Sensia* Petition, like the *GroupMe* Petition, involves statutory
            interpretation of the term, "ATDS," a matter best resolved by the courts 5

        2.   Courts in this Circuit have already resolved the issues on which
            Defendant bases its Motion ...................................................................6

        3.   The FCC has already ruled on the issues on which Defendant bases its
            Motion ....................................................................................................7

    C.   The Issue Is Not Solely Within the FCC's Discretion, and Is, in Fact, Best
        Committed to Resolution by the Courts.............................................10

    D.   There Is No Substantial Danger of Inconsistent Rulings .................11

        1.   The *Sensia* Petition raises issues not presented here ...................11

        2.   Even if the FCC takes up the *Sensia* Petition, a stay is nevertheless
            unnecessary to prevent inconsistent rulings .............................................14

        3.   There is no indication that the FCC will take up the *Sensia* Petition ........14

        4.   The courts and the FCC have broadly and consistently construed the term,
            "ATDS" ...............................................................................................15

    E.   Plaintiff Will Be Unduly Prejudiced by a Stay of Litigation, Whereas
        Defendant Has Offered No Evidence That it Will Be Prejudiced by the Denial
        of a Stay .................................................................................................16

IV.   CONCLUSION ..............................................................................................18

i

**TABLE OF AUTHORITIES**

CASES

*Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934 (8th Cir. 2005)..................................... 4

*Beller v. Health & Hosp. Corp.*, 703 F.3d 388 (7th Cir. 2012)....................................... 17

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) ........................................... 17

*Brown v. MCI WorldCom Network Servs., Inc.*,
    227 F.3d 1166 (9th Cir. 2002) ........................................................................... 3

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ................... 10, 11

*Clark v. Time Warner Cable*, 523 F.3d 1110 (9th Cir. 2008) ....................................... 3

*CMAX, Inc. v. Hall*, 300 F.2d 265 (9th Cir. 1962) ................................................ 16

*Frydman v. Portfolio Recovery Assocs., LLC*, No. 11 CV 524, 2011 WL 2560221 (N.D. Ill. June 28,
    2011) .............................................................................................5, 6, 16, 17

*Gomez v. Campell-Ewald Co.*, 768 F.3d 871 (9th Cir. Sept. 19, 2014) ........................... 3, 7

*In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012) ............... 6, 8

*Int'l Union, United Auto Aerospace and Agric. Implement Workers of Am. (UAW) v N.L.R.B.*, 459 F.2d
    1329 (C.A.D.C. 1972) .................................................................................. 14

*Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92 (N.D. Ill. 2013) ............................. 5, 17

*Joffe v. Acacia Mortg. Corp.*, 121 P.3d 831 (Ct. App. 2005) ...................................... 9

*Jordan v. Nationstar Mortgage LLC*, No. 14-CV-00787-WHO, 2014 WL 5359000 (N.D. Cal. Oct. 20,
    2014) ..............................................................................................4, 11, 15

*Knutson v. Reply!, Inc.*, No. 10–cv–01267, 2011 WL 1447756 (S.D.Cal. Apr. 13, 2011)....................... 13

*Landis v. North American Co.*, 299 U.S. 248 (1936)................................................ 18

*Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857 (9th Cir. 1979) ............................ 18

*Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1109 (9th Cir. 2005)..................................... 16

*Maronyan v. Toyota Motor Sales, U.S.A., Inc.*, 658 F.3d 1038 (9th Cir. 2011)........................ 3

*Meyer* v. *Portfolio Recovery Associates*, 707 F. 3d 1036 (9th Cir. 2012) ......................... 6

*Mid-Continent Petroleum Corp. v. Keen*, 157 F.2d 310 (8th Cir. 1946) .................................................... 14

*Nat. Resources Defense Council v. Norton*, No. 64 ERC 1718, 2007 WL 14283 (E.D. Cal. Jan. 3, 2007)

................................................................................................................................................................ 16

*Nat'l Commc'ns Ass'n, Inc. v. American Tel. and Tel. Co.*, 46 F.3d 220 (2d Cir. 1995) .................... 16, 17

*P.R. Mallory & Co. v. NLRB*, 400 F.2d 956 (7th Cir.1968) ............................................................... 14

*Pimental v. Google, Inc.*, 2012 WL 1458179 (N.D. Cal. Apr. 26, 2012) ...........................................passim

*Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009 (9th Cir. 2007) ........................... 11

*Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474 (8th Cir. 1988) ......................................... 4

*Robinson v. Midland Funding, LLC*,

    No. 10cv2261 MMA (AJB), 2011 WL 1434919 (S.D. Cal. April 13, 2011) ..................................... 4

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) ...................................................... 6, 7

*Sherman v. Yahoo! Inc.*, 997 F. Supp. 2d 1129 (S.D. Cal. 2014), *reconsideration denied (July 3, 2014)* . 7

*Syntek Semiconductor Co. Ltd. v. Microchip Tech. Inc.*,

    307 F.3d 775 (9th Cir. 2002) .......................................................................................................... 3

*Tovar v. Midland Credit Mgmt.*, No. 10cv2600 MMA (MDD), 2011 WL 1431988 (S.D. Cal. April 13,

    2011) .............................................................................................................................................. 4

*U.S. v. General Dynamics Corp.*, 828 F.2d 1356 (9th Cir. 2002) ........................................................... 3

STATUTES

47 U.S.C. § 227(a)(1) ............................................................................................................................. 10

Mobile Informational Call Act of 2011 (H.R. 3035) ............................................................................ 9

OTHER AUTHORITIES

137 Cong. Rec. S18784 (1991), dkt. 16-21 (statement of Sen. Hollins) ................................................. 9

Letter of the National Association of Attorneys General (December 7, 2011) ......................................... 9

Notice of Proposed Rule Making in re Regulations Implementing the TCPA, 17 FCC Red. 17474, ¶ 24,

    2002 WL 31084939 (2002) .............................................................................................................. 8

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* Final Rule, 68 FR

44144-01, ¶ 95 (July 25, 2003)..................................................................................................... 8

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO STAY LITIGATION

# I.     INTRODUCTION

Defendant urges the Court to stay this litigation under the doctrine of primary jurisdiction to permit the FCC to issue a declaratory ruling in response to the *Sensia* Petition, which seeks clarification regarding the definition of "automatic telephone dialing system" ("ATDS"), as the term is used in the TCPA.  Defendant, however, has fallen far short of carrying its burden to demonstrate that the doctrine of primary jurisdiction applies.

First, Defendant has failed to establish that the issues raised in its Motion are not within the conventional experience of judges and involve technical or policy consideration solely within the FCC's particular field of expertise.  To the contrary, the Motion raises a legal issue—not a technical one—that the courts, not the FCC, are best suited to resolve.  In fact, courts in this Circuit have already addressed these very issues.

Second, and relatedly, Defendant has failed to demonstrate that the issues raised in the Motion are solely within the FCC's discretion.  Rather, they involve statutory interpretation, which is a matter best committed to the courts for resolution.

Third, Defendant has not established any danger of inconsistent rulings.  Indeed, it has failed to articulate even a single example of any potential danger.  No danger of inconsistent rulings is present here because, (i) the *Sensia* Petition raises issues not present here, (ii) even if the FCC takes up the Petition, a stay is nevertheless unnecessary here, (iii) there is no indication that the FCC will take up the Petition, and (iv) the courts and the FCC have already addressed the issues raised in the Petition.

Finally, Defendant has offered no evidence—beyond generic assertions of "judicial waste"— that it will be prejudiced by the denial of a stay.

Recently, this Court denied a similar motion to stay in *Pimental v. Google*.  The facts in *Pimental* are directly analogous to those here.  Accordingly, for the same reasons the Court denied the motion in *Pimental*, so too should it deny Defendant's Motion here.[1]

---

[1] Plaintiff provided a copy of the *Pimental* opinion to Defendant before it filed its Motion to Stay, but Defendant nevertheless decided to proceed with its Motion—without even attempting to discuss it in its moving papers.

1

1   **II.      STATEMENT OF FACTS**

2          On February 2, 2015, this Court denied Defendant's Motions to Dismiss and Strike.  (CM/ECF

3   Doc. #57 ["Order"].)  The Court held, among other things, that the facts alleged by Plaintiff "render[ed]

4   plausible the general allegation that the message was sent using an automated system capable[] of storing

5   or producing and dialing numbers randomly or sequentially."  (*See* Order at 7:19-8:19.)

6          On January 28, 2015, Defendant filed its Motion to Stay Ligation ("Motion" or "Mot."), arguing

7   that the litigation should be stayed under the doctrine of primary jurisdiction to allow the FCC to issue a

8   declaratory ruling in response to the *Sensia* Petition, which seeks clarification regarding the definition of

9   "automatic telephone dialing system," as the term is used in the TCPA.  (*See generally* Mot.)[2]

10         According to Defendant, the *Sensia* Petition involves four separate entities, each of which form a

11   potential component of an ATDS: Sensia, Textmunications, Air2Web, and the common carriers.

12             Sensia transmitted its customer data to Textmunications; Textmunications stored the data

13             in its computer system and used its access to Air2Web's system to upload Sensia's

14             customer data and marketing messages; Air2Web directly or indirectly, in the form of

15             SMS text message, transmitted the customer's cell phone number and the marketing

16             message to the common carrier; and the common carrier transmitted the message to the

17             customers' cell phone numbers.

18   (Mot. at 1:20-25.)[3]  In this connection, the *Sensia* Petition posed the following question: must the

19   "storage" and "dialing" capacities of an ATDS be united in a single entity to trigger TCPA liability, or is

20   liability triggered even if those two capacities are mediated by different entities (*i.e.*, Textmunications

21   and Air2Web)?

22         In contrast, and by Defendant's own admission, only three components are involved here: Bebe,

23   Air2Web, and the common carriers.

24

25   _____

26   [2] The TCPA defines an ATDS as "equipment which has the capacity . . . (A) to store or produce
telephone numbers to be called, using a random or sequential number generator; and (B) to dial such
numbers.  47 U.S.C. § 227(a)(1).

27   [3] Plaintiff does not agree that the common carriers form part of the ATDS.  Yet, even adopting
Defendant's own definitions, the *Sensia* Petition is irrelevant here.

28

1    Defendant transmitted Plaintiff's cell phone number to Air2Web, Air2Web used its

2    system to forward Plaintiff's cell phone number and the text of the at-issue… text

3    message to Plaintiff's carrier, and the carrier then transmitted the message to Plaintiff's

4    cell phone.

5   (*Id.* at 2:4-7.)  Absent from this system is an entity analogous to Textmunications.[4]

6   The *Sensia* Petition, however, specifically focuses on the relationship between Textmunications,

7   as the entity capable of "storing" the phone numbers, and Air2Web, as the entity capable of "dialing" the

8   numbers.  Here, by contrast, "storage" and "dialing" capabilities were presumably unified in Air2Web.

9   Accordingly, the issues presented in the *Sensia* Petition are irrelevant to this case.

10  **III.    ARGUMENT**

11          **A.    The Doctrine of Primary Jurisdiction**

12  The primary jurisdiction doctrine "applies in a limited set of circumstances."  *Clark v. Time*

13  *Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008).  The doctrine "does not require that all claims

14  within an agency's purview be decided by the agency."  *Brown v. MCI WorldCom Network Servs., Inc.*,

15  277 F.3d 1166, 1172 (9th Cir. 2002).  Nor is it intended "to 'secure expert advice' for the courts from

16  regulatory agencies every time a court is presented with an issue conceivably within the agency's ambit."

17  *Id.* (quoting *U.S. v. Gen. Dynamics Corp.*, 828 F.2d 1356, 1365 (9th Cir. 1987)).  "Rather, it is a doctrine

18  used by the courts to allocate <u>initial</u> decision-making responsibility between agencies and courts where

19  such [jurisdictional] overlaps and potential for conflicts exist."  *Syntek Semiconductor Co., Ltd. v.*

20  *Microchip Tech. Inc.*, 307 F.3d 775, 780 (9th Cir. 2002) (emphasis added; internal quotations and

21  citations omitted).

22  In determining whether to defer to the agency, courts traditionally consider whether: (i) the issue

23  is within the "conventional experiences of judges" or "involves technical or policy considerations within

24  the agency's particular field of expertise," (ii) the issue "is particularly within the agency's discretion,"

25  and (iii) "there exists a substantial danger of inconsistent rulings."  *Pimental v. Google, Inc.*, 2012 WL

26

27  [4] The Ninth Circuit has recently addressed this issue, holding that a defendant may be held

28  vicariously liable for TCPA violations where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party caller.  *See Gomez v. Campell-Ewald Co.*, 768 F.3d 871, 877-79 (9th Cir. Sept. 19, 2014).

1458179, *2 (N.D. Cal. Apr. 26, 2012) (citing *Maronyan v. Toyota Motor Sales, U.S.A., Inc.*, 658 F.3d

1038, 1048-49 (9th Cir. 2011)).  Ultimately, the doctrine "applies in a limited set of circumstances,"

*Clark*, 523 F.3d at 1114, and "is to be invoked sparingly, as it often results in added expense and delay."

*Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934, 938 (8th Cir. 2005) (quoting *Red Lake Band of*

*Chippewa Indians v. Barlow*, 846 F.2d 474, 477 (8th Cir. 1988)).

This Court's decision in *Pimental* is instructive.  *Pimental*, 2012 WL 1458179.  In *Pimental*,

plaintiffs alleged that defendants violated the TCPA by using an ATDS to transmit text messages to

plaintiffs' cellular telephone numbers without obtaining plaintiffs' prior express consent.  *Id.* at *1.

Defendants filed a motion to stay litigation under the doctrine of primary jurisdiction to permit the FCC

to decide two issues raised in a petition filed before the FCC (*i.e.*, the *GroupMe* petition).  *Id.*  The

petition sought clarification of the phrase, "prior express consent," and the term, "capacity," as used in

the TCPA.  *Id.* at *2.  After a review of the *Maronyan* factors, *supra*, the Court declined to apply the

doctrine of primary jurisdiction and denied defendant's motion to stay.  *Id.* at **3-5.  For the same

reasons, the Court should also deny Defendant's motion here, as explained in greater detail below.[5]

**B.      Whether Defendant's Equipment Constitutes an ATDS Is Within the**
**Conventional Experience of Judges and Does Not Involve Technical or Policy**
**Considerations Solely Within the FCC's Particular Field of Expertise**

Situations in which the doctrine of primary jurisdiction has been invoked usually involve issues

of first impression or a particularly complicated issue.  *Pimental*, 2012 WL 1458179, at *3.  Neither of

those considerations applies here.

When a pending FCC action does not raise an issue of first impression, a district court should

deny a motion to stay litigation.  *See, e.g., id.* at *5 (denying motion to stay); *Tovar v. Midland Credit*

*Mgmt.*, No. 10-cv-2600 MMA (MDD), 2011 WL 1431988, at *3 (S.D. Cal. April 13, 2011) (denying

motion to stay pending FCC action, noting that the issues "are not ones of first impression"); *Robinson v.*

---

[5]  *And see Jordan v. Nationstar Mortgage LLC*, No. 14-CV-00787-WHO, 2014 WL 5359000, at
*8 (N.D. Cal. Oct. 20, 2014) (rejecting application of the primary jurisdiction doctrine because "[t]he
interpretation of 'capacity' is within the Ninth Circuit's experience, does not involve technical expertise,
and does not impose a substantial danger of inconsistent rulings. Moreover, it is not obvious that the
petitions pending before the FCC, assuming even that the FCC eventually rules on them, will be
determinative of the outcome of this case.").

*Midland Funding, LLC*, No. 10-cv-2261 MMA (AJB), 2011 WL 1434919, at *6 (S.D. Cal. April 13, 2011) (denying motion to stay); *Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 101 (N.D. Ill. 2013) (same); *Frydman v. Portfolio Recovery Assocs., LLC*, No. 11 CV 524, 2011 WL 2560221, at *9 (N.D. Ill. June 28, 2011) (denying motion to stay pending FCC action).

In *Pimental*, the Court held that interpretation of the phrase "prior express consent" and the term "capacity" did not require the FCC's policy expertise or specialized knowledge, and were matters safely within the conventional experience of judges. *Pimental*, 2012 WL 1458179, at *3. Further, the Court found that courts and the FCC had interpreted these statutory terms in the past. *Id.*

        **1.**      **The *Sensia* Petition, like the *GroupMe* Petition, involves statutory interpretation of the term, "ATDS," a matter best resolved by the courts**

The *Sensia* Petition raises an issue directly analogous to the one presented in the *GroupMe* petition: both ask whether a particular piece of equipment falls within the TCPA's definition of ATDS. "On March 1, 2012, GroupMe petitioned the FCC for 'clarification' regarding . . . whether the equipment used for transmission of the text messages at issue falls within the TCPA's definition of ATDS." *Pimental*, 2012 WL 1458179, at *2. Specifically, "GroupMe [sought] clarification on whether the term 'capacity' as used in the definition for ATDS means a theoretical, potential capacity to auto-dial, or rather the actual, existing capacity of the equipment at the time of use, could, in fact, have employed the functionalities described in the TCPA." *Id.*

Similarly, the *Sensia* Petition asks whether a particular piece (or pieces) of equipment constitutes an ATDS for the purposes of the TCPA—specifically, whether the equipment possesses the "capacity" to store and dial phone numbers. This is conceptually analogous to the issue raised in the *GroupMe* Petition.

Because this Court held in *Pimental* that the statutory interpretation of "ATDS" and "capacity" fall safely within the conventional experience of judges, it should likewise conclude that the *Sensia* Petition raises issues best committed to resolution by the courts, notwithstanding Defendant's attempt to cast the issue as a complicated technical one. *Pimental*, 2012 WL 1458179, at *3 ("The district court is suited to resolve issues of statutory interpretation of … the term 'capacity.'"); *Frydman*, 2011 WL 2560221, at **3-4 ("Whether the predictive dialers used by defendant are 'automatic telephone dialing

1   systems' or 'autodialers' as these terms are used in the TCPA is a straightforward interpretive question
2   addressed by prior FCC rulings and some case law.").
3        The issue presented in the *Sensia* Petition—distilled to its essence and ignoring Defendant's
4   attempts to unnecessarily complicate the issue—is best understood as a legal question: must the
5   "storage" and "dialing" components of an ATDS be concentrated within a single entity to trigger TCPA
6   liability, or may TCPA liability be triggered even where those capacities have intentionally been divided
7   among separate entities in an attempt to deprive consumers of the TCPA's protections?  Courts within
8   this Circuit and the FCC have already addressed similar issues.[6]

9        **2.    Courts in this Circuit have already resolved the issues on which Defendant**
10            **bases its Motion**

11       Time and again, courts in this Circuit have been presented with different equipment
12   configurations, each time falling on the side of inclusivity and categorizing the equipment as an ATDS
13   (consistent with the broad protections offered by the TCPA).  *See Satterfield v. Simon & Schuster, Inc.*,
14   569 F.3d 946, 951 (9th Cir. 2009) (finding genuine issue of material fact whether the telephone system at
15   issue had the requisite capacity to be considered an ATDS under the TCPA); *Meyer* v. *Portfolio*
16   *Recovery Associates*, 707 F. 3d 1036, 1043 (9th Cir. 2012) ("As one commenter points out, the evolution
17   of the teleservices industry has progressed to the point where using lists of numbers is far more cost
18   effective. The basic function of such equipment, however, has not changed—the capacity
19   to dial numbers without human intervention. . . .  PRA's predictive dialers fall squarely within the FCC's
20   definition of 'automatic telephone dialing system.'"); *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F.
21   Supp. 2d 1253, 1260 (S.D. Cal. 2012) (defendant "failed to show that a machine which is fed a large list
22   of telephone numbers and then dials them sequentially or randomly [], should not be considered an
23   ATDS.").
24       Indeed, the Ninth Circuit has recently addressed issues similar to those raised in the *Sensia*
25   Petition, holding a defendant liable where a third party dialed phone numbers on defendant's behalf.  In
26   *Gomez v. Campell-Ewald Co.*, the Navy hired Campell-Ewald Company, a marketing consultant, to

27   _____
28       [6] Indeed, Defendant concedes that "this Court could perform the same analysis as being tasked
     to the FCC . . . ." (*See* Mot. at 5:13-14.)

develop and execute a multimedia recruiting campaign. *Gomez*, 768 F.3d at 873. Campbell-Ewald then hired Mindmatics to generate a list of phone numbers that fit a set of conditions defined by the Navy and to dial the corresponding numbers. *Id.* Campbell-Ewald argued that it could not be held liable for TCPA violations "because it outsourced the dialing and did not actually make any calls on behalf of its client." *Id.* at 877. The court considered several district court opinions (*i.e.*, those finding TCPA liability where an agency relationship existed between defendant and a third-party caller), the plain language of the TCPA, FCC regulations, policy considerations, and Ninth Circuit precedent (namely, *Satterfield*, *supra*), and held that a defendant may be held vicariously liable for TCPA violations where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party caller. *Id.* at 877-79.

The issues in *Sensia* are analogous to those in *Gomez*: Sensia (the Navy) hired a third party, Textmunications (Campbell-Ewald) to conduct a marketing campaign; Textmunications (Campbell-Ewald) then outsourced the dialing of phone numbers to another third party, Air2Web (Mindmatics). Under traditional agency principles, Textmunications (Campbell-Ewald) should be held vicariously liable for the actions of Air2Web (Mindmatics). *Gomez* is therefore dispositive of both the issues raised in the *Sensia* Petition and those raised in Defendant's Motion.

Similarly, in *Sherman v. Yahoo! Inc.*, the defendant, as here, argued that its equipment did not have the "requisite capacity to **both** store numbers and dial random or sequential numbers." *Sherman v. Yahoo! Inc.*, 997 F. Supp. 2d 1129, 1136 (S.D. Cal. 2014), *reconsideration denied (July 3, 2014)* (emphasis in original). The court concluded that there was a genuine issue of material fact as to whether the equipment constituted an ATDS within the meaning of the TCPA. *Id.*[7]

### 3. The FCC has already ruled on the issues on which Defendant bases its Motion

The FCC has also spoken to the definition of an "ATDS," generally, and the meaning of the term "capacity," specifically, under the TCPA. In an exercise of its TCPA rulemaking authority under

---

[7] Moreover, the Ninth Circuit has already held that the focus under the TCPA must be on the capacity of the equipment to store, produce, or call randomly or sequentially generated telephone numbers, not whether the equipment actually did these things. *Satterfield*, 569 F.3d at 951.

1  47 U.S.C. § 227(b)(2), the FCC issued several reports and orders clarifying the TCPA's provisions.

2  These reports and orders confirm that the TCPA is liberally construed to prevent companies from

3  devising clever ways to make an end-run around the definition of "ATDS."

4  In 2002, the FCC issued a Notice of Proposed Rulemaking, recognizing "that in the last decade

5  new technologies have emerged to assist telemarketers in dialing the telephone numbers of potential

6  customers.  More sophisticated dialing systems, such as predictive dialers and other electronic hardware

7  and software containing databases of telephone numbers, are now widely used by telemarketers to

8  increase productivity and lower costs."  Notice of Proposed Rule Making in re Regulations

9  Implementing the TCPA, 17 FCC Red. 17474, ¶ 24, 2002 WL 31084939 (2002).

10  In the Final Rule that followed, the FCC concluded that to be considered an ATDS under the

11  TCPA, "equipment need only have the 'capacity to store or produce telephone numbers' . . . [as] it is

12  clear from the statutory language and the legislative history that Congress anticipated that the FCC . . .

13  might need to consider changes in technology." (2003 FCC Order, ¶ 95.)[8]  The FCC further noted that

14  although "telemarketers may have [in the past] used dialing equipment to create and dial 10-digit

15  telephone numbers arbitrarily . . . the evolution of the teleservices industry has progressed to the point

16  where using lists of numbers is far more effective."  *Id.*  Notwithstanding, "[t]he basic function of such

17  equipment . . . has not changed—the capacity to dial numbers without human intervention."  *Id.*; *see also*

18  *In re Jiffy Lube*, 2012 WL 762888, at *6 (citing United States Department of Justice Response to Motion

19  to Dismiss (11-MD-2261-JM-JMA, Dkt. 46) ("As the government argues, 'Congress anticipated that

20  advancements in technology would allow telemarketers to employ new and more sophisticated ways of

21  auto-dialing large lists of numbers.'")).  Accordingly, the FCC "believe[d] that the purpose of the

22  requirement that equipment have the 'capacity to store or produce telephone numbers to be called' is to

23  ensure that the prohibition on autodialed calls not be circumvented." (2003 Order ¶ 96.)[9]

---

25  [8] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* Final Rule, 68 FR 44144-01, ¶ 95 (July 25, 2003) ("2003 Order").

26  [9] Notably, in a joint letter to members of Congress, all fifty Attorneys General of the United

27  States recently expressed their opposition to proposed legislation limiting the definition of an ATDS.
*See* Mobile Informational Call Act of 2011 (H.R. 3035).  In relevant part, the letter stated:

As far back as 2003, the FCC specifically interpreted the term ATDS to apply to equipment in which storage and dialing capabilities were distributed across different entities. (*Id.* ¶ 95.) The equipment described in the 2003 Order worked as follows: a phone number was added to a database by a third-party group creator, and then, separate and apart from the creation of a group or any conduct by the group creator, Defendant's systems automatically accessed the databases to transmit their own text messages without human intervention. *Id.*

Accordingly, the FCC has sufficiently resolved these issues as they affect this case.[10] Granting a stay while the FCC considers the *Sensia* Petition would do little more than provide Defendant with a means of prolonging this litigation endlessly, filing new petitions to reconsider with the FCC whenever the agency releases its next guidance, if at all. As discussed below, the FCC's ability to issue regulations and guidance on these matters does not strip this Court of the ability under the primary jurisdiction doctrine to consider the claims alleged in the pleadings. Furthermore, that the FCC has exercised its authority to reach decisions consistent with those reached by the Courts weighs against applying the primary jurisdiction doctrine here.

---

> H.R. 3035 would revise the definition of "automatic telephone dialing system" to include only equipment that uses random or sequential number generators. Most modern automatic dialers, however, already use preprogrammed lists. As a result, H.R. 3035 would effectively allow telemarketers to robo-dial consumers just by avoiding already antiquated technology.

Letter of the National Association of Attorneys General (December 7, 2011) (available at http://law.ga.gov/vgn/images/portal/cit_79369762/179228493Final%20HR3035%20Letter.pdf). In the face of strong opposition, the proposed legislation was later withdrawn.

[10] The legislative history of the TCPA is also consistent with FCC and judicial interpretations of "ATDS" and "capacity" and confirms that the terms take into account the sorts of variations Defendant contends require additional consideration. *See* 137 Cong. Rec. S18784 (1991), dkt. 16-21 (statement of Sen. Hollins) ("[T]he FCC is not limited to considering existing technologies. The FCC is given the flexibility to consider what rules should apply to future technologies as well as existing technologies."). Indeed, by making "capacity" the relevant standard, Congress sought to avoid circumvention of the prohibition on unsolicited calls: "the wording of the statute is not limited to 1991 technology . . . and demonstrates Congress anticipated that the TCPA would be applied to advances in automatic telephone dialing technology." *Joffe v. Acacia Mortg. Corp.*, 121 P.3d 831, 839 (Ct. App. 2005); *see also* 2003 Order ¶ 96 (noting that the purpose of the definition of ATDS "is to ensure that the prohibition on autodialed calls not be circumvented").

**C.      The Issue Is Not Solely Within the FCC's Discretion, and Is, in Fact, Best
Committed to Resolution by the Courts**

The second factor in the primary jurisdiction analysis requires that the Court consider whether the issues are solely within the agency's discretion.  Contrary to Defendant's contention, Congress has not placed the task of defining "ATDS" as it is used in the TCPA solely with the FCC.  *Pimental*, 2012 WL 1459179, at *4.

> Matters particularly within the agency's discretion tend to be ones in which Congress has explicitly delegated the responsibility.  For example, in *Clark*, *supra*, "Congress ha[d] specifically delegated the responsibility to the FCC to define 'slamming' violations." []  Here, by contrast, Congress has defined the term "automatic telephone dialing system."  Although Defendants argue that the term "capacity" within the definition for ATDS … [is] not defined in the TCPA, Congress has not placed this task terms particularly within the agency's discretion.

*Id.*  Accordingly, the court found that this factor did not weigh in favor of Defendant's request for a stay.

Because the term "ATDS" is expressly defined by the TCPA itself, the FCC cannot simply redefine its meaning to suit Defendant.  *See* 47 U.S.C. § 227(a)(1); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984);[11] *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1025-26 (9th Cir. 2007); *see also* 47 C.F.R. § 1.2 (the FCC is empowered to issue rulings for the purpose of "terminating a controversy or removing uncertainty," but is not given the authority to rewrite statutes or contradict Congressional intent).  Under *Chevron*, even if the FCC were to overstep its authority and adopt a meaning contrary to the TCPA, this Court would not be required to give such an interpretation deference.  *Chevron*, 467 U.S. at 842-43.  Accordingly, because Congress did not grant the

---

[11] Under *Chevron*, agency interpretations of federal law are given deference under a two-step test: (1) "if the intent of Congress in clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress;" and (2) "if a statute is silent or ambiguous with respect to the issue at hand, [the court] defer[s] to the agency so long as 'the agency's answer is based on a permissible construction of the statute." *Satterfield*, 569 F.3d at 952 (quoting *Chevron*, 467 U.S. 842-43).  As shown, Congress clearly intended to broadly define "ATDS" to encompass a wide range of equipment and cover new and emerging technologies.

1   FCC sole and unlimited authority to interpret the meaning of the TCPA, this factor cannot be used to

2   support the Defendants' request for a stay based upon primary jurisdiction.[12]

3          Moreover, as explained above, the definition of "ATDS" has been repeatedly addressed by the

4   courts without any apparent difficulty.

5          **D.        There Is No Substantial Danger of Inconsistent Rulings**

6          To carry its burden under the primary jurisdiction doctrine, the movant must provide specific

7   examples of inconsistent rulings. *Jordan v. Nationstar Mortgage LLC*, No. 14-CV-00787-WHO, 2014

8   WL 5359000, at *8 (N.D. Cal. Oct. 20, 2014).  Merely asserting that inconsistent rulings are a possibility

9   is insufficient to carry that burden. *See id.*  Here, Defendant has failed to articulate even a single example

10  of an inconsistent ruling; their position is based on mere speculation.  (*See* Mot. at 8:18-9:14.)

11         In *Pimental*, the court did not see any danger of inconsistent rulings if the matter was not stayed.

12  *Pimental*, 2012 WL 1458179, at *4.  First, the court found that the *GroupMe* petition did not raise the

13  same issues as those raised by defendants in *Pimental*. *Id.*[13]  Second, the court found that even to the

14  extent the issues raised in the *GroupMe* petition were relevant to the litigation, there was still no risk of

15  inconsistent rulings because if, as defendants represented, the FCC was in fact poised to rule on the

16  issues, an expedited ruling would be available before the issues were presented to the Court or a jury.  *Id.*

17  at *5.  Third, the Court found that there was no indication that the FCC had taken up or would take up

18  the issues. *Id.*

19         These findings apply with equal force here.

20         **1.        The *Sensia* Petition raises issues not presented here**

21         Defendant's Motion is artfully drafted to convey the impression that the equipment used in this

22  case and the *Sensia* action are identical.  Conspicuously absent from the Motion, however, is an

23

24  _____

25  [12] And given that Defendant has failed to provide any concrete information regarding its equipment to refute Plaintiffs' allegations that it uses an ATDS, as explained in greater detail, below, no resort to the FCC is necessary in the first instance.

26  [13] Likewise, in *Jordan*, the court concluded that "[a]n FCC decision on whether an ATDS may include equipment with the 'potential capacity' to store or produce numbers is irrelevant to the facts here because the declarations submitted with Nationstar's motion do not state that its equipment has the 'potential capacity' to perform such functions." *Jordan*, at *9.

27

28

unambiguous statement to this effect.  Nor, tellingly, does Defendant offer any proof whatsoever that the equipment is identical, or even similar.

Instead, the strongest assertion that Defendant can muster is the following: "The statements in [the Scholl Declaration filed in the *Sensia* case] describe systems and equipment Air2Web used to provide services to Textmunications.  The statements [in the Scholl Declaration] also describe the systems and equipment Air2Web used to provide services to Defendant, as described in the Air2Web Contract."  (CM/ECF Doc. No. 56-2 [Lautier Decl.] ¶ 6.)  This assertion is notable for its tepidity.  It does not in any way imply that the equipment used in this case and *Sensia* are identical—only that the two cases may involve some overlap of systems and equipment, however marginal.[14]

Defendant's inability to unambiguously declare that the equipment are identical is best understood in the context of its offer of proof: Defendant has made none.  Nowhere does Mr. Lautier attest that he ever directly examined the equipment used in the *Sensia* case.  Rather, his assessment is based on a review of Air2Web's affidavit in the *Sensia* case.  More egregious, Mr. Lautier also does not attest that he ever directly examined the equipment used in ***this*** case.  Instead, his testimony is premised on an examination of the Air2Web Application and Service Agreement, which only describes the relevant equipment in the most general terms.  (*See* Agreement, Schedule A § 1.)  Defendant's offer of proof should therefore be stricken as irrelevant, disputed, lacking personal knowledge, lacking foundation, and unduly prejudicial.[15]  Simply put, Defendant has provided no basis for a determination that the equipment are the same.

Read carefully, even Defendant's Motion implies that the *Sensia* Petition is wholly irrelevant.  As described above, *Sensia* involves three separate entities: (1) <u>Sensia</u> provided its customer data to (2) <u>Textmunications</u>, who "stored" the data and then transmitted it to (3) <u>Air2Web</u>, who then "dialed" the cell phone numbers.  The *Sensia* Petition posed the following question: must the "storage" and "dialing"

---

[14] Moreover, this effectively concedes that this case does not involve any entity with a role analogous to the one played by Textmunications in the *Sensia* case.

[15] Plaintiff's Evidentiary Objections to Defendant's Motion is filed concurrently with this Opposition.

1    capacities of an ATDS be united in a single entity to trigger TCPA liability, or is liability triggered even

2    if those two capacities are mediated by different entities (*i.e.*, Textmunications and Air2Web)?

3         By contrast, here, only two entities are involved: (1) Bebe, which (presumably) transmitted its

4    customer data to (2) Air2Web, which then (presumably) stored and dialed the cell phone numbers.  Here,

5    the storage/production and dialing capacities are presumably integrated under Air2Web.  Accordingly,

6    even if the FCC were to respond to the *Sensia* Petition, any declaratory ruling—finding either that the

7    storage/production and dialing capacities must be united in a single entity to constitute an ATDS, or can

8    be distributed over two entities—would be of no relevance to the equipment used here.[16]

9         The manifest deficiencies of Mr. Lautier's testimony (and Defendant's other purported

10   evidence) underscores the need for discovery regarding the equipment.  Now that this case has moved

11   past the pleading stage, and the scope of discovery is clearly delineated, Defendant should respond to the

12   discovery already propounded by Plaintiff.  *See Hickey,* 887 F. Supp. 2d at 1130 ("Plaintiff ha[d] . . .

13   provided sufficient detail to make a plausible claim under the TCPA and to allow for discovery of further

14   evidence related to Voxer's ATDS functionality."); *Knutson v. Reply!, Inc.,* No. 10–cv–01267, 2011 WL

15   1447756, at *1 (S.D. Cal. Apr. 13, 2011) (noting "the difficulty a plaintiff faces in knowing the type of

16   calling system used without the benefit of discovery"); *Maier v. J.C. Penney Corp., Inc.*, 2013 WL

17   3006415, at *3 (S.D. Cal. June 13, 2013) (at the pleadings stage, the defendant likely has sole knowledge

18   of the type of equipment it used to place the "call" in dispute, and will therefore only come to light once

19   discovery has been undertaken).  The need for discovery is particularly acute here, in light of

20   Defendant's failure to provide any detail regarding its equipment.[17]

21         _____

22   [16] Even if Defendant were somehow able to conceptually map the entities in *Sensia* onto those

23   here, there is still no guarantee that the equipment used is the same.  The Agreement states that Air2Web "offers certain developmental and professional services to design and develop modifications or enhancements to current or future Applications that utilize the Air2Web Gateway Platform (hereinafter, 'Customization Services')."  (Agreement, Schedule B § 1.)  Accordingly, Air2Web might have provided

24   customized services to Defendant.  Therefore, the equipment used in this case may have been unique.

25   [17] Defendant's failure to provide any concrete evidence concerning its equipment, combined with its failure to provide substantive responses to Plaintiff's discovery, suggests that, in fact, its

26   equipment bears little resemblance to the equipment at issue in *Sensia*.  Federal courts almost universally recognize the Adverse Inference Rule: When a party has relevant and important evidence within its

27   control, and fails to produce such evidence, that failure give rise to an inference that the evidence is unfavorable to him or her.  *See, e.g., Int'l Union, United Auto Aerospace and Agric. Implement Workers of Am. (UAW) v N.L.R.B.,* 459 F.2d 1329, 1335-36 (C.A.D.C. 1972); *P.R. Mallory & Co. v. NLRB,* 400

28   F.2d 956, 959 (7th Cir.1968) (a party's failure to produce evidence that he be expected to produce under

**2.** **Even if the FCC takes up the *Sensia* Petition, a stay is nevertheless unnecessary to prevent inconsistent rulings**

If, as Defendant asserts, the FCC is poised to take up the *Sensia* Petition, then the FCC will have made a decision before the issues are presented to the Court or a jury. *See Pimental*, 2012 WL 1458179, at *5. At this point in the litigation, however, the Court has not been asked to rule on the definition of an ATDS, and if the FCC is genuinely poised to rule on that issue, the Court will be able to consider such a decision. *See id.*

In *Pimental*, the Court emphasized the need for discovery to obtain the facts and expert opinions necessary, so that once the issues are decided by the FCC or the Court, the Court could apply the undisputed facts to the law on motion for summary judgment, or a jury can find those facts at a trial on the merits. *Id.* "A stay will not permit the parties to obtain the discovery necessary to resolve the factual disputes Defendants raise in their Answer and Affirmative Defenses." *Id.*

Likewise, here, discovery is necessary to determine the nature of Defendant's equipment. Defendant has refused to provide substantive responses to Plaintiff's discovery on the grounds that the Court had not yet ruled on its motion to dismiss, and therefore the scope of discovery was ostensibly unclear. Now that the Court has denied Defendant's motion to dismiss, however, Defendant's scope objections have been rendered moot, and Plaintiff now expects Defendant's further responses

**3.** **There is no indication that the FCC will take up the *Sensia* Petition**

In *Pimental*, the court stated that it was reluctant to stay the proceeding pending an FCC ruling because there was no indication that the FCC had taken up or would take up the issues. *Pimental*, 2012 WL 1458179, at *5. The court also held that, if the GroupMe petition for expedited action was acted upon, the parties could bring it to the Court's attention. *Id.*

---

the circumstances gives rise to a presumption against the party failing to produce it); *Mid-Continent Petroleum Corp. v. Keen*, 157 F.2d 310, 315 (8th Cir. 1946) (an inference that relevant evidence is unfavorable is justifiable where the evidence is within the control of the party but is unable to produce evidence to support his claim). The theory behind the Rule is that, all things being equal, a party will of its own volition introduce the strongest evidence available to prove its case. If evidence within the party's control would in fact strengthen the party's case, the party can be expected to introduce it even if it is not subpoenaed. Conversely, if such evidence is not introduced, it may be inferred that the evidence is unfavorable to the party suppressing it. *Int'l Union*, 459 F.2d at 1338.

Defendant offers no evidence that the FCC is poised to take up the *Sensia* Petition. Rather, Defendant assigns undue weight to the *Sensia* court's request that the FCC "act promptly on [the Petition]." That the **court** requested expedited action, however, does not mean that the **FCC** will, in fact, take such action. Indeed, the *Sensia* Petition, which Defendant calls "recent," was filed more than eight months ago on May 27, 2014.

Since passage of the TCPA in 1991, the FCC has responded to only a fraction of the petitions submitted to it. *See, e.g.*, rulings in response to *GroupMe*, *SoundBite*, *Charvat*, and *DISH Network* petitions. Any claim that the TCPA will "imminently" issue a ruling in response to the *Sensia* Petition, therefore, is mere hyperbole.

Unlike Defendant here, in *Jordan*, defendant proffered evidence that the FCC would take up the petition, including a statement by the FCC Commissioner expressing concern over "a growing backlog of petitions pending at the FCC," and noting, "the FCC needs to address this inventory of petitions as soon as possible." *Jordan*, 2014 WL 5359000, at *9. Despite the offer of evidence, the court nevertheless found that because the issues raised by defendant were only a subset of the large number of TCPA-related issues currently under consideration by the FCC, there was no guarantee that the FCC would rule on the issues imminently, let alone that a ruling would determine the outcome of the case. *Id.* at *10. Additionally, defendant proffered the Commissioner's statement to Congress that the FCC planned to resolve more than one-third of the pending petitions regarding the TCPA "within the next several months." *Id.* The court, again, found that this was no guarantee the FCC would be able to follow through on its plan, or that the petitions relevant to the case were among those the agency planned to resolve. *Id.*[18]

Here, Defendant here proffers **no** evidence that the FCC will imminently take up the Petition. Accordingly, this factor also weighs against granting a stay under the doctrine of primary jurisdiction.

### 4. The courts and the FCC have broadly and consistently construed the term, "ATDS"

---

[18] *And see McKenna v. WhisperText*, No. 5:14-CV-00424-PSG, 2014 WL 4905629, at *4 (N.D. Cal. Sept. 29, 2014) (denying motion to stay on the grounds that the "it is entirely unclear whether the FCC will issue a ruling pertinent to this case . . . .").

1    As explained above, both the courts and the FCC have construed the meaning of the term

2    "ATDS" broadly and consistently to encompass new and developing technologies.  Accordingly, any

3    claims that there is a risk of inconsistent determinations is overstated.  This factor of primary jurisdiction

4    thus also fails to support granting the requested stay.

5        **E.    Plaintiff Will Be Unduly Prejudiced by a Stay of Litigation, Whereas Defendant**

6            **Has Offered No Evidence That it Will Be Prejudiced by the Denial of a Stay**

7        Finally, courts determining whether to stay a case on grounds of primary jurisdiction must also

8    consider general principles governing stay requests.  *See, e.g.*, *Nat. Resources Defense Council v.*

9    *Norton*, No. 64 ERC 1718, 2007 WL 14283, *14 (E.D. Cal. Jan. 3, 2007) (In determining whether to

10   grant a stay based on primary jurisdiction, "a court should take into consideration the possible damage

11   which may result from the granting of a stay, [and] the hardship or inequity which a party may suffer in

12   being required to go forward.") (citing *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962)).  In

13   considering requests for stays, the Ninth Circuit has cautioned that a party seeking "a stay must make out

14   a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that

15   the stay for which he prays will work damage to someone else."  *Lockyer v. Mirant Corp.*, 398 F.3d

16   1098, 1109 (9th Cir. 2005).  Courts weigh the benefits of applying the primary jurisdiction doctrine

17   against the potential litigation costs resulting from complications and delay.  *Nat'l Commc'ns Ass'n, Inc.*

18   *v. Am. Tel. and Tel. Co.*, 46 F.3d 220, 223 (2d Cir. 1995); *see also Frydman*, 2011 WL 2560221, at *7.

19       It is well recognized that "[a]gency decision making often takes a long time and the delay

20   imposes enormous costs on individuals, society, and the legal system."  *Nat'l Commc'ns Ass'n*, 46 F.3d

21   at 225 (internal citations and quotations omitted).  *Soppet*, for example, noted that the FCC petition that

22   resulted in a 2008 FCC declaratory ruling was initiated in 2005.  *Soppet*, 679 F.3d at 643.  *Frydman*

23   likewise recognized that the delay encountered waiting for an agency decision is often lengthy.  2011

24   WL 2560221, at *7 (noting, with a touch of humor, that "[w]hether the FCC's . . . process is completed

25   this year, next year, or in the next century, the results of that process are likely of only limited utility for

26   the Court to decide the issues in this case.  Therefore, judicial economy will be served by proceeding

27   with this case and letting the FCC's process run its own course.").  Indeed, the *Sensia* Petition has been

28   pending since May 27, 2014.

Moreover, Defendant has cited no evidence or argument that any change to the definition of "ATDS" by the FCC would apply retroactively. In *Jamison*, the court noted "[t]he defendants have not offered any evidence or argument to suggest that if the FCC were to change its position that change would apply retroactively to the pending litigation." *Jamison*, 290 F.R.D. at 102; *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (holding that agency regulations cannot be applied retroactively unless Congress has so authorized the administrative agency and the language of the regulations require it); *Beller v. Health & Hosp. Corp.*, 703 F.3d 388, 391 (7th Cir. 2012). The *Jamison* court therefore concluded that a change in the FCC's rules would likely not affect the plaintiff's claims. *Jamison*, 290 F.R.D. at 102; *see also Frydman*, 2011 WL 2560221, at *6 (declining to refer case to FCC under doctrine of primary jurisdiction because any ruling would likely only be made on a prospective basis).

In short, the substantial delay that would result from a stay and the impact to Plaintiff and the Class will outweigh any potential benefits of waiting for the FCC to rule on these issues:

> In this case, awaiting a ruling by the FCC would likely involve substantial delay, and as discussed above, a ruling on the pending petitions would not be dispositive on the outcome of the litigation. The impact of such delay on the expedient resolution of disputes and the interest of providing certainty to the parties here and to others similarly situated outweigh any potential benefits of deferring to the FCC. Nationstar will not be prejudiced if the case moves forward, because any FCC ruling that might excuse Nationstar of liability may be addressed through a renewed motion to stay under the primary jurisdiction doctrine or a motion for summary judgment.[] Given Rule 1's mandate "to secure the just, speedy, and inexpensive determination of every action and proceeding," this case should go forward.

*Jordan*, 2014 WL 5359000, at **12-13 (denying defendant's motion for stay).

A party seeking a stay "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else." *Landis v. North American Co.*, 299 U.S. 248, 255 (1936). Thus, "[o]nly in rare circumstances will a litigant in one cause be compelled to stand aside" to await a ruling in another action. *Id.*; *see also Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 864 (9th Cir. 1979) ("A stay should

not be granted unless it appears likely the other proceedings will be concluded within a reasonable time in relation to the urgency of the claims presented to the court.").

Defendant only generically references some abstract "wasting of judicial and party resources and time" (*see* Mot. at 9:13-14; *and see id.* at 5:12-13), and being "spared the costs of motion practice and discovery" (*see id.* at 5:16-17).  These boilerplate statements fall far short of establishing hardship, let alone the "clear case of hardship or inequity," required in this Circuit.  As the *Lockyer* court noted, "being required to defend a suit, without more, does not constitute a 'clear case of hardship or inequity'" justifying a stay.  398 F.3d at 1112.

## IV.     CONCLUSION

For these reasons, Plaintiff respectfully requests that Defendant's Motion to Stay be denied in its entirety.

Dated:  February 11, 2015

Respectfully submitted,

EcoTech Law Group, P.C.

By:   /s/
Dara Tabesh
Attorneys for Plaintiff Melita Meyer