PILLSBURY WINTHROP SHAW PITTMAN LLP
MARK E. ELLIOTT (CA Bar No. 157759)
mark.elliott@pillsburylaw.com
AMY L. PIERCE (CA Bar No. 210539)
amy.pierce@pillsburylaw.com
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
Telephone: (213) 488-7100
Facsimile: (213) 629-1033

Attorneys for Defendant BEBE STORES, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| MELITA MEYER, individually, and on behalf of all others similarly situated,<br><br>Plaintiff(s),<br><br>vs.<br><br>BEBE STORES, INC.,<br><br>Defendant(s). | Case No.: 14-CV-00267-YGR<br><br>**CLASS ACTION**<br><br>**BEBE STORES, INC.'S SUPPLEMENTAL BRIEFING ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**Re: Dkt. No. 84**<br><br>Date: April 26, 2016<br>Time: 2:00 P.M.<br>Dept.: 1, 4th Floor<br>Judge: Hon. Yvonne Gonzalez Rogers |
| SAMANTHA RODRIGUEZ, individually, and on behalf of all others similarly situated,<br><br>Plaintiff(s),<br><br>vs.<br><br>BEBE STORES, INC.,<br><br>Defendant(s). | Case No.: 14-CV-01968-YGR |

As ordered by this Court on June 22, 2016 (Dkt. No. 100), defendant bebe stores, inc. ("bebe") hereby submits its Supplemental Briefing on Plaintiffs' Motion for Class Certification:

I. **WHETHER PLAINTIFFS HAVE ALLEGED INJURY-IN-FACT SUFFICIENTLY TO CONFER ARTICLE III STANDING IN THIS CASE IN LIGHT OF *SPOKEO***

On May 16, 2016, the U.S. Supreme Court, in *Spokeo, Inc. v. Robins*, No. 13-1339, __ U.S. __ (May 16, 2016), issued a ruling confirming that "the injury-in-fact requirement requires a plaintiff to allege an injury that is both 'concrete *and* particularized.'" (Emphasis added by Court). The Court confirms that "[a] 'concrete' injury must be '*de facto*'; that is, it must actually exist." This term is "meant to convey the usual meaning of the term—'real,' and not 'abstract.'" According to the Court, "because Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is … instructive and important." The Court cautions, however, that "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." Ultimately, the *Spokeo* Court concludes that "Robins cannot satisfy the demands of Article III by alleging a bare procedural violation" because it "may result in no harm," and remands the matter to the Ninth Circuit.

The *Spokeo* Court's ruling confirms bebe's theory that Plaintiffs lack Article III standing. As they admit, after engaging in discovery with bebe, Plaintiffs, at best, are left with causes of action premised *exclusively* on an alleged "bare procedural violation" of the federal Telephone Consumer Protection Act ("TCPA"), which is not sufficient under *Spokeo*; Plaintiff Rodriguez has confirmed that she provided prior express consent and, without question, she has no cause of action under the TCPA. *See, generally*, Plaintiffs' Consolidated Complaint for Damages and Injunctive Relief Pursuant to the Telephone Consumer Protection Act, 47 U.S.C. §§ 227 et seq. (Dkt. No. 77) ("Compl."). Because they invited bebe to send the Opt-in Text, there was no nuisance or invasion of privacy.

Plaintiffs acknowledge that bebe "used a single, uniform, systematic script for acquiring cell-phone numbers from customers at the point of sale... In other words, [bebe's] own 'evidence' shows that Defendant engaged in a single, common course of conduct with respect to the entire putative class." Reply, pp. 1:2-11, 8:21-9:6, 12:17-22. In its Opposition, bebe explains in detail the training its stylists were provided and submitted to this Court a copy of the scripts provided to the stylists among other documents confirming its practices. Opposition, pp. 4:22-5:21. bebe explained that "stylists were told, '[i]f a Client provides her cell phone number, let her know that she will receive a text message where she can opt in to our NEW text messaging promotion program!' Shahian Decl., Ex. 7; Kourtoglou Decl., Exs. T, V, W." Opposition, pp. 4:27-5:2. Plaintiffs admit that they "voluntarily and deliberately provided a cell phone number to bebe after engaging with a stylist." Opposition, pp. 9:9-10:13; Reply, p. 12:17-22; *see also* Complaint ¶ 17.

In open court, Plaintiffs' attorneys confirmed that, even if their clients did not recall it, the stylist provided them with the information included in the scripts about bebe Texts, *i.e.*,:

> "…[bebe's] own 30(b)(6) witness confirmed that they draft these scripts for a reason, and they spend a lot of time and effort educating all of their employees at the point of sale to make sure that this specific script is given to everybody who is asked for their cell phone number.
> Now, whether or not the individual plaintiffs here remember that, the testimony is and all the evidence is that that disclosure was given to everyone at the time that they were asked for their cell phone number. So whether or not they remember it doesn't change whether or not the disclosure was made. And I think that is common to all class members and, therefore, I think the named plaintiffs are typical of everyone.
> In fact, [bebe's] 30(b)(6) witness specifically said that given that our clients gave their cell phone number at the point of sale, that they would have heard the same script that everybody else heard. And I think we cited that testimony for Your Honor."

Reporter's Transcript of Proceedings (Dkt. No. 96) ("Transcript"), p. 19:6-24. We are left with Plaintiffs both complaining about an Opt-in Text that they were told they would receive *before* they voluntarily provided their cell phone numbers to bebe, confirming that there was no nuisance or invasion of privacy. Complaint ¶¶ 19, 28; Opposition, p. 10:8-11.

1   Plaintiffs both admittedly provided prior express consent to receive the Opt-in Text
2   that they now complain about. The FCC and myriad courts agree that persons who
3   knowingly release their phone numbers have in effect given their invitation or permission to
4   be sent a text to the cell phone number provided, absent instructions to the contrary. Thus,
5   Plaintiffs ipso facto gave prior express consent to receive the Opt-in Text and, accordingly,
6   there are no TCPA violations.

7   After admitting that the Plaintiffs gave prior express consent to receive the Opt-in
8   Text, Plaintiffs' attorneys attempt to rehabilitate their position with respect to Plaintiff
9   Meyer, contending that "there is no dispute that she never received any sort of – or
10  provided any sort of written consent." Transcript, p. 20:17-21. The TCPA *only* requires
11  prior express consent for a text message sent prior to October 16, 2013 and for a non-
12  telemarketing, informational text message sent on or after October 16, 2013. *See* 47 U.S.C.
13  § 227(b)(1)(A)(iii); 47 C.F.R. § 64.1200(a)(2); In re Rules and Reg's Implementing the Tel.
14  Consumer Prot. Act of 1991, 27 F.C.C.R. 1830, 1839, 1856-67 (Feb. 15, 2012) ("2012
15  TCPA Order") ¶ 28; *see also Aderhold,* 2014 WL 794802 at *9 (text that was intended to
16  permit plaintiff to complete registration was not telemarketing). It only requires prior
17  express written consent for text messages sent on or after October 16, 2013 "that include[]
18  or introduce[] an advertisement or constitutes telemarketing, using an [ATDS]." 47 C.F.R.
19  § 64.1200(a)(2); *see also* 2012 TCPA Order; 47 U.S.C. § 227(a)(5) (definition of
20  unsolicited advertisement); 47 C.F.R. § 64.1200(f)(1) (definition of advertisement); 47
21  C.F.R. § 64.1200(f)(12) (definition of telemarketing). Recent guidance from the FCC
22  confirms that "a one-time text sent in response to a consumer's request for information does
23  not violate the TCPA or the [FCC's] rules" under certain circumstances. *See* In the Matter
24  of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,
25  CG Docket No. 02-278, Declaratory Ruling And Order (July 10, 2015) ("Omnibus
26  Ruling"), ¶ 106; *see* Declaration of Angela Kourtoglou in Support of bebe stores, inc.'s
27  Opposition to Plaintiffs' Motion for Class Certification ("Kourtoglou Decl."), Ex. AZ.
28

1    The Opt-in Text did not *introduce* Plaintiffs to bebe Texts and it was not an *offer* of

2    a discount—it did not include a "promo code." *See* Kourtoglou Decl., Exs. V, AR;

3    Declaration of Payam Shahian in Support of Plaintiff's Motion for Class Certification

4    (Unredacted Version) ("Shahian Decl."), Ex. 6.[1] Rather, the stylists introduced customers to

5    bebe Texts and the concept of the promotional discount as an incentive for customers to

6    enroll in bebe Texts. The script supports bebe's position that the Opt-in Text was

7    administrative in nature not telemarketing. Stylists told Plaintiffs that they would "receive a

8    text message where she can opt in to our NEW text messaging promotion program!"

9    Shahian Decl., Ex. 7; *see also* Kourtoglou Decl., Exs. T, V, W." They were also told that

10   only if they *completed their enrollment*, would they receive an offer "valid for 10% off [of

11   her] next in-store purchase of regular price merchandise." Shahian Decl., Ex. 6. Stylists

12   were also trained to tell customers that "to receive the discount code, they must respond to

13   the initial text to opt-in to the program." Kourtoglou Decl., Ex. V*;* Shahian Decl., Ex. 6.

14   Plaintiffs gave the requisite prior express consent to receive the Opt-in Text and,

15   accordingly, they have no TCPA claim.

16         Ultimately, in support of their Motion, Plaintiffs contend that the harm that they

17   suffered is "annoyances and invasions of privacy," "exactly the harms the Legislature

18   sought to prevent in enacting the TCPA: 'Congress enacted the TCPA in 1991 to address

19   certain practices thought to be an invasion of consumer privacy and a risk to public safety.'

20   2015 TCPA Order at 7 ¶ 4; and see 2012 TCPA Order at 10 ¶ 24 ('While current

21   regulations provide a measure of consumer protection from unwanted and unexpected calls,

22   the complaint data, as noted above, show that the proliferation of intrusive, annoying

23   telemarketing calls continues to trouble consumers.')." Reply in Support of Plaintiffs'

24   Motion for Class Certification (Dkt. No. 91-3) ("Reply"), p. 14:14-20; Compl. ¶ 39

---

[1] *See, e.g.*, Petition for Expedited Declaratory Ruling Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 29 FCC Rcd. 3442, 3445 (2014) ("Groupme"), 29 FCC Rcd. at 3444-45. Like in *GroupMe*, the Opt-in Text was *expected* by the customer who provided her cell phone numbers after being introduced to bebe Texts by marketing and/or a stylist and *desired* because it enabled her to complete her enrollment in bebe Texts and to, among other things, receive the promised discount code.

("Plaintiffs and the other Class Members were harmed by the acts of Defendant in at least the following ways: Defendant, either directly or through its agents, illegally contacted Plaintiffs and the other Class Members via their cellular telephone numbers by using unsolicited SMS or text messages and invading the privacy of said Plaintiffs and the other Class Members. Plaintiffs and the other Class Members were damaged thereby.").

As noted by the FCC in its July 10, 2015 omnibus ruling, "[i]n enacting the TCPA, Congress made clear that its intent 'when it established the TCPA in 1991, was to protect consumers from the nuisance, invasion of privacy, cost, and inconvenience that autodialed and prerecorded calls generate.'" *See* Omnibus Ruling, ¶ 29; *see also id.*, ¶ 2. Likewise, the FCC "has traditionally sought to 'reasonably accommodate[] individuals' rights to privacy as well as the legitimate business interests of telemarketers." *Id.*, n. 6.

Plaintiffs have failed to demonstrate that their interests were even arguably within the zone of interests intended to be protected by the TCPA. *Leyse v. Bank of America Nat'l Ass'n*, 804 F.3d 316, 325-26 (3d Cir. 2015); *Stoops v. Wells Fargo Bank NA*, No. 3:15-83 (W.D. Pa. June 24, 2016) (Docket No. 79). After inviting bebe to send the Opt-in Text, Plaintiffs' receipt of the Opt-in Text does not amount to a "concrete" harm because it was neither a nuisance nor an invasion of privacy, as required by *Spokeo*.

In light of this new binding authority from the Supreme Court, Plaintiffs lack Article III standing for the sole claims alleged in their Complaint. Accordingly, not only should the Court deny their Motion, it should dismiss their Complaint in its entirety for lack of Article III standing.

II.  WHETHER MEMBERSHIP IN CLUB BEBE ESTABLISHES CONSENT, EITHER AS TO THE MAIN CLASS OR THE POST-OCTOBER 2013 SUB-CLASS

At the outset, bebe's position continues to be that only prior express consent was required for it to send the Opt-in Text because the text was administrative in nature not telemarketing. Accordingly, the prior express consent standard is applicable to *both* of Plaintiffs' proposed classes and, as explained herein, customers' memberships in clubbebe establish that they provided the requisite consent.

As bebe explained in its Opposition, approximately 80% of its customers are members of clubbebe (Kourtoglou Decl., Ex. DT-B, pp. 36:2-10, 41:6-17) and clubbebe members "[b]y enrolling in the clubbebe Rewards Program,… agree to be bound by the full Terms and Conditions" governing clubbebe (*id.*, Ex. D (bebe000049). Fundamental to bebe's Opposition, the clubbebe Terms & Conditions confirm, *in writing*, that members "consent to the use of the members' personal information… *for marketing and promotional purposes unless the member has opted out*, and…consent[] to the receipt of information provided by bebe" (emphasis added). *Id.*, Exs. D, E, F, G. Clubbebe members elect to be communicated with through various channels, including direct mail, email and/or text message. *Id.*, Kourtoglou Decl., Exs. C, H, K, L, M, N, O, P. Thus, 80% of the customers that provided their cell phone number to bebe at the POS during the class period had provided their prior express consent to receive the Opt-in Text at the cell phone number the customer designated. Notwithstanding the foregoing, each of these clubbebe members further received the scripted information when they provided their cell phone number to a stylist at the POS. *See* Transcript, p. 19:6-24.

Customers could enroll in clubbebe and update their clubbebe profile online or in-store, but customers otherwise manage their clubbebe account profile on www.bebe.com through the "preference center." Kourtoglou Decl., Exs. C, H, K, L, M, N, O, P. Thus, each of them provided the requisite prior express consent by their participation in clubbebe and by voluntarily providing their cell phone number after receiving the scripted information from a stylist.

Clubbebe members further provided prior express written consent to receive telemarketing text messages at the cell phone number the customer designated. The FCC confirmed that a consumer's written consent to receive telemarketing text messages must be signed and be sufficient to show that the consumer "received 'clear and conspicuous disclosure' of the consequences of providing the requested consent" and "having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates." *In re Rules and Reg's Implementing the Tel. Consumer Prot. Act of*

*1991*, 27 F.C.C.R. 1830 ¶ 33 (Feb. 15, 2012). The FCC further confirmed that "consent obtained in compliance with the E-SIGN Act will satisfy the requirements of our revised rule, including permission obtained via an email, website form, text message, telephone keypress, or voice recording." *Id*. at ¶ 34 (Feb. 15, 2012). Clubbebe members provided prior written consent via bebe's website, text message and by participating in clubbebe. *See, e.g.*, Kourtoglou Decl., Exs. C, H, K, L, M, N, O, P. Thus, whenever a clubbebe member provided her cell phone number (*e.g.*, on-line, at a POS or on a client capture card), her prior express consent and, moreover, her prior express written consent to receive an Opt-in Text and telemarketing text messages *had already been obtained by bebe*.

Plaintiff Rodriguez, a member of clubbebe for 10+ years, in fact, updated her clubbebe profile by adding her cell phone number when she made her purchase and, in turn, promptly sent a Response Text simply stating "YES." Shahian Decl., Ex. 8 p. 6; Kourtoglou Dec., AX. Plaintiff Meyer was not a clubbebe member. Nonetheless, for the reasons set forth herein and in bebe's Opposition, only prior express consent was required for bebe to send its Opt-in Text to the number voluntarily provided by Plaintiff Meyer after the stylist provided her with the scripted information about bebe Texts.

III. STATUS OF ANY DISCOVERY ON THE QUESTION OF RECORDS FROM AIR2WEB (OR OTHER SOURCES) THAT WOULD ESTABLISH CLASS MEMBERSHIP

Plaintiffs issued two subpoenas to mGage, LLC on or about May 20, 2016 for *Air2Web* documents. One subpoena sought:

> "All documents regarding the text message campaign Air2Web administered for bebe, Inc., including lists of all numbers to which Air2Web sent text messages on behalf of bebe in .xlsx format; and all documents regarding the system(s) and technology used by Air2Web in order to send text messages on behalf of bebe, Inc."

The other subpoena sought:

> "All documents regarding the text message campaign Air2Web administered for bebe, Inc., including lists of all numbers to which Air2Web sent text messages on behalf of bebe in .xlsx format; and all documents regarding the system(s) and technology used by Air2Web in order to send text messages on behalf of bebe, Inc."

1 | Both subpoenas purported to require mGage, LLC to produce *Air2Web* documents on June
2 | 20, 2016. Bebe has received no information regarding whether mGage produced any
3 | documents.

4 | bebe has serious concerns that even if mGage, in fact, produced any documents,
5 | Plaintiffs have no way to authenticate these documents, as required by Federal Rule of
6 | Evidence 901(a). Plaintiffs' counsel at the hearing on their Motion already objected to an
7 | Air2Web document in bebe's possession (Kourtoglou Decl., Ex. AR) on the ground that
8 | "It's an unauthenticated document." Transcript, p. 7:23-8:15. Plaintiffs' counsel took the
9 | position that, simply by looking at the document "I have no idea what this is talking about"
10 | and, for this reason, "this document is irrelevant." *Id*. p. 8:6-15.

11 | mGage employees should not be assumed to be witnesses with knowledge of
12 | Air2Web's business activities and records, as contemplated by Federal Rule of Evidence
13 | 901(b)(1), and mGage employees should also not be assumed to be able to provide
14 | evidence about any data compilations or processes or systems Air2Web had in place, as
15 | contemplated by Federal Rule of Evidence 901(b)(8), (9), respectively. Finally, mGage
16 | employees should not be assumed to have the ability to establish that any purported
17 | Air2Web records are excluded from the hearsay rules as business records of Air2Web.

18 | Without someone to authenticate any documents produced by mGage that
19 | purportedly are Air2Web's documents neither the Court not the parties will have any idea
20 | what the documents mean and, for that matter, whether they are accurate or complete and,
21 | for these reasons, they would be irrelevant.

Dated: July 8, 2016

PILLSBURY WINTHROP SHAW PITTMAN LLP
MARK E. ELLIOTT (CA Bar No. 157759)
AMY L. PIERCE (CA Bar No. 210539)

By: _____/s/ Amy L. Pierce_____
      Amy L. Pierce

Attorneys for Defendant BEBE STORES, INC.