Payam Shahian (State Bar No. 228406)
pshahian@slpattorney.com
Christine Haw (State Bar No. 289351)
chaw@slpattorney.com
**STRATEGIC LEGAL PRACTICES, APC**
1875 Century Park East, Suite 700
Los Angeles, California 90067
Telephone: (310) 277-1040
Facsimile: (310) 943-3838

Thomas A. Kearney (State Bar No. 90045)
tak@kearneylittlefield.com
Prescott W. Littlefield (State Bar No. 259049)
pwl@kearneylittlefield.com
**KEARNEY LITTLEFIELD LLP**
3436 N. Verdugo Road, Suite 230
Glendale, California 91208
Telephone: (213) 473-1900
Facsimile: (213) 473-1919

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

MELITA MEYER, SAMANTHA RODRIGUEZ, and COURTNEY BARRETT, individually, and on behalf of all others similarly situated,

        Plaintiffs,

        v.

BEBE STORES, INC.

        Defendant.

Case No. 4:14-cv-00267-YGR

**DECLARATION OF RANDALL A. SNYDER**

Judge:    Hon. Yvonne Gonzales Rogers

## DECLARATION OF RANDALL A. SNYDER

I, Randall A. Snyder, hereby declare as follows:

    1.  My name is Randall A. Snyder. I am an adult over the age of 18 and a resident of the state of Nevada. I have personal knowledge of each of the matters stated herein, and if called to testify I could and would testify competently about them.

1

2.       I am an independent telecommunications technology consultant and reside at 8113 Bay Pines Avenue, Las Vegas, Nevada, 89128. I have been retained by Mazie Slater Katz & Freeman, LLC in the matter *Meyer et al. v. Bebe Stores, Inc.*, 4:14-cv-00267-YGR (N.D. Cal.) to provide my expert opinions relating to mobile marketing technology utilized by Defendant bebe Stores, Inc. ("Defendant" or "bebe"). In particular, I have been asked to determine whether the Defendant operated equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, or from a list or database of numbers, and whether the Defendant operated equipment which has the capacity to dial telephone numbers without human intervention. Moreover, I have been asked to provide my opinions regarding whether there is a viable method to determine which telephone numbers contained within Defendant's database would have been sent a text message.

3.       My opinions in this declaration are based on my knowledge, education, experience, expertise, training and my review of the following documents in this case: Plaintiffs' Consolidated Complaint for Damages and Injunctive Plaintiffs' First Amended Consolidated Complaint for Damages and Injunctive Relief Pursuant to the Telephone Consumer Protection Act, 47 U.S.C. §§ 227 et seq.; Federal Communications Commission Petition for Expedited Declaratory Ruling on Autodialer Issue (*Fried v. Sensia Salon, Inc.*); Declaration of Erik Lautier in Support of Motion to Stay Litigation to Permit FCC to Rule on Recently Filed Petition; Supplemental Responses of Defendant Bebe Stores, Inc. to Plaintiff's Request for Admissions; Memorandum of Points and Authorities in Support of Defendant's Motion to Stay Litigation to Permit FCC to Rule on Recently Filed Petition; Request for Judicial Notice in Support of Defendant's Motion to Stay Litigation to Permit FCC to Rule on Recently Filed Petition; Supplemental Responses of Defendant Bebe Stores, Inc. to Plaintiff's Request for Production [Nos. 1-65]; Supplemental Responses of Defendant Bebe Stores, Inc. to Plaintiff's Second Set of Interrogatories; Plaintiff's Memorandum of Points and Authorities in Support of Motion for

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Class Certification; Responses of Defendant Bebe Stores, Inc. to Plaintiff's First Set of

Interrogatories; Responses of Defendant Bebe Stores, Inc. to Plaintiff's Second Set of

Interrogatories; Declaration of Payam Shahian in Support of Plaintiffs' Motion for Class

Certification; Air2Web Application and Services Agreement (Bates Nos. bebe000001–

bebe000028); Cell Phone Capture/Text Message Program Description (Bates Nos. bebe000032–

bebe000040); Bebe's Customer Database Records (Bates Nos. bebe002029-bebe002030);

Deposition Transcript of Christiane Grando; Deposition Transcript of Angela Kourtoglou;

Deposition Transcript of Sheela Agarwal; Memorandum of Points and Authorities in Support of

Bebe Stores, Inc.'s Motion to Decertify Both Subclasses [F.R.C.P. Rule 23]; Declaration of

Angela Kourtoglou in Support of Bebe Stores, Inc.'s Motion to Decertify Both Subclasses

Pursuant to F.R.C.P. Rule 23; Memorandum of Points and Authorities in Support of Bebe Stores,

Inc.'s Motion to Strike and Motion for a More Definite Statement [F.R.C.P. Rule 12(E), (F)];

Bebe Stores, Inc.'s Objections to Plaintiffs' Proposed Trial Plan; Declaration of Amy L. Pierce

in Support of Bebe Stores, Inc.'s Objections to Plaintiffs' Proposed Trial Plan; Mobile Marketing

Association, Global Code of Conduct (dated July 15, 2008); Mobile Marketing Association, U.S.

Consumer Best Practices for Messaging, Version 7.0 (dated October 16, 2012); the Telephone

Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA") and regulations promulgated

thereunder; the Federal Communications Commission's ("FCC") Report and Order in the Matter

of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 dated

October 16, 1992; the FCC's Report and Order in the Matter of Rules and Regulations

Implementing the Telephone Consumer Protection Act of 1991 dated July 3, 2003; the FCC's

Declaratory Ruling in the Matter of Rules and Regulations Implementing the Telephone

Consumer Protection Act of 1991 Request of ACA International for Clarification and

Declaratory Ruling dated January 4, 2008; the Appeal from the United States District Court for

the Northern District of California, No. 07-16356, D.C. No. CV-06-02893-CW Opinion, filed

3

June 19, 2009; the FCC's Report and Order in the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 dated February 15, 2012; the FCC's Notice of Proposed Rulemaking in the Matter of the Middle Class Tax Relief and Job Creation Act of 2012, Establishment of a Public Safety Answering Point Do-Not-Call Registry dated May 22, 2012; the FCC's Declaratory Ruling in the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, SoundBite Communications, Inc. Petition for Expedited Declaratory Ruling dated November 29, 2012; the FCC's Declaratory Ruling in the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 dated July 10, 2015; and the FCC Enforcement Advisory No. 2016-06 Robotext Consumer Protection, Text Message Senders Must Comply With The Telephone Consumer Protection Act dated November 18, 2016.

4.      I have over 30 years of experience in telecommunications network and system architecture, engineering, design and technology. I am an expert in the fields of both wireline and wireless telecommunications networking technology. A copy of my *curriculum vitae* is attached to this Declaration. I have been retained as a testifying or consulting expert in over 135 cases regarding cellular telecommunications technology, including over 75 cases regarding Short Message Service ("SMS") technology and nearly 100 cases regarding the TCPA and associated regulations. In addition, I have been retained as an expert by both plaintiffs and defendants in cases involving the TCPA.

5.      I have taught many classes and seminars on both wireline and wireless telecommunication network technologies and have been a panelist and speaker at numerous conferences at the Institute of Electrical and Electronics Engineers ("IEEE"), the Personal Communication Society ("PCS"), and the Cellular Telecommunications and Internet Association ("CTIA") as an expert in telecommunication networks. I spent seven years developing standards within the American National Standards Institute's subsidiary organization, the

Telecommunications Industry Association ("TIA"), providing technical contributions and authoring and editing telecommunications proposed standards documents. Most notably, I authored and oversaw the standardization of Interim Standard 93, providing interconnection technology between wireline and wireless networks, which is a fully accredited national standard of the American National Standards Institute ("ANSI").

6.      I am the co-author of the McGraw-Hill books "Mobile Telecommunications Networking with IS-41," and "Wireless Telecommunications Networking with ANSI-41, 2nd edition" published in 1997 and 2001, respectively. I have been issued 26 patents myself on telecommunications networking technology and currently have five additional published patents pending. I have also authored several articles on telecommunications technology and have been quoted numerous times in industry trade publications. I have been hired as a consultant by the CTIA, as well as by many wireline and wireless telecommunications companies, including Bell Laboratories, McCaw Cellular, AirTouch, AirTouch International, AT&T Wireless, AT&T Mobility, Lucent, Nokia, Ericsson, Motorola, Samsung, Siemens, Nextwave, MCI, Daewoo, Globalstar, T-Mobile, Sprint, U.S. Cellular, Teleglobe Canada, Teledesic and other telecommunications technology vendors and service providers. I was also nominated in 2006 for a National Television Arts Emmy Award for Outstanding Achievement in Advanced Media Technology for unique wireless content distribution technology I designed while employed at Entriq, Inc.

7.      In addition, in 2002, I was co-founder of m-Qube, Inc., one of the first text message-based mobile marketing and SMS aggregator companies in the U.S. M-Qube founded and established the Mobile Marketing Association (see http://www.mmaglobal.com) which subsequently established the technology and methodology for the use of text message based short codes as well as mobile marketing guidelines and rules within North America.

8.      Moreover, I have been issued 12 patents on SMS technology, including the

5

invention of "short code" technology, and my books have been cited in four additional patents on SMS technology. Still more detail, as well as details of publications that I have authored or co-authored within at least the past 10 years, are provided in my attached *curriculum vitae* (a true and correct copy of which is attached hereto as Exhibit A) along with a list of cases where I served as a testifying or consulting expert and my standard rate sheet. I am being compensated at the rate of $450 per hour for my study, analysis and testimony in this case.

**INTRODUCTION**

9.      It is my understanding that the TCPA defines an automatic telephone dialing system ("ATDS") as "equipment which has the capacity – (i) to store or produce telephone numbers to be called, using a random or sequential number generator; and (ii) to dial such numbers." Additionally, the Federal Communications Commission ("FCC") has issued regulations that also define an ATDS as including the capacity to dial telephone numbers from a provided list or database of telephone numbers without human intervention.

10.     Based on my review of the relevant documents and the facts described above, it is my opinion that the text messages sent to the Plaintiffs and the potential class members were sent using an ATDS as defined within the TCPA. I base this opinion on my knowledge, education, experience, expertise, training and on the evidence I have reviewed.

11.     I also understand the definition of the classes in this case are as follows:

i. Post-October 16, 2013 Non-Club bebe Class:

All persons within the United States who provided their mobile telephone number to bebe in one of bebe's stores at the point-of-sale and were sent an SMS or text message from bebe during the period of time beginning October 16, 2013 and continuing until the date the Class is certified, who were not members of Club bebe during the Class Period.

ii. Post-October 16, 2013 Club bebe Class:

All persons within the United States who provided their mobile telephone number to bebe in one of bebe's stores at the point-of-sale and were sent

DECLARATION OF RANDALL A. SNYDER                    CASE NO. 4:14-CV-00267-YGR

an SMS or text message from bebe during the period of time beginning October 16, 2013 and continuing until the date the Class is certified, who were members of Club bebe during the Class Period.

12.     Furthermore, it is my opinion that using the Defendant's own customer relationship management ("CRM") database, it can be determined which cellular telephone numbers would have been sent a text message on behalf of bebe.

**INDUSTRY BACKGROUND**

13.     The use of Short Message Service, more commonly known as "text messaging" in the U.S., has become ever-present. SMS is a communications system and method that was designed to enable an individual cellular telephone subscriber to send, or originate, a short text message communication (typically no more than 160 characters) from his or her cellular telephone to another individual subscriber's cellular telephone that is the intended destination of the message, *i.e.*, the message recipient. SMS text messages are sent individually from one subscriber to another using a cellular telephone number as the destination address of the message. The message sender's cellular telephone number is preserved as part of the message at the destination cellular telephone where the message is received so that the message recipient knows the cellular telephone number of the message sender.

14.     Over the past several years many companies have emerged that provide what is known as value-added text messaging services using SMS technology, meaning that they provide a variety of text messaging services (*i.e.*, SMS) that are not strictly peer-to-peer in the sense of subscriber-to-subscriber manual communications; rather, these companies use automatic computer equipment to send and receive text messages using SMS to and from individual cellular telephone subscribers. These "mobile marketing" companies are external entities to the cellular network carriers.

15.     Mobile marketing companies are typically in the business of creating and

operating text message-based applications on behalf of other branded companies in order to develop and maintain communication with cellular telephone subscribers for commercial purposes. The automatic computer equipment that these mobile marketing companies utilize is used for a variety of text messaging applications, marketing campaigns and dialogs on behalf of the branded company to communicate with cellular subscribers. Common applications are voting (the most popular example being the text message voting used to vote for contestants on the *American Idol* television program) as well as receiving news alerts, informative notifications, coupons and sports scores where short messages are sent to cellular subscribers on a regular basis.

16.   Moreover, these mobile marketing companies utilize equipment that has the ability to send any number of text messages *en masse* to cellular telephone subscribers as well as receive individual text messages from those subscribers, on behalf of a branded company. Messages sent from the branded company, using a mobile marketing company's computerized messaging platform, to a cellular subscriber are termed "mobile-terminated" and messages sent from a cellular subscriber to a branded company are termed "mobile-originated."

17.   Mobile marketing companies send and receive text messages by connecting to the cellular carrier networks using internet-based connections and communications protocols. The primary protocol used is known as the Short Message Peer-to-Peer ("SMPP") protocol. SMPP is an internet-based communications protocol specifically designed for communications between a mobile marketing company and a cellular network's Short Message Service Center ("SMSC"). SMSCs are network entities that are maintained and controlled within the cellular carriers' networks and are the store and forward repositories for text messages to be both delivered to and sent from mobile subscribers.

18.   Mobile marketing companies' connections to the cellular network operators are internet connections and typically use a special number as the address by which cellular text

DECLARATION OF RANDALL A. SNYDER                                          CASE NO. 4:14-CV-00267-YGR

messages are sent and received in order to communicate with cellular subscribers. All messages sent to a particular subscriber are delivered to that subscriber's "home" SMSC within the subscriber's home cellular network. Since mobile marketing companies are not cellular subscribers, they are not identified by a mobile telephone number; rather, they use a special number as an originating address for text messages sent to cellular subscribers. This number is known as a "short code." A short code is a special and unique 5- or 6-digit number that is obtained from an independent agency, ©Telcordia Technologies, Inc. dba "iconnectiv."[1] that manages and assigns these number resources in the United States. Prior to 2016, Neustar, Inc. was the agency that managed and assigned these short code resources.

19.    Individual short code numbers are either leased by the mobile marketing companies on behalf of the branded companies for which a text messaging application is being run or they can be leased by the branded companies themselves and provided to the mobile marketing companies. In either case, the mobile marketing companies subsequently request that these numbers be provisioned (*i.e.*, programmatically stored) by the cellular network operators so that mobile-originated messages can be properly sent from cellular subscribers to the correct mobile marketing company platform applications. In this case, the cellular network operators approve the service application that uses an individual short code before it is provisioned in their networks. The process requires that the mobile marketing company draft and submit a detailed written description of the service application that uses the short code. The detailed description typically contains a representation of the text content of messages that are to be sent to and received from cellular subscribers, the precise "opt-in" method to be used by cellular telephone subscribers, the anticipated number of cellular telephone subscribers expected to be involved in the application communication, the anticipated number of text messages expected to be sent and received in the application communication, when the application will start and end, how the

---

[1] *See* https://www.usshortcodes.com/info/.

DECLARATION OF RANDALL A. SNYDER                                    CASE NO. 4:14-cv-00267-YGR

subscriber can "opt-out" of the program along with other details.

20.     In many cases, mobile marketing companies do not connect directly to the cellular carrier networks (*e.g.*, Verizon Wireless or AT&T Mobility). Establishing and maintaining direct connections to individual carrier networks is expensive, time consuming and technically difficult. Because of business and technical barriers, mobile marketing companies sometimes connect indirectly to the carrier networks through intermediary companies known as SMS aggregators. These SMS aggregators are in the business of connecting to multiple cellular carrier networks and reselling that connectivity to mobile marketing companies.

21.     Aggregation of multiple cellular carrier network connections into a single connection to a mobile marketing company is highly advantageous. First, it enables a mobile marketing company to send and receive text messages to and from cellular telephone subscribers quickly and easily. Second, it enables the mobile marketing company to send and receive text messages to and from all mobile subscribers in the U.S. at once, regardless of which cellular carrier serves them. And third, SMS aggregators can ensure that any short codes used to access SMS applications are provisioned on all the cellular carrier networks.

22.     Mobile marketers typically provide a software-based application programming interface ("API") that can be used by their branded company clients to develop a software application that connects to their message delivery platform for that application. An API is essentially a programmatic method of communication between two computer systems. The API can be used as part of a software application created by the branded company to access the message delivery platform or it can be an online portal accessible by the branded company via a web-based user interface ("UI"). These software methods enable a branded company to create a message template for the content that will appear in the body of the text messages and then upload, or otherwise choose, a list of cellular telephone numbers for which the text messages are to be sent. The message template is essentially a prerecorded text message body

10

that is stored within the mobile marketing application system. The mobile marketing application system automates the process of repeatedly copying and constructing individual text messages with the prerecorded message body to be sent *en masse* as mobile-terminated text messages to the previously provided and stored cellular telephone numbers.

23.     Note that there are many companies that provide both mobile marketing and SMS aggregation services to external branded companies.

24.     Based on my review of the materials and documentation provided to me in this case, Air2Web, Inc. ("Air2Web") was the mobile marketing and SMS aggregation company employed by the Defendant to automatically transmit cellular text messages *en masse* using the short code "42323." Air2Web was acquired by Velti PLC in September, 2011 and its mobile marketing product was subsequently known as the "mGage" platform. (Exhibit B.) Air2Web operates an automatic computer equipment system providing SMS-based services that enable text message communications between the automatic system and cellular telephone subscribers. The messaging services that Air2Web enables is used to form a commercial relationship with cellular subscribers and to use the cellular networks and text messaging technology to form that relationship. (Exhibit C.)

25.     Air2Web is a company that provides mobile marketing and text messaging services to branded companies such as bebe. Based on my knowledge, education, experience, expertise, training and my review of the materials and documentation provided to me in this case, Air2Web is a mobile marketing and SMS aggregation company. As such, it operates an automatic computer equipment system providing SMS-based applications that enable text message communications between those applications that are run on the system and cellular telephone subscribers. The promotional marketing application that Air2Web developed and maintained was used to form a commercial relationship with cellular subscribers and to use the cellular networks and text messaging technology to form that relationship.

11

**OPT-IN**

26.     "Opting-in" is a term that describes a method by which a cellular subscriber explicitly and expressly provides individual consent to inform a mobile marketing company that they are willing to receive text messages for a specific text message application or campaign. In my experience, consent is not broadly given for multiple commercial text message applications nor is it given in some "open-ended" fashion (*i.e.*, without limitation) such that a cellular subscriber "opts-in" to receive any and all text messages in perpetuity.

27.     There are two reasons why express and formal "opt-in" techniques are used for automatic commercial text messaging applications: (i) to enable cellular telephone subscribers to reliably provide knowing, voluntary, clear, unmistakable, explicit and express consent for a particular commercial text messaging program; and (ii) to inform the mobile marketing company that they are willing to incur appropriate text messaging charges for that application program.

28.     The "opt-in" method requiring a "mobile-originated" text message to be sent by a cellular subscriber as a response to some "call-to-action" is a very reliable means for the mobile marketing company to obtain express and knowing consent to send application text messages to a cellular subscriber. For a given application or text message campaign, this call-to-action can be a commercial advertisement from a website, television, radio, newspaper, magazine, billboard, etc. For instance, the actual call-to-action is usually a read or heard message indicating that the cellular subscriber can send a text message to a particular numeric address along with a keyword or words that make up the body of the message. The cellular subscriber uses this mobile-originated text message that is sent to the mobile marketing company to "opt-in" to the desired application service (such as to receive regular sports updates or to vote for an American Idol contestant).

29.     The call-to-action requires that consumers respond by executing the initial

12

cellular communication first so they can unmistakably and voluntarily provide express consent. Using this method, cellular subscribers must use their own cellular telephones to respond to a given text message application and the response text message automatically contains the cellular telephone number of the cellular subscriber. This provides a very reliable express means for the mobile marketing company to ensure that the cellular subscriber responding to the call-to-action is, in fact, the authorized cellular subscriber who wishes to receive text messages for that application.

30.     When a cellular subscriber responds to a branded text messaging application using a short code address along with a keyword or words that make up the body of the message, the mobile marketing company records and saves the cellular subscribers' telephone numbers in a database or electronic list. The cellular subscriber phone numbers typically need to be saved and stored in a database by the mobile marketing company for a given application or campaign for a variety of reasons. The application may be based primarily on mobile-terminated messages once a subscriber has "opted-in," such as sending sports scores, news, notifications, reports or alerts on a regular basis, or the application may be based on an ongoing dialog between the mobile marketing company and the cellular subscriber such as trivia questions and responses.

31.     There are other common methods used for the "opt-in" process. Cellular subscribers can provide some indication of willingness to receive mobile-terminated text messages from the mobile marketing company by filling in a web-based form on an Internet website or via a mobile application. This is typically the case when the crux of a specific text message application or campaign is based on the mobile marketing company sending out a mobile-terminated text message first, to initiate the application, campaign or dialog with the cellular subscriber.

32.     The "opt-in" method requiring a mobile-originated text message to be sent by a cellular subscriber as a response to a "call to action" is the most reliable means of obtaining

13

consent to receive application text messages. This is because cellular subscribers must use their own cellular telephones to "opt-in" to a given text message application and the "opt-in" text message automatically contains the cellular telephone number of the cellular subscriber. This provides a fairly reliable means for the mobile marketing company to ensure that the cellular subscriber "opting-in" is, in fact, an authorized cellular subscriber that wishes to receive text messages for that application. Conversely, consent provided on an Internet website form simply requires the entry of a cellular telephone number as well as some indication that the user is "opting-in." This can be a dangerous mechanism as any user can enter any cellular telephone number into a website form and there is no way that this user can be truly authorized, except by the mobile marketing company sending a mobile-terminated text message to the cellular telephone number requesting a confirmation. If the user who entered the cellular telephone number is not truly the cellular subscriber, then the cellular subscriber using the telephone number will receive an unknown confirmation message. In this case, the actual cellular subscriber receives an unauthorized and unwanted text message and may provide no consent to receive text messages; however, the damage is already done. In today's environment, "opting-in" via cellular telephone is typically preferable for text message applications as even very active cellular telephone users are not used to consenting to text message services on an Internet website. Also, many text message applications are specifically targeted to cellular subscribers on the move, so the "call to action" engages the subscribers when they are not at or near a personal computer.

33.     Cellular telephone numbers supplied to the branded company by other means, such as those which were provided to bebe in this case, provide no way to ensure that the cellular subscriber has expressly and explicitly "opted-in" and authorized the branded company to send promotional text messages. Furthermore, there is no automatic mechanism deployed that

enables cellular subscribers themselves to control the "opt-in" process and the subsequent receipt of unwanted or unsolicited commercial text messages. These unsolicited and unwanted commercial text messages are not only an annoyance to cellular subscribers, but result in improper text message charges to those subscribers. These charges can be especially harmful to pre-paid cellular subscribers as the charges are instantly deducted from their current pre-paid account balances, limiting their use of any cellular services including voice calls.

**THE MOBILE MARKETING ASSOCIATION ("MMA")**

34.    The MMA is a global non-profit trade organization that issues codes of conduct and best practices for all companies engaged in mobile marketing and mobile commercial activities. As part of their function, they provide industry guidelines for commercial text messaging applications and programs. The MMA is the global authoritative organization providing best practices, guidelines, rules and instructions for all companies involved in communicating with cellular telephone subscribers using SMS-based text messaging technology. Among the goals of the MMA is to ensure that mobile marketers comply with all federal, state and local laws regarding mobile communications with consumers. The MMA's guidelines define the "opt-in" processes that branded companies can use to properly ensure that cellular subscribers are protected from unsolicited and unwanted text message communications.

35.    Both Velti and Air2Web were members of the MMA and, in fact, in June 2013, Velti released and distributed a white paper on mobile marketing data trends and best practices via the MMA website. (Exhibit D.) As MMA members, Both Velti and Air2Web were aware of the MMA's specifications for proper mobile marketing programs.

36.    According to the MMA's Global Code of Conduct:

> "Mobile Marketers ask for and obtain consent by obtaining an explicit opt-in from the user for all mobile messaging programs. This can be accomplished via an SMS or MMS opt-in process, a voice response, website registration, other MMA recognized methods or other legitimate methods."

15

"Mobile Marketers must implement consent (opt-in) for a specific messaging program. Consent is not carried into other programs unless the user has consented to such communications either 1) when they consented to the initial program or 2) upon the commencement of a subsequent messaging program."

(Exhibit E, p. 1.)

37.     Furthermore, according to the MMA's U.S. Consumer Best Practices (Exhibit F):

"At all times, programs must be in accordance with applicable federal and state laws, rules and regulations."

(Exhibit F, p. 7.)

"Content providers must obtain opt-in approval from subscribers before sending them any SMS or MMS messages or other content from a short code."

(Exhibit F, p. 8.)

"When opt-in to a recurring program occurs via the web or other non-mobile point of origination, the content provider must obtain verification that the subscriber is in possession of the handset being opted-in to the service.

"For recurring standard rate programs, subscribers should indicate their willingness to participate in a program and receive messages from the program as follows:

    1.  Subscriber initiates opt-in to a recurring Standard Rate Program by responding to a call to action (CTA):

        i.)   Subscriber may send a Mobile Originated (MO) message from their handset to the short code.

        ii.)  Subscriber may initiate opt-in from a web interface.

        iii.) Subscriber may initiate opt-in from a WAP interface.

        iv.)  Subscriber may initiate opt-in from an IVR system."

(Exhibit F, p. 8.)

38.     In addition, the MMA provides clear best practices and instructions to enable cellular subscribers to "opt-out" of receiving any text messages from an automatic application program:

> "After opt-in to a recurring program, a confirmation Mobile Terminating (MT) message must be sent to the subscriber containing, at minimum, the following information:
>
> a)  Service description
>
> b)  Program Sponsor
>
> c)  Additional carrier costs (e.g. Msg&Data Rates May Apply)
>
> d)  Frequency of messaging
>
> e)  Customer support information (HELP)
>
> f)  Opt-Out information (STOP)"

(Exhibit F, p. 9.)

39.     "Opting-out" is a term that describes a method by which a cellular subscriber explicitly and expressly revokes individual consent to inform a mobile marketing application that they are no longer willing to receive text messages from that application for a specific text message application.

40.     For "opting-out," the MMA mandates the following instructions to mobile marketing companies:

> "Content providers must offer subscribers the opportunity to cancel the service at any time. The following rules govern program opt-out:
>
> "A subscriber must be able to stop participating and receiving messages from any program by sending STOP to the short code used for that program.
>
> •   "END, CANCEL, UNSUBSCRIBE or QUIT should also be opt-out key words for all programs; however, content providers should feature the word STOP in their advertising and messaging. Messaging content providers must process a

stop message from a subscriber regardless of the keyword STOP's case sensitivity."

(Exhibit F, p. 10.)

## FACTS REGARDING PLAINTIFF MEYER

41.     Plaintiff Meyer purchased a dress at one of bebe's stores. During her interaction at the transaction point-of-sale ("POS"), one of bebe's employees requested her to provide a telephone number. Sometime thereafter, on December 10, 2013, Plaintiff Meyer received the following unsolicited text message from the Defendant from the short code "42323" (a true and correct copy of which is shown in Exhibit G):

**bebe: Get on the list! Reply YES to confirm opt-in. 10% OFF reg-price in-store/online. Restrictions apply. 2msg/mo, w/latest offers. Msg&data rates may apply.**

42.     Note that this text message received by Plaintiff Meyer provides no means to opt-out, as required by the MMA.

## FACTS REGARDING PLAINTIFF BARRETT

43.     Similar to Plaintiff Meyer, Plaintiff Barrett engaged in an interaction at one of Bebe's stores. During her interaction at the transaction POS on December 12, 2016, one of bebe's employees requested her to provide her cellular telephone number, which was then entered into the cellular phone field within Bebe's CRM database. (Bates Nos. bebe002029-bebe002030.) Within a few hours thereafter, Plaintiff Barrett received a similar unsolicited text message to that of Plaintiff Meyer.

## FACTS REGARDING DEFENDANT BEBE

44.     Bebe is a company that operates retail clothing stores marketing and selling products to the public, from both traditional brick-and-mortar stores and online via the Internet.

45.     Bebe is a company that used automatic mobile text messaging to communicate various marketing and advertising information to consumers.

46.     Bebe entered into a contract with Air2Web to enable bebe to use Air2Web's automatic mobile text messaging capabilities. (Bates Nos. bebe000001–bebe000028, bebe000078).

47.     Subsequent revisions to the contract enabled Air2Web to transmit up to 700,000 mobile-terminated text messages per month to cellular subscribers via eight cellular carriers on Bebe's behalf. (Exhibit H, Bates Nos. bebe000015, bebe000025.)

48.     Bebe, along with Air2Web, executed and operated the "clubbebe" mobile marketing text message campaign. (Exhibit I.)

49.     Either Bebe or Air2Web leased the short code "42323" from iconnectiv to operate the clubbebe mobile marketing text message campaign.

50.     Bebe's employees collected telephone numbers of customers and potential customers at the transaction POS within its retail store for the clubbebe mobile marketing campaign. (Exhibit I, Bates No. bebe000036.)

51.     The collected telephone numbers are then stored by bebe's employees in bebe's CRM database. (Exhibit J, Grando Dep., 25:16-26:19; Exhibit K, Kourtoglou Dep., 25:6-22.)

52.     The collected telephone numbers in bebe's CRM database are then transferred to Air2Web's automatic text messaging system using a database script. (Exhibit L, Agarwal Dep., 11:21-12:8.) A script is simply a software program that is used to import data, export data, access data, query data or otherwise perform data operations on a database.

53.     Within a few hours of collecting customers' cellular telephone numbers at the POS, at least one mobile-terminated text message was sent to those numbers. (Exhibit K, 46:17-47:2.)

**FACTS REGARDING AIR2WEB**

54.     Air2Web was a mobile telecommunications technology company providing

19

mobile marketing and SMS aggregation services to branded companies.

55.     Air2Web provided a web-based user interface enabling bebe to create and store prerecorded text messages for the clubbebe campaign on Air2Web's automatic text messaging system. (Exhibit J, 43:25-44:5.)

56.     Air2Web's system enables bebe personnel to create prerecorded message bodies to be programmatically inserted into text messages. These prerecorded message bodies are subsequently and programmatically used, along with the originating short code number "42323" (*i.e.*, the "from" field) and stored destination address cellular telephone numbers (*i.e.*, the "to" field), to automatically create computerized text messages to be delivered to cellular subscribers *en masse*.

57.     It is evident that bebe used computer equipment to execute automatic text message campaigns, such as the one which caused the Plaintiffs and potential class members to receive the text messages at issue in this case. Furthermore, bebe obtained and stored cellular telephone numbers of consumers enabling it to create automatic text message campaigns using Air2Web's automatic text messaging system.

58.     This equipment, used by bebe and operated by Air2Web, automatically transmitted cellular text messages *en masse*. Air2Web operated an automatic computer equipment system providing SMS-based services that enabled text message communications between the automatic system and cellular telephone subscribers.

59.     Since each mobile-terminated text message sent to the cellular subscribers that engaged in the automatic text message campaign contains the short code number "42323" as the originating address, they must have been sent by automatic computer equipment. Mobile-terminated text messages containing a short code can only be sent by computer equipment; otherwise, the originating address of the mobile-terminated text messages would appear as a standard 10-digit cellular telephone number. There is no way to transmit a text message

20

manually from a cellular telephone that contains a short code number as the originating address.

60.     There is no doubt that prerecorded text message content was entered into and stored on Air2Web's automatic text messaging system. This prerecorded content was automatically replicated and used to create the text messages sent *en masse* to cellular subscribers. The predefined text, entered into the automatic text messaging system, was certainly entered into the computer once by bebe personnel at some point prior to the initiation of the automatic text message campaign; however, the replication of this content, placement of the content into the body of the appropriate mobile-terminated text messages, creation of the SMS communications protocol format and the transmission of the SMS messages that were sent *en masse* occurred in a completely automatic fashion.

61.     The telemarketing text messages automatically transmitted by Air2Web on behalf of Bebe are not messages that are sent peer-to-peer by a human; rather, they are automatic text messages sent *en masse* from Air2Web's computerized automatic text messaging system to cellular telephone subscribers.

## THE TCPA, FCC AND AUTOMATIC TELEPHONE DIALING SYSTEMS

62.     For ease of reference, this section simply presents the TCPA definitions and FCC regulations that I understand from Plaintiffs' counsel to be those most applicable to my analysis in this case.

63.     The TCPA prohibits unsolicited calls to cellular telephone numbers using an "automatic telephone dialing system" ("ATDS"), which the statute defines as "equipment which has the capacity— (i) to store or produce telephone numbers to be called, using a random or sequential number generator; and (ii) to dial such numbers." (See *Telephone Consumer Protection – Restrictions on use of telephone equipment 47 U.S.C. § 227(a)(1)*).

64.     The FCC has held that prohibitions under the TCPA apply equally to both voice calls and SMS text message calls to cellular telephone numbers (see *Rules and Regulations*

*Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, February 15th, 2012*).

65.     Furthermore, the FCC recently re-affirmed this interpretation in *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG Docket No. 02-278, WC Docket No. 07-135, July 10, 2015:

> "Text messages are "calls" subject to the TCPA, as previously determined by the Commission." (p. 5.)

66.     In addition, the TCPA prohibits any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other common carrier service, or any service for which the called party is charged for the call.

67.     In the FCC's Report and Order of October 16, 1992, the Commission stated:

> "We emphasize that under the prohibitions set forth in 227(b)(1) and in 64.1200(a)-(d) of our rules, only calls placed by automatic telephone dialing systems or using an artificial or prerecorded voice are prohibited. If a call is otherwise subject to the prohibitions of 64.1200, persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary. Hence, telemarketers will not violate our rules by calling a number which was provided as one at which the called party wishes to be reached. However, if a caller's number is 'captured' by a Caller ID or an ANI device without notice to the residential telephone subscriber, the caller cannot be considered to have given an invitation or permission to receive autodialer or prerecorded voice message calls. Therefore, calls may be placed to "captured" numbers only if such calls fall under the existing exemptions to the restrictions on autodialer and prerecorded message calls." (¶ 31.)

68.     In the FCC's Report and Order of July 3, 2003, the Commission stated:

> "We emphasize that under the prohibitions set forth in 227(b)(1) and in 64.1200(a)-(d) of our rules, only calls placed by automatic telephone dialing systems or using an artificial or prerecorded voice are prohibited. If a call is otherwise subject to the prohibitions of 64.1200, persons who knowingly release their phone numbers have in effect given their

22

invitation or permission to be called at the number which they have given, absent instructions to the contrary. Hence, telemarketers will not violate our rules by calling a number which was provided as one at which the called party wishes to be reached. However, if a caller's number is 'captured' by a Caller ID or an ANI device without notice to the residential telephone subscriber, the caller cannot be considered to have given an invitation or permission to receive autodialer or prerecorded voice message calls. Therefore, calls may be placed to "captured" numbers only if such calls fall under the existing exemptions to the restrictions on autodialer and prerecorded message calls." (¶ 31.)

Furthermore:

"[T]o exclude from these restrictions equipment that use predictive dialing software from the definition of 'automated telephone dialing equipment' simply because it relies on a given set of numbers would lead to an unintended result. Calls to emergency numbers, health care facilities, and wireless numbers would be permissible when the dialing equipment is paired with predictive dialing software and a database of numbers, but prohibited when the equipment operates independently of such lists and software packages. We believe the purpose of the requirement that equipment have the "capacity to store or produce telephone numbers to be called" is to ensure that the prohibition on autodialed calls not be circumvented. Therefore, the Commission finds that a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress." (¶ 133.)

69.     Moreover, the FCC has held that prohibitions under the TCPA apply to calls automatically dialed from stored lists of telephone numbers or a database of numbers, as well as random or sequentially generated numbers, without human intervention.

70.     In the FCC's Report and Order of January 4, 2008, the Commission noted:

"…that the evolution of the teleservices industry had progressed to the point where dialing lists of numbers was far more cost effective, but that the basic function of such dialing equipment, had not changed—the capacity to dial numbers without human intervention. The Commission noted that it expected such automated dialing technology to continue to develop and that Congress had clearly anticipated that the FCC might need to consider changes in technology." (¶ 13.)

Furthermore, the Commission found that:

"…calls to emergency numbers, health care facilities, and wireless numbers are permissible when the dialing equipment is paired with

predictive dialing software and a database of numbers, but prohibited when the equipment operates independently of such lists, would be inconsistent with the avowed purpose of the TCPA and the intent of Congress in protecting consumers from such calls." (¶ 14.)

71. In the FCC's Notice of Proposed Rulemaking of May 22, 2012, the Commission stated:

"Under the TCPA, the term "automatic telephone dialing system" is defined as 'equipment which has the capacity– (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers.' Id. at § 227(a)(1). The Commission has emphasized that this definition covers any equipment that has the specified capacity to generate numbers and dial them without human intervention whether or not the numbers called are randomly or sequentially generated or come from calling lists." (p. 4, footnote 12.)

72. In the FCC's Declaratory Ruling and Order of July 10, 2015, the Commission stated:

"The Commission declined to distinguish between calls to wireless telephone numbers made by dialing equipment 'paired with predictive dialing software and a database of numbers' and calls made 'when the equipment operates independently of such lists and software packages.' Recognizing the developments in calling technology, the Commission found that '[t]he basic function of such equipment, however, has not changed—the capacity to dial numbers without human intervention.' The Commission found it troubling that predictive dialers, like dialers that utilize random or sequential numbers instead of a list of numbers, retain the capacity to dial thousands of numbers in a short period of time and that construing the autodialer definition to exclude predictive dialers could harm public safety by allowing such equipment to be used to place potentially large numbers of non-emergency calls to emergency numbers, a result the TCPA was intended to prevent. The Commission concluded that the TCPA's unqualified use of the term 'capacity. was intended to prevent circumvention of the restriction on making autodialed calls to wireless phones and emergency numbers and found that "a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress." (¶ 14.)

73. The FCC also directly addressed Air2Web's role as an SMS aggregator comprising an ATDS in its Declaratory Ruling and Order of July 10, 2015:

"We also find that parties cannot circumvent the TCPA by dividing ownership of dialing equipment. In their Petition, Fried and Evans seek a

24

ruling that a combination of equipment used by separate entities to send text messages constitutes an autodialer under the TCPA. The Petitioners in this case received text messages from a beauty salon that had contracted with another party, Textmunications, Inc. (Textmunications), to transmit advertisements in the form of text messages to their current and former customers. Textmunications, in turn, contracted with Air2Web, a mobile messaging aggregator, to transmit the messages. As described in the Fried Petition and the Referral Order, the beauty salon provided customer data to Textmunications, who stored this information on its own equipment and databases. Textmunications then entered into an agreement with Air2Web to use its equipment to transmit the text messages to the recipients. In effect, the separate equipment divided the storage and calling functions between these two companies. As a result, Air2Web and Textmunications allege that their equipment should not be considered an autodialer because neither system, acting independently, has the capacity both to store or produce numbers, and dial those numbers as required by the TCPA. (¶ 23.)

We conclude that such equipment can be deemed an autodialer if the net result of such voluntary combination enables the equipment to have the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers. The fact that two separate entities have voluntarily entered into an agreement to provide such functionality does not alter this analysis. As one commenter notes, this conclusion is consistent with the statutory language and prior Commission interpretations of the TCPA. The TCPA uses the word "system" to describe the automated dialing equipment that is defined in section 227(a)(1) of the Act. The Commission noted, in concluding that a predictive dialer meets the definition of an autodialer, that "[t]he hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers." As a result, the Commission has recognized that various pieces of different equipment and software can be combined to form an autodialer, as contemplated by the TCPA. The fact that these individual pieces of equipment and software might be separately owned does not change this analysis." (¶ 24.)

**TELEPHONE NUMBERING AND NUMBER ANALYSIS**

74. Nearly 50% of all households in the U.S. today exclusively use cell phones. Cellular telephone numbers are often used as home, residential, business or other numbers and are subsequently designated as such on forms and other records. Due to the inherent unreliability of these forms and records as the guiding information for making automatic outbound telephone calls, most telemarketers use a highly reliable and inexpensive technology solution that has been

25

available to them for well over a decade.

75. In November, 2003, the FCC mandated the implementation of a service known as "number portability" to be offered by both landline and cellular common carriers to all landline and cellular subscribers. Specifically, the service is characterized by two features: Local Number Portability ("LNP") and Wireless Local Number Portability ("WLNP"). LNP enables cellular subscribers to "port," or transfer, their cellular telephone numbers from a cellular carrier to a landline carrier within a defined geographic local area to essentially become home landline telephone numbers and vice versa. WLNP enables cellular subscribers to "port," or transfer, their cellular telephone numbers from one cellular carrier to another, allowing them to essentially own their telephone number regardless of which cellular carrier they wish to subscribe.

76. Because of number portability, there is no distinguishing characteristic within the telephone number format and the value of the digits themselves to determine which carrier services a particular telephone number and whether the number is even a landline or cellular number. The standard numbering plan in the United States for both landline and cellular telephone numbers is the ten-digit number format: "NPA-NXX-XXXX." "NPA" refers to the Numbering Plan Area, more commonly known as the three-digit "area code." The NPA is also of the format "NXX." The entire format of the number, "NXX-NXX-XXXX" refers to a numbering plan where the digit "N" can be any number from 2 through 9 and the digit "X" can be any number from 0 through 9.

77. Prior to November, 2003 and the implementation of number portability as mandated by the FCC, the North American Numbering Plan Administrator ("NANPA") provided blocks of numbers to each individual telephone carrier (either wireline or cellular) to provide to its subscriber customers. The NANPA is the North American authority that operates, manages and maintains all aspects of the use of telephone numbers in the United States and its territories as well as Canada, Bermuda and 17 Caribbean nations. Because number portability had yet to take

effect, the values of telephone numbers of the format "NXX-NXX-XXXX" easily and unambiguously revealed whether an individual telephone number was served by a wireline or cellular telecommunications carrier. This is because blocks of numbers provided by the NANPA to the individual telecommunications carrier companies were based upon the NPA values (the first three digits of the telephone number, with the format "NXX") and the exchange code values (the second three digits of the telephone number, with the format "NXX").

78. If a subscriber wishes to port his or her landline telephone number to a cellular telephone number, or vice versa, or their telephone number to another competing landline or cellular carrier, the carrier is required to do so within a few hours or less. To do this, all of the landline and cellular carriers are connected to a nationwide real-time number portability database. The primary number portability database is owned, operated and maintained by an independent company known as ©Telcordia Technologies, Inc. dba "iconnectiv."[2] Because of the FCC mandate for number portability among all common carriers, a centralized real-time telephone number portability database needs to be employed for any and all telephone calls to be completed to the appropriate carrier network.

79. The number portability database essentially associates each and every telephone number with a landline or cellular carrier network identifier, enabling calls to be made to the proper landline or cellular carrier network. During the course of establishing each and every telephone call and to deliver those calls to the proper network servicing the called party numbers, the number portability database is queried in real-time so that calls can terminate in the proper carrier network and properly delivered to the called party. Due to the critical nature of this service, reliability of iconnectiv's database is among the highest in the telecommunications industry.

80. Iconnectiv maintains and operates the authoritative number portability database

---

[2] http://www.iconectiv.com/numbering/number-portability-administration-center-npac.

serving the carriers. Because of the FCC mandate for number portability among all common carriers, a centralized real-time telephone number portability database needs to be employed so that all telephone calls can be routed to the appropriate carrier network and be completed. Without that database, it would be difficult or impossible to route telephone calls to the appropriate carriers.

81. Iconnectiv, as well as other information services companies that provide wholesale access to iconnectiv's database, is commonly employed by telemarketing companies to analyze databases or lists of telephone numbers prior to calling them using an automatic telephone dialing system. Iconnectiv and its client wholesalers lease and maintain access to the number portability database enabling organizations to definitively know whether any telephone numbers in a list of numbers are cellular or not. I have personally been involved with contracting these organizations to obtain this telephone number data, both for wireless network products I have personally designed and in many TCPA cases.

82. Aside from iconnectiv, there exist several commercial information service companies that collect, maintain and analyze telephone number data for various commercial information purposes. Beside subscribing to iconnectiv's database, these companies can provide the porting and carrier history of cellular and landline telephone numbers.

83. I have a great deal of personal and technical experience with third-party information service companies such as CompliancePoint[3] (a subsidiary of PossibleNOW, Inc.) and Contact Center Compliance Corporation.[4] These organizations maintain a complete database, updated daily, of all telephone numbers and related information used in the United States. For each telephone number in the United States, these organizations can determine the associated telecommunications carrier, whether the number is a landline number or cellular number, and the

---

[3] *See* http://www.CompliancePoint.com.
[4] *See* http://www.DNC.com.

porting history of the telephone number.

84. In fact, these organizations can access this information for any given date in the past, regardless of whether the number was ever ported before or after that date. This is because these companies download the updates to the iconnectiv number portability database on a daily basis and continually store and save the downloaded data along with the date of the update. Thus, historical information regarding a telephone number's type (*e.g.*, landline or cellular), associated carrier and date of any changes is continually and always preserved. I have been personally involved with these companies to provide telephone number data analyses in several TCPA class action lawsuits.

85. In order for an SMS aggregator to send automatic text messages containing a short code address from a computerized platform to cellular subscribers, it must first determine the cellular carrier that serves that number. Once that carrier is determined, the automatic mobile-terminated message can then be transmitted to that particular carrier over the appropriate connection and subsequently to the cellular subscriber. To do this, SMS aggregators maintain connectivity to iconnectiv's real-time database. Before each text message is transmitted, the SMS aggregator performs validation of the format of the telephone number; if valid, it then performs a query to iconnectiv's database.

86. Telephone number validation is the process whereby a telephone number is determined to be a valid format, that is, of the form NXX-NXX-XXXX as previously described. If a telephone number is not of this format, an error is recorded and no text message is transmitted. If the format is valid, a query is made by passing the cellular telephone number (which is the destination address of the mobile-terminated text message) to the iconnectiv database requesting the identification and type of carrier associated with that number. The carrier type indicates whether the number is a landline or cellular number. If the telephone number in the query is not in service, or otherwise not a verifiable number, an error response is returned to

29

the SMS aggregator and a message is not transmitted. If a carrier identifier value and carrier type is returned from the database to the SMS aggregator for the query, and if the carrier type is cellular, and if the SMS aggregator maintains a connection to the indicated cellular carrier, only then can the automatic text message be transmitted by the SMS aggregator to the carrier indicated in the query response.

87. If the carrier is not a cellular carrier or if a connection to the carrier identified is not supported by the SMS aggregator, a message is not transmitted.

88. Based on my knowledge, education, experience, expertise and training, it is my opinion that consumers' telephone numbers can be definitively and clearly determined to be either cellular or landline numbers. Moreover, the method described is the precise means by which Air2Web (or any other SMS aggregator) would have used for the cellular telephone numbers provided to them by the Defendant before sending text messages to the Plaintiffs and the potential class members.

89. Accordingly, the list of telephone numbers that were produced in discovery in this case (Bates Nos. bebe002029-bebe002030) can be analyzed by the same means in order to determine which of these numbers would have been sent a text message. This analysis will produce a final list of cellular telephone numbers that would have been sent a text message by Air2Web on behalf of the Defendant.

90. The ability to perform the process described to determine whether a list of phone numbers were sent a text message or not from Defendant (and the potential class members) is an inexpensive and straightforward administrative process commonly used in the telemarketing industry.

**CONCLUSIONS**

91. Bebe is a company marketing and selling retail products and services to the public, from both traditional brick-and-mortar department stores and online via the Internet.

DECLARATION OF RANDALL A. SNYDER                                    CASE NO. 4:14-cv-00267-YGR

92. Air2Web was a mobile marketing technology company providing automatic text message services and SMS aggregation services to branded companies.

93. Bebe maintained a business relationship with Air2Web and Air2Web enabled bebe to use Air2Web's automatic text message and SMS aggregation systems.

94. Air2Web operated technology to perform automatic text message marketing and promotional campaigns on behalf of bebe.

95. Bebe collected telephone numbers from customers at the retail POS and stored them in a database.

96. Bebe electronically transferred the list of telephone numbers to Air2Web's automatic text messaging system.

97. Air2Web automatically applied both the numeric short code "42323" as the origination address and each collected and stored cellular telephone number as the destination address into the text messages to be sent.

98. Air2Web programmatically assembled and created each complete text message in an automatic fashion without human intervention.

99. Air2Web automatically sent those created text messages to the appropriate cellular networks which subsequently sent them to cellular telephone subscribers *en masse*.

100. Continuous storage of the collected cellular telephone numbers enabled bebe and Air2Web to continue to automatically transmit text messages to consumers.

101. The computer system equipment employed by bebe has the capacity to automatically send text messages *en masse* from a list of numbers supplied to it without human intervention.

102. The computer system equipment employed by bebe did, in fact, automatically send text messages *en masse* from a list of numbers without human intervention.

103. It is my understanding from Plaintiffs' counsel that the FCC has determined

DECLARATION OF RANDALL A. SNYDER                    CASE NO. 4:14-cv-00267-YGR

that Air2Web's automatic text messaging system can be deemed to be an ATDS if the result of the combination Air2Web's system and another system that stores telephone numbers to be dialed enables the equipment to have the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers.

104.     Based on my analysis of the equipment employed by bebe and Air2Web's automatic text messaging system, I conclude that this equipment has the capacity to, and does, store telephone numbers to be called, dials (*sends messages to*) telephone numbers from a stored list of numbers and automatically dials (*sends text messages to*) those telephone numbers without human intervention.

105.     Therefore, I conclude that the equipment used by bebe to operate the automatic mobile text message campaign at issue in this case qualifies as an ATDS as defined within the TCPA and associated regulations.

**SUMMARY OF OPINIONS**

106.     It is my opinion, based on my knowledge, education, experience, expertise, training, my review of the relevant documents and the facts described above, that bebe employed equipment which has the capacity to, and does, store telephone numbers to be called from a list of numbers and automatically sends text messages to those telephone numbers without human intervention.

107.     It is my opinion, based on my review of the relevant documents and the facts described above, that the Defendant employed an ATDS as defined within the TCPA to send automatic text messages to cellular telephone numbers, including to the cellular telephone numbers of the Plaintiffs and potential class members.

108.     It is my opinion, based on my knowledge, education, experience, expertise, training and the facts described above that telephone numbers within Defendant's CRM database can be analyzed to produce a final list of only cellular telephone numbers that were sent a text

message by Defendant. Furthermore, the ability to do so is a commonly-practiced and straightforward administrative process.

109.    My opinions in this declaration are based upon extensive experience in the telecommunications industry, a detailed understanding of telecommunications systems, a detailed understanding of Short Message Service ("SMS") technology and a detailed understanding of mobile marketing employing SMS technology. I hereby reserve the right to supplement or modify my opinions detailed in this report to the extent that new information is made available through discovery or other means.

I declare that the foregoing is true and correct subject to the laws of perjury of the United States.

Executed in Las Vegas, Nevada, on this 26th day of December 2016.

*Randall A. Snyder*
_____
Randall A. Snyder

# EXHIBIT A

## Randall A. Snyder
## Curriculum Vitae

## Professional Summary

Mr. Snyder has over 30 years of experience in telecommunications network and system architecture, engineering, design and technology. He has expertise in the fields of both wireline and wireless telecommunications networking technology. He has been retained as an expert witness in over 135 cases regarding telecommunications technology including nearly 100 Telephone Consumer Protection Act (TCPA) cases, patent cases and other areas of litigation regarding telecommunications network technology.

Mr. Snyder has taught many classes and seminars on both wireline and wireless telecommunication network technologies and has been a panelist and speaker at numerous conferences at the Institute of Electrical and Electronics Engineers (IEEE) and the Cellular Telecommunications and Internet Association (CTIA). He spent several years developing network technology standards within the American National Standards Institute (ANSI) and the Telecommunications Industry Association (TIA), providing technical contributions and authoring and editing telecommunications proposed standards documents. Most notably, ANSI-93, providing interconnection technology between wireline and wireless telecommunications networks.

Mr. Snyder is the co-author of the McGraw-Hill books "Mobile Telecommunications Networking with IS-41," and "Wireless Telecommunications Networking with ANSI-41, 2nd edition" published in 1997 and 2001, respectively. He holds 29 patents on telecommunications networking technology and has been hired as a consultant by the CTIA, as well as many wireline and wireless telecommunications companies, including Bell Laboratories, IBM, Google, McCaw Cellular, AirTouch, AirTouch International, AT&T Wireless, AT&T Mobility, Lucent, Nokia, Ericsson, Motorola, Samsung, Siemens, Nextwave, MCI, Daewoo, Globalstar, T-Mobile, Sprint, U.S. Cellular, Teleglobe Canada, Teledesic and others. He was also nominated in 2006 for a National Television Arts Emmy Award for Outstanding Achievement in Advanced Media Technology for unique wireless content distribution technology he designed while at Entriq, Inc.

## Subject Matter Expertise

- Wireless and cellular network systems
- Wireless and cellular network architectures
- Network interconnectivity
- GSM, UMTS, LTE and ANSI-41 (CDMA) standards and networks
- Location Based Services (LBS)
- Short Message Service (SMS)
- Multimedia Message Service (MMS)
- Wireless Application Protocol (WAP)

- Call Processing and Calling Features
- Billing Systems Support (BSS)
- Operations, Administration, Maintenance & Provisioning (OAM&P, OSS)
- Signaling System No. 7 (SS7)
- LTE Diameter Signaling
- Multifrequency Signaling
- Automatic Telephone Dialing Systems (ATDS)

## Randall A. Snyder
## Curriculum Vitae

## Notable Expert Witness Engagements

- Retained as Plaintiff's testifying expert witness in *Satterfield v. Simon & Schuster, Inc.* No. 07-16356, D.C. No. CV-06-02893-CW Opinion. Appeal from the United States District Court for the Northern District of California. Opinion remanded by the United States Court of Appeals for the Ninth Circuit. Personally cited in opinion by N.R. Smith, Circuit Judge, June 19, 2009.

  Result of expert opinion greatly expanded the TCPA and was followed by formal FCC Declaratory Rulings citing this case that text messages are calls as defined by the TCPA, and sending messages to a stored electronic list of telephone numbers falls within the definition of an Automatic Telephone Dialing System (ATDS).

- Retained as Plaintiff's testifying expert witness in *Gomez v. Campbell-Ewald Company*. No. 13-55486, D.C. No. 2:10-CV-02007-DMG-CW Opinion. Appeal from the United States District Court for the Central District of California. Opinion vacated by the United States Court of Appeals for the Ninth Circuit. Opinion by Fortunato P. Benavides, Circuit Judge. Filed September 19, 2014. Appellate court opinion upheld by the Supreme Court of the United States. Opinion by Justice Ginsburg, January 20, 2016.

- Retained by the Department of Justice Canada as Plaintiff's consulting expert in *Commissioner of Competition v. Rogers Communications Inc., Bell Canada, Telus Corporation and the Canadian Wireless Telecommunications Association*. Defendants accused of deceptive and misleading marketing practices related to premium text messages leading to improper charging for multimedia content delivery using various mobile billing mechanisms. Case settled favorably for the Canada Competition Bureau in May, 2016.

- Retained by IBM de México as testifying expert witness in *IBM de México Comercialización y Servicios, S. de R.L. de C.V. adverse Iusacell, S.A. de C.V.* International $4B material breach of contract case under the International Chamber of Commerce International Court of Arbitration. A decision is currently being deliberated by the international court.

## Education

| Year | College or University | Degree |
|------|----------------------|--------|
| 1984 | Franklin and Marshall College | B.A., Mathematics (minor in Astronomy) |

> **Randall A. Snyder**
> **Curriculum Vitae**

## Professional Experience

| | |
|---|---|
| From: | January 2007 |
| To: | Present |
| Organization: | Wireless Research Services, LLC; Las Vegas, NV |
| Title: | President and Founder |
| Summary: | Technology and expert witness consulting services. Areas of subject matter expertise include mobile and cellular networking, 2G, 2.5G, 3G, LTE, GSM, ANSI-41, LBS, SMS, MMS, WAP, SS7, Diameter Signaling, Automatic Telephone Dialing Systems (ATDS) and mobile multimedia systems. With this expertise, primary consulting is in the area of system and product analysis, architecture, design, development, management and marketing as well as patent preparation and development, expert reports, expert testimony and litigation support. Particular areas of expert witness experience include patent litigation and the Telephone Consumer Protection Act (TCPA). |

| | |
|---|---|
| From: | September 2007 |
| To: | August 2010 |
| Organization: | Finsphere Corporation; Bellevue, WA |
| Title: | Vice President Product Management & Wireless Engineering |
| Summary: | Was among the first handful of employees at Finsphere prior to Series A funding. As vice president of product management and wireless engineering and a member of the executive management team, was responsible for product management activities and wireless technology solutions for Finsphere's products. These products encompassed mobile location based software-as-a-service (SaaS) products offered primarily to financial institutions and banks. Responsibilities included product requirements and system functionality, strategic planning, R&D of new technologies, wireless network interconnectivity as well as wireless technology for Finsphere's products. Was also responsible for market strategies, white papers and development and management of intellectual property and patent applications. |

| | |
|---|---|
| From: | May 2004 |
| To: | April 2007 |
| Organization: | Entriq, Inc.; Carlsbad, CA |
| Title: | Vice President Product Management |
| Summary: | Was responsible for the entire product management team and system architecture for Entriq's products and services. Products encompassed mobile and broadband pay media applications (specializing in video), digital rights management (DRM) and security solutions, e-commerce and m-commerce systems as well as ad management and delivery solutions for both broadband and mobile media services. Responsibilities also included network and protocol analysis, market analysis, evaluation of third-party software and services, all vendor contract negotiations, RFP responses and overall administrative responsibility for the entire product line. Was responsible for directing |

and managing the technical writing department producing all user documentation associated with the products. Was nominated for a National Television Arts and Sciences Emmy Award for Outstanding Achievement in Advanced Media Technology for unique mobile technology designed, developed and commercially deployed as part of Entriq's solution.

| | |
|---|---|
| From: | February 2002 |
| To: | November 2003 |
| Organization: | m-Qube, Inc. (acquired by Verisign); Boston, MA |
| Title: | Vice President Product Management and Carrier Marketing and Founder |
| Summary: | Was responsible for the entire product management and carrier marketing teams, member of the executive management team and one of the founders. Was responsible for all product management, system engineering and product strategy for all business conducted with the wireless industry and carriers. Was in charge of the market strategy and wireless network architecture for m-Qube's mobile marketing service, a value-added service offering mobile marketing solutions to wireless carriers using short message services (SMS) for GSM and CDMA networks. The service architecture enabled branded companies to deploy promotional marketing and messaging campaign dialogs with mobile subscribers via SMS. The network architecture required definition and design of all aspects of the overall network including SMS technology, interconnectivity to the wireless carriers, signaling, traffic management, market requirements for features and services, network equipment specifications and OA&M. |

| | |
|---|---|
| From: | April 2001 |
| To: | February 2002 |
| Organization: | Bitfone Corporation; Mountain View, CA |
| Title: | Vice President Product Management and Marketing |
| Summary: | Was responsible for the entire product management team and all of the company's product definitions, strategies and positioning. Had direct responsibility for market and product requirements, market research, competitive analysis, product strategy and sales strategy. Bitfone's products included the iBroker, a mobile Internet technology infrastructure platform to enhance WAP, MMS, mobile e-mail and wireless messaging. Was also responsible for the mProve product (obtained via merger with Digital Transit, Inc.) providing over-the-air firmware and software update technology to mobile devices. |

| | |
|---|---|
| From: | November 2000 |
| To: | April 2001 |
| Organization: | Openwave Systems (via merger of Phone.com and Software.com); Redwood City, CA |
| Title: | Executive Director Emerging Technologies |
| Summary: | Was responsible for new 3G technologies and providing market and product plans for those technologies for the entire product line. Primary responsibility for the 3GPP Multimedia Messaging Service (MMS), collecting market requirements from customers, developing corporate strategy for MMS and preparing the organization for |

<div style="border:1px solid black; text-align:center;">

**Randall A. Snyder**
**Curriculum Vitae**

</div>

additional development of the product. In addition, taught wireless technology classes to the different departments at Openwave and educated them on wireless service provider strategies and network technologies.

| | |
|---|---|
| From: | March 2000 |
| To: | November 2000 |
| Organization: | @Mobile and Software.com (via acquisition); Santa Barbara, CA |
| Title: | Director Wireless Product Management |
| Summary: | Was responsible for the product managers and for all of the wireless internet infrastructure products. Responsibilities included the overall market and product strategy for Software.com's wireless e-mail, short message service, instant messaging and unified messaging products. Was responsible for the overall revenues generated from these products based on detailed product plans and internal organizational planning. Much of his time was spent working with the executive management team and the sales directors on corporate market strategy. |

| | |
|---|---|
| From: | December 1999 |
| To: | March 2000 |
| Organization: | FreeSpace Communications, Inc.; Palo Alto, CA |
| Title: | Consulting Network Systems Engineer |
| Summary: | Was responsible for the complete design of the backbone network architecture for a new broadband fixed wireless data network. This new architecture incorporated DSL as the backbone network technology. The network architecture required definition and design of all aspects of the overall network plan including DSL technology, IP technology, ATM technology, interconnectivity to the PSTN, operations signaling, traffic engineering, market requirements for network features and services, network equipment specifications and OA&M. |

| | |
|---|---|
| From: | April 1992 |
| To: | December 1999 |
| Organization: | Synacom Technology, Inc.; San Jose, CA |
| Title: | Executive Director Product Marketing and Management |
| Summary: | |

1998 – 1999    Executive Director Product Marketing and Management

- Responsible for managing the entire product management and marketing department of Synacom Technology, including market research and planning, product management and market communications. Lead the entire design, definition and product direction of all aspects of Synacom's products.

1997 – 1998    Director Systems Engineering

- Responsible for coordinating and managing the overall functional and requirements specifications for all Synacom's products as well as the detailed test

**Randall A. Snyder**
**Curriculum Vitae**

plans used for alpha system testing of those products. Also responsible for directing and managing the technical writing department producing all of the user documentation associated with all of the products. Provided the primary sales engineering support for sales and marketing and was involved in nearly every aspect of the product lifecycle.

1996 – 1997        Director Consulting Services and Principal Engineer

- Responsible for obtaining, coordinating and managing all technical consulting projects performed by the company. These projects included wireless network architecture and design for both IS-41 and GSM networks for dozens of client companies (carriers and equipment manufacturers). In this role, continued as a member of both the ANSI/TIA TR45.2 Subcommittee for cellular radio intersystem operations standards and the ANSI/TIA TR46 Committee for 1900 MHz GSM PCS standards. Major contributor to TR46 in the area of GSM-to-IS-41 network interworking. Also authored, edited and published TIA standard specification IS-93 for cellular network interconnections to the PSTN and ISDN.

1992 – 1996        Principal Engineer

- Consulted for McCaw Cellular, AT&T Wireless, AirTouch Cellular, AirTouch Satellite Services, Globalstar, Nokia, MCI, Sprint PCS, XYPoint, NextWave, NewNet American Personal Communications, CTIA and several other national and international wireless telecommunications companies.

- Wrote wireless network design and analysis papers including HLR specifications, Authentication Center specifications, PCS network design, short message service (SMS) design, intelligent network applications of wireless technology and in-house expert in signaling protocols. Extensive experience with Signaling System No. 7, including both protocol implementation and design. Authored the Standard Requirements Document for the SS7-based A-interface between the base station and MSC used throughout the TIA. Also involved in the design of the Bellcore WACS/PACS technology, digital cellular network service and feature descriptions, SCPs and HLRs. Extensive experience developing the architecture and design of distributed intelligent networks including, SS7, cellular, PCS, AIN and WIN networks. Key member of the original Cellular Digital Packet Data (CDPD) architecture and design team. Designed the CDPD air interface protocol emulator developed and marketed by AirLink Communications, Inc.

From:          December 1990
To:            April 1992
Organization:  AT&T Bell Laboratories; Whippany, NJ
Title:         Consulting Member of the Technical Staff
Summary:       Evaluated wireless technology services for the Wireless Systems Architecture group. Also participated as a system engineer on the design of the Global System for Mobile (GSM) communication architecture and a software engineer developing the base station controller (BSC) for GSM. Also responsible for planning, coordinating, designing and testing the SS7 protocol software for the GSM A-interface between the BSC, MSC and operations and maintenance center (OMC). High-level and detailed

┌─────────────────────────────────┐
│       **Randall A. Snyder**     │
│       **Curriculum Vitae**      │
└─────────────────────────────────┘

design specifications were developed to coordinate the protocol testing between two remote laboratories. Provided the traffic analysis and traffic engineering of call traffic for the BSC. Specifically designed and developed the dynamic traffic overload control subsystem for the BSC. Presentations were given to technical staffs at multiple Bell Laboratories facilities supporting this work.

From:          May 1987
To:            December 1990
Organization:  DGM&S, Inc.; Mt. Laurel, NJ
Title:         Senior Staff Consultant
Summary:       Responsible for the design, development and test coordination of an advanced intelligent network applications platform for a service control point (SCP). Also spent several years as a consulting software engineer for Siemens AG, developing and testing SS7 and call control software for the EWSD digital switching system for international as well as U.S. national network implementations. This work involved extensive travel to both Frankfurt and Munich, Germany for software system design and testing. Also involved in the concept, design and technical marketing of proprietary enabling technology software products for SS7 and ISDN.

From:          May 1986
To:            May 1987
Organization:  ADP, Inc.; Mt. Laurel, NJ
Title:         Senior Software Engineer and Analyst
Summary:       Responsible for the design and development of data communications and real time database application software for a host data center that provided real time financial information to large brokerage houses. Data communication protocol expertise in HDLC, RS-232 and IBM BiSync.

From:          June 1984
To:            May 1986
Organization:  C3, Inc.; Cape May, NJ
Title:         Consulting Systems Analyst and Software Engineer
Summary:       Civilian consulting systems analyst and engineer to the U.S. Coast Guard Electronics Engineering Center (EECEN) for C3, Inc. Developed sophisticated database software for shipboard use including inventory and law enforcement applications. The work included the follow-through of the entire project lifecycle including writing of requirements, functional, design and program specifications, coding, debugging, alpha and beta testing, release, shipboard installation and continuing technical support of the product. Received a personal commendation from Admiral W.F. Merlin, Chief, Office of Command, Control and Communications, for successful efforts on these projects.

| Randall A. Snyder |
| Curriculum Vitae |

---

## Professional Affiliations, Achievements & Awards

- Personal commendation from Admiral W.F. Merlin, Chief, Office of Command, Control and Communications, USCG (1986)
- Nominated, Technology and Engineering Emmy Award for Outstanding Achievement in Advanced Media Technology, 2006

---

## Patents, Publications & Citations

### Issued Patents

| Patent | Date | Description |
|---|---|---|
| US 9,185,123 | 11/10/2015 | Systems and Method for Mobile Identity Protection for Online User Authentication |
| US 9,154,952 | 10/6/2015 | Systems and Methods for Authenticating a User of a Computer Application, Network, or Device Using a Wireless Device |
| US 9,092,803 | 7/28/2015 | System and Method to Initiate a Mobile Data Communication Utilizing a Trigger System |
| US 8,954,102 | 2/10/2015 | System and Method for Determining and Delivering Appropriate Multimedia Content to Data Communication Devices |
| US 8,938,215 | 1/20/2015 | System and Method to Initiate a Mobile Data Communication Utilizing a Trigger System |
| US 8,923,902 | 12/30/2014 | Mobile Messaging Short Code Translation and Routing System and Method |
| US 8,839,394 | 9/16/2014 | Systems and Methods for Authenticating a User of a Computer Application, Network, or Device Using a Wireless Device |
| US 8,831,564 | 9/9/2014 | System and Method for Mobile Identity Protection Using Mobile Device Signaling Network Derived Location Pattern Recognition |
| US 8,819,141 | 8/26/2014 | Centralized Mobile and Wireless Messaging Opt-out Registry System and Method |
| US 8,761,732 | 6/24/2014 | System and Method to Initiate a Mobile Data Communication Utilizing a Trigger System |
| US 8,670,753 | 3/11/2014 | System and Method for Determining and Delivering Appropriate Multimedia Content to Data Communication Devices |
| Israel 200949 | 1/10/2014 | System and Method for Automated Analysis Comparing a Wireless Device Location with Another Geographic Location |
| Mexico 308720 B | 12/4/2013 | Sistema y Metodo para el Analisis Automatizado que Compara una Ubicacion del Dispositivo Inalambrico con Otra Ubicacion Geografica |

<div style="text-align:center; border:1px solid black;">

**Randall A. Snyder
Curriculum Vitae**

</div>

| | | |
|---|---|---|
| US 8,588,748 | 11/19/2013 | System and Method for Mobile Identity Protection of a User of Multiple Computer Applications, Networks or Devices |
| US 8,437,784 | 5/7/2013 | System and Method to Initiate a Mobile Data Communication Utilizing a Trigger System |
| US 8,374,634 | 2/12/2013 | System and Method for Automated Analysis Comparing a Wireless Device Location with Another Geographic Location |
| US 8,280,348 | 10/2/2012 | System and Method for Mobile Identity Protection Using Mobile Device Signaling Network Derived Location Pattern Recognition |
| US 8,155,677 | 4/10/2012 | Mobile Messaging Short Code Translation and Routing System and Method |
| New Zealand 580499 | 8/31/2012 | System and Method for Automated Analysis Comparing a Wireless Device Location with Another Geographic Location |
| US 8,131,262 | 3/6/2010 | System and Method to Initiate a Mobile Data Communication Utilizing a Trigger System |
| US 8,116,731 | 2/14/2012 | System and Method for Mobile Identity Protection of a User of Multiple Computer Applications, Networks or Devices |
| Australia 2008/115299 | 2/9/2012 | System and Method for Automated Analysis Comparing a Wireless Device Location with Another Geographic Location |
| S. Africa 2009/06947 | 1/26/2011 | System and Method for Automated Analysis Comparing a Wireless Device Location with Another Geographic Location |
| US 7,792,518 | 9/7/2010 | System and Method to Initiate a Mobile Data Communication Utilizing a Trigger System |
| US 7,403,788 | 7/22/2008 | System and Method to Initiate a Mobile Data Communication Utilizing a Trigger System |
| US 6,128,389 | 10/3/2000 | Authentication Key Management System and Method |
| US 5,970,144 | 10/19/1999 | Secure Authentication-Key Management System and Method for Mobile Communications |
| US 5,850,445 | 12/15/1998 | Authentication Key Management System and Method |
| US 5,799,084 | 8/25/1998 | System and Method for Authenticating Cellular Telephonic Communication |

## Publications

1. What Workers Want from Wireless by Randall A. Snyder; April 15, 2004. America's Network, Advantar Communications, Santa Ana, California USA.

2. Snyder, Randall A. and Gallagher, Michael D. Wireless Telecommunications Networking with ANSI-41 Second Edition; McGraw-Hill, New York, NY USA; © Copyright 2001 Randall A. Snyder and Michael D. Gallagher. *Foreword by Tom Wheeler, current Chairman, Federal Communications Commission.*

3. Forecasting SS7 Traffic by Randall A. Snyder; November 1, 2000. Wireless Review, Volume 17, Number 21, Intertec Publishing, Overland Park, KS USA.

4. Gallagher, Michael D. and Snyder, Randall A. Mobile Telecommunications Networking with IS-41; McGraw-Hill, New York, NY USA; © Copyright 1997 Michael D. Gallagher and Randall A. Snyder.

5. IS-41/GSM Interoperability by Randy Snyder; December, 1995, Cellular Networking Perspectives, Cellular Networking Perspectives, LTD, Calgary, Alberta, Canada.

> **Randall A. Snyder**
> **Curriculum Vitae**

## Citations

1. Commendation from Admiral W.F. Merlin, Chief, Office of Command, Control and Communications, USCG (1986).

2. Method and Apparatus for Routing Short Messages, US Patent #6308075, Issued October 23, 2001.

3. Mediation Software for Delivery of Interactive Mobile Messaging and Personalized Content to Mobile Devices. Patent Application # 20020120779, August 29, 2002.

4. Automatic In-Line Messaging System, US Patent #6718178, Issued April 6, 2004.

5. Method and System for Wireless Instant Messaging, US Patent #7058036, Issued June 6, 2006.

6. United States Court of Appeals for the Ninth Circuit. Satterfield v. Simon & Schuster, Inc. No. 07-16356, D.C. No. CV-06-02893-CW Opinion. Appeal from the United States District Court for the Northern District of California. Opinion by N.R. Smith, Circuit Judge. Filed June 19, 2009.

## Randall A. Snyder
## Curriculum Vitae

## Litigation Support Experience

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 related to unlawful cellular telephone calls |
| Law Firm: | Law Office of Michael A. Ziegler, P.L. |
| Case Name: | Francescutti v. The CBE Group, Inc. |
| Services Provided: | Testifying expert for plaintiff |
| Disposition: | Ongoing |
| Date: | 2016 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 related to unlawful cellular telephone calls |
| Law Firm: | Haines & Krieger, LLC |
| Case Name: | Self-Forbes v. Advanced Call Center Technologies, LLC |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Ongoing |
| Date: | 2016 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology |
| Law Firm: | Engstrom, Lipscomb & Lack |
| Case Name: | Nghiem v. Dick's Sporting Goods, Inc. |
| Services Provided: | Testifying expert for plaintiff |
| Disposition: | Ongoing |
| Date: | 2016 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Intellectual property (patents) related to short message service (SMS) technology |
| Law Firm: | United States Department of Justice (DOJ) |
| Case Name: | CellCast Technologies, LLC v. The United States of America |
| Services Provided: | Testifying expert, expert reports for defendant |
| Disposition: | Ongoing |
| Date: | 2016 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 related to unlawful cellular telephone calls |
| Law Firm: | McGuire Law, P.C. |
| Case Name: | Katz v. American Honda Motor Co., Inc. |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Ongoing |
| Date: | 2016 |

```
┌─────────────────────────────────┐
│         Randall A. Snyder        │
│         Curriculum Vitae         │
└─────────────────────────────────┘
```

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 related to unlawful cellular telephone calls |
| Law Firm: | Bursor & Fisher, P.A. |
| Case Name: | Morris v. SolarCity Corp. |
| Services Provided: | Testifying expert for plaintiff |
| Disposition: | Ongoing |
| Date: | 2016 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology |
| Law Firm: | Keller Rohrback, L.L.P. |
| Case Name: | Wick v. Twilio, Inc. |
| Services Provided: | Consulting expert for plaintiff |
| Disposition: | Ongoing |
| Date: | 2016 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 related to unlawful cellular telephone calls |
| Law Firm: | Edelman, Combs, Latturner & Goodwin, LLC |
| Case Name: | Bailey v. Santander Consumer USA, Inc. |
| Services Provided: | Testifying expert, expert reports, depositions for plaintiff |
| Disposition: | Settled |
| Date: | 2016 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful cellular telephone calls |
| Law Firm: | Bailey & Glasser LLP |
| Case Name: | Newhart v. Quicken Loans, Inc. et al. |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Ongoing |
| Date: | 2016 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 related to unlawful cellular telephone calls |
| Law Firm: | Manchee & Manchee, PC |
| Case Name: | Gibbs v. Ocwen Loan Servicing, LLC |
| Services Provided: | Testifying expert for plaintiff |
| Disposition: | Ongoing |
| Date: | 2016 |

*Expert Engagement:*

<div style="border:1px solid black; text-align:center">

**Randall A. Snyder**
**Curriculum Vitae**

</div>

Type of Matter:        Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 related to
                       unlawful cellular telephone calls
Law Firm:              Maney & Gordon, P.A.
Case Name:             Holland v. Keesler Federal Credit Bureau
Services Provided:     Testifying expert, expert reports, depositions for plaintiff
Disposition:           Ongoing
Date:                  2016

*Expert Engagement:*
Type of Matter:        Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                       related to short message service (SMS) technology
Law Firm:              McGuire Law, P.C.
Case Name:             Spencer v. Kohl's Department Stores, Inc.
Services Provided:     Testifying expert, expert reports for plaintiff
Disposition:           Ongoing
Date:                  2016

*Expert Engagement:*
Type of Matter:        Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                       related to unlawful cellular telephone calls
Law Firm:              Parisi & Havens LLP
Case Name:             Slovin v. SunRun. Inc.
Services Provided:     Testifying expert for plaintiff
Disposition:           Ongoing
Date:                  2016

*Expert Engagement:*
Type of Matter:        Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 related to
                       unlawful cellular telephone calls
Law Firm:              Law Office of Chris R. Miltenberger, PLLC
Case Name:             Harrington v. RoundPoint Mortgage Servicing Corporation
Services Provided:     Testifying expert for plaintiff
Disposition:           Ongoing
Date:                  2016

*Expert Engagement:*
Type of Matter:        Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 related to short
                       message service (SMS) technology
Law Firm:              Law Office of Troy D. Krenning, LLC
Case Name:             Newton v. Comdata, Inc.
Services Provided:     Testifying expert for plaintiff
Disposition:           Settled
Date:                  2016

*Expert Engagement:*
Type of Matter:        Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 related to
                       unlawful cellular telephone calls

> **Randall A. Snyder**
> **Curriculum Vitae**

Law Firm:           Bursor & Fisher, P.A.
Case Name:          Yerkes v. RGS, Financial, Inc.
Services Provided:  Testifying expert for plaintiff
Disposition:        Settled
Date:               2016

*Expert Engagement:*
Type of Matter:     Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                    related to short message service (SMS) technology
Law Firm:           Manning Law APC
Case Name:          Vizcarra v. Macys.com Inc. et al.
Services Provided:  Testifying expert, expert reports for plaintiff
Disposition:        Settled
Date:               2016

*Expert Engagement:*
Type of Matter:     Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 related to
                    unlawful cellular telephone calls
Law Firm:           Sulaiman Law Group, Ltd.
Case Name:          Deaderick v. Contract Callers, Inc.
Services Provided:  Testifying expert for plaintiff
Disposition:        Withdrawn
Date:               2016

*Expert Engagement:*
Type of Matter:     Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                    related to short message service (SMS) technology
Law Firm:           McGuire Law, P.C.
Case Name:          Zeidel v. A&M (2015) LLC
Services Provided:  Testifying expert, expert reports for plaintiff
Disposition:        Ongoing
Date:               2015 – 2016

*Expert Engagement:*
Type of Matter:     Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                    related to unlawful cellular telephone calls
Law Firm:           Marquis Aurbach Coffing
Case Name:          Fisher v. MJ Christensen Jewelers, LLC
Services Provided:  Testifying expert, expert reports for plaintiff
Disposition:        Ongoing
Date:               2015 – 2016

Type of Matter:     Competition Act, § 74.1 R.S.C. 1985, c. C-34 class action related to false and
                    misleading advertisements related to premium text messaging and short message
                    service (SMS) technology
Law Firm:           Department of Justice Canada
Case Name:          Commissioner of Competition v. Rogers Communications Inc., Bell Canada,

<div style="border:1px solid black; text-align:center">

**Randall A. Snyder**
**Curriculum Vitae**

</div>

Services Provided:    Telus Corporation and the Canadian Wireless Telecommunications Association
Consulting expert for plaintiff
Disposition:    Settled
Date:    2013 – 2016

*Expert Engagement:*
Type of Matter:    Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 related to unlawful cellular telephone calls
Law Firm:    Maney & Gordon, P.A.
Case Name:    Ritter v. Wells Fargo Bank, N.A.
Services Provided:    Testifying expert for plaintiff
Disposition:    Settled
Date:    2015

*Expert Engagement:*
Type of Matter:    Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology
Law Firm:    Bock & Hatch, LLC
Case Name:    Kozlow v. Shopkick, Inc.
Services Provided:    Testifying expert for plaintiff
Disposition:    Withdrawn
Date:    2015

*Expert Engagement:*
Type of Matter:    Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful cellular telephone calls
Law Firm:    Edelson PC
Case Name:    Suttles v. Mutual of Omaha Insurance Company
Services Provided:    Testifying expert, expert reports for plaintiff
Disposition:    Ongoing
Date:    2015

*Expert Engagement:*
Type of Matter:    Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 related to unlawful cellular telephone calls
Law Firm:    Manchee & Manchee, PC
Case Name:    Gebray v. Ocwen Loan Servicing, LLC
Services Provided:    Testifying expert, expert reports for plaintiff
Disposition:    Ongoing
Date:    2015

*Expert Engagement:*
Type of Matter:    California Invasion of Privacy Act (Penal Code §§ 630) class action related to unlawful recording of telephone conversations
Law Firm:    Keller Grover LLP and Law Offices of Scot D. Bernstein
Case Name:    Saunders v. Cabela's Incorporated
Services Provided:    Testifying expert, expert reports for plaintiff

```
┌─────────────────────────────┐
│      Randall A. Snyder       │
│      Curriculum Vitae        │
└─────────────────────────────┘
```

Disposition:          Settled
Date:                 2015

*Expert Engagement:*
Type of Matter:       Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                      related to short message service (SMS) technology
Law Firm:             McGuire Law, P.C.
Case Name:            Lozano v. Avenue Stores, LLC
Services Provided:    Consulting expert for plaintiff
Disposition:          Settled
Date:                 2015

*Expert Engagement:*
Type of Matter:       Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                      related to short message service (SMS) technology
Law Firm:             Bailey & Glasser LLP
Case Name:            Phillips v. Mozes, Inc. et al.
Services Provided:    Testifying expert, expert reports, depositions for plaintiff
Disposition:          Settled
Date:                 2015

*Expert Engagement:*
Type of Matter:       Intellectual property (patents) related to mobile location based technology and
                      short message service (SMS) technology
Law Firm:             Knobbe, Martens, Olson & Bear, LLP
Case Name:            TeleCommunication Systems, Inc. v. Airbus DS Communications, Inc.
Services Provided:    Testifying expert for defendant
Disposition:          Settled
Date:                 2015

*Expert Engagement:*
Type of Matter:       Intellectual property (patents) related to machine-to-machine (M2M) mobile
                      technology
Law Firm:             Paul Hastings LLP
Case Name:            M2M Solutions LLC v. Novatel Wireless Solutions, Inc.
Services Provided:    Testifying expert, USPTO affidavits for patent reexamination for defendant
Disposition:          Ongoing
Date:                 2015

*Expert Engagement:*
Type of Matter:       Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                      related to short message service (SMS) technology
Law Firm:             Mazie Slater Katz & Freeman LLC
Case Name:            Meyer v. Bebe Stores Inc.
Services Provided:    Testifying expert for plaintiff
Disposition:          Ongoing

**Randall A. Snyder**
**Curriculum Vitae**

Date:                    2015

*Expert Engagement:*
Type of Matter:          Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                         related to short message service (SMS) technology
Law Firm:                Strategic Legal Practices, APC
Case Name:               Haghayeghi v. Guess Inc.
Services Provided:       Testifying expert for plaintiff
Disposition:             Ongoing
Date:                    2015

*Expert Engagement:*
Type of Matter:          Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 related to
                         unlawful cellular telephone calls
Law Firm:                Bailey & Glasser LLP
Case Name:               Stein v. Monterey Financial Services, Inc.
Services Provided:       Testifying expert, expert reports for plaintiff
Disposition:             Ongoing
Date:                    2015

*Expert Engagement:*
Type of Matter:          Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 related to
                         unlawful cellular telephone calls
Law Firm:                Aronovitz Law
Case Name:               McKee v. Navient Solutions, Inc.
Services Provided:       Testifying expert for plaintiff
Disposition:             Ongoing
Date:                    2015

*Expert Engagement:*
Type of Matter:          Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                         related to short message service (SMS) technology
Law Firm:                Butsch Roberts & Associates, LLC
Case Name:               Moore v. Family Dollar Stores, Inc.
Services Provided:       Testifying expert, expert reports for plaintiff
Disposition:             Settled
Date:                    2015

*Expert Engagement:*
Type of Matter:          Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 related to
                         unlawful cellular telephone calls
Law Firm:                Bailey & Glasser LLP
Case Name:               Jones v. FMS Corp., U.S. Department of Education
Services Provided:       Testifying expert for plaintiff
Disposition:             Settled
Date:                    2015

## Randall A. Snyder
## Curriculum Vitae

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology |
| Law Firm: | Tycko & Zavareei LLP |
| Case Name: | Lathrop v. Uber Technologies, Inc. |
| Services Provided: | Testifying expert for plaintiff |
| Disposition: | Ongoing |
| Date: | 2015 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | California Invasion of Privacy Act (Penal Code §§ 630) class action related to unlawful recording of telephone conversations |
| Law Firm: | Keller Grover LLP and Law Offices of Scot D. Bernstein |
| Case Name: | Roberts v. Wyndham International, Inc. |
| Services Provided: | Testifying expert, expert reports, depositions for plaintiff |
| Disposition: | Settled |
| Date: | 2015 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Intellectual property (patents) related to short message service (SMS) technology |
| Law Firm: | Paul Hastings LLP |
| Case Name: | Nova Transforma Technologies, LLC v. AT&T Mobility LLC |
| Services Provided: | Consulting expert, USPTO affidavits for patent reexamination for defendant |
| Disposition: | Settled |
| Date: | 2015 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 related to unlawful cellular telephone calls |
| Law Firm: | Maney & Gordon, P.A. |
| Case Name: | Drew v. Ocwen Loan Servicing, LLC |
| Services Provided: | Testifying expert, expert reports, depositions, trial testimony for plaintiff |
| Disposition: | Plaintiff obtained statutory damages for willful TCPA violations |
| Date: | 2015 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful cellular telephone calls |
| Law Firm: | Parisi & Havens LLP |
| Case Name: | Kleja v. Transworld Systems, Inc. |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Settled |
| Date: | 2015 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | California Invasion of Privacy Act (Penal Code §§ 630) class action related to unlawful recording of telephone conversations |

<div style="border:1px solid black; text-align:center">

**Randall A. Snyder**
**Curriculum Vitae**

</div>

Law Firm:             Keller Grover LLP and Law Offices of Scot D. Bernstein
Case Name:            McCabe v. Six Continents Hotels, Inc.
Services Provided:    Testifying expert, expert reports, depositions for plaintiff
Disposition:          Settled
Date:                 2015

*Expert Engagement:*

Type of Matter:       Material Breach of Contract
Law Firm:             Hogan Lovells USA LLP
Case Name:            IBM de México Comercialización y Servicios, S. de R.L. de C.V. adverse
                      Iusacell, S.A. de C.V.
Services Provided:    Testifying expert, expert reports for IBM México
Disposition:          Ongoing
Date:                 2014 – 2016

*Expert Engagement:*

Type of Matter:       Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                      related to unlawful cellular telephone calls
Law Firm:             Caddell & Chapman
Case Name:            Hooker v. Sirius XM Radio, Inc.
Services Provided:    Testifying expert for plaintiff
Disposition:          Settled
Date:                 2014 – 2016

*Expert Engagement:*

Type of Matter:       Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                      related to short message service (SMS) technology
Law Firm:             Heyrich Kalish McGuigan, PLLC
Case Name:            Gragg v. Orange Cab Company, Inc. et al
Services Provided:    Testifying expert, expert reports, depositions for plaintiff
Disposition:          Settled
Date:                 2013 – 2016

*Expert Engagement:*

Type of Matter:       Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                      related to unlawful cellular telephone calls
Law Firm:             McGuire Law, P.C.
Case Name:            Valladares v. Blackboard, Inc.
Services Provided:    Testifying expert for plaintiff
Disposition:          Settled
Date:                 2014 – 2015

*Expert Engagement:*

Type of Matter:       Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 related to
                      unlawful cellular telephone calls
Law Firm:             Lemberg & Associates LLC
Case Name:            Hamlett et al v. Santander Consumer USA Inc. et al

<div align="center">

**Randall A. Snyder**
**Curriculum Vitae**

</div>

| | |
|---|---|
| Services Provided: | Testifying expert, expert reports, depositions for plaintiff |
| Disposition: | Settled |
| Date: | 2014 – 2015 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful cellular telephone calls |
| Law Firm: | Parisi & Havens LLP |
| Case Name: | Lofton v. Verizon Wireless LLC |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Settled |
| Date: | 2014 – 2015 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology |
| Law Firm: | McGuire Law, P.C. |
| Case Name: | Spencer v. AT&T Digital Life, Inc. |
| Services Provided: | Testifying expert, expert reports, depositions for plaintiff |
| Disposition: | Settled |
| Date: | 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology |
| Law Firm: | Butsch Roberts & Associates, LLC |
| Case Name: | In re: Life Time Fitness, Inc. |
| Services Provided: | Consulting expert for plaintiff |
| Disposition: | Settled |
| Date: | 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful cellular telephone calls |
| Law Firm: | Morgan & Morgan, P.A. |
| Case Name: | Cauchon v. Whetstone Partners, LLC, d/b/a eTitleLoan |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Settled |
| Date: | 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Intellectual property (patents) related to short message service (SMS) technology |
| Law Firm: | McGuireWoods LLP |
| Case Name: | Comcast Cable Communications, LLC v. Sprint Communications Company L.P. |
| Services Provided: | Consulting expert for defendant |
| Disposition: | Ongoing |
| Date: | 2014 |

| Randall A. Snyder |
|:---:|
| **Randall A. Snyder** |
| **Curriculum Vitae** |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology |
| Law Firm: | Bock & Hatch, LLC |
| Case Name: | Kozlow v. Hangtime, Inc. |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Settled |
| Date: | 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful cellular telephone calls |
| Law Firm: | Parisi & Havens LLP |
| Case Name: | In re Collecto, Inc. |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Ongoing |
| Date: | 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful cellular telephone calls |
| Law Firm: | Edelson PC |
| Case Name: | Birchmeier et al v. Caribbean Cruise Line, Inc. et al |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Settled |
| Date: | 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology |
| Law Firm: | Keogh Law, Ltd. |
| Case Name: | Johnson v. Yahoo! Inc. |
| Services Provided: | Testifying expert, expert reports, depositions for plaintiff |
| Disposition: | Ongoing |
| Date: | 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology |
| Law Firm: | Jacobs Kolton, Chtd. |
| Case Name: | Nunes v. Twitter, Inc. |
| Services Provided: | Consulting expert for plaintiff |
| Disposition: | Ongoing |
| Date: | 2014 |

*Expert Engagement:*

| | |
|---|---|
| **Randall A. Snyder** | |
| **Curriculum Vitae** | |

Type of Matter:          Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                         related to unlawful cellular telephone calls
Law Firm:                Manning Law, PLLC
Case Name:               Manning v. Lendio, Inc.
Services Provided:       Testifying expert for plaintiff
Disposition:             Ongoing
Date:                    2014

*Expert Engagement:*
Type of Matter:          Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                         related to short message service (SMS) technology
Law Firm:                The Law Offices of Joseph R. Manning, Jr.
Case Name:               Vargem v. Tax Defense Partners, LLC
Services Provided:       Testifying expert for plaintiff
Disposition:             Ongoing
Date:                    2014

*Expert Engagement:*
Type of Matter:          Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                         related to unlawful cellular telephone calls
Law Firm:                Steptoe & Johnson PLLC
Case Name:               Cain v. Monitronics, International, Inc.
Services Provided:       Consulting expert for defendant
Disposition:             Ongoing
Date:                    2014

*Expert Engagement:*
Type of Matter:          Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                         related to short message service (SMS) technology and unlawful cellular
                         telephone calls
Law Firm:                Mantese Honigman Rossman and Williamson, P.C.
Case Name:               Glassbrook v. Rose Acceptance, Inc. and First National Bank of America
Services Provided:       Testifying expert, expert reports, depositions for plaintiff
Disposition:             Ongoing
Date:                    2014

*Expert Engagement:*
Type of Matter:          Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                         related to unlawful cellular telephone calls
Law Firm:                Kazerouni Law Group, APC
Case Name:               Iniguez v. The CBE Group, Inc.
Services Provided:       Testifying expert, expert reports for plaintiff
Disposition:             Settled
Date:                    2014

*Expert Engagement:*
Type of Matter:          Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action

| Randall A. Snyder |
| Curriculum Vitae |

related to unlawful cellular telephone calls
Law Firm:               Keogh, Cox & Wilson, Ltd.
Case Name:              Hetherington v. Omaha Steaks, Inc. and Omaha Steaks International, Inc.
Services Provided:      Testifying expert, expert reports for plaintiff
Disposition:            Settled
Date:                   2014

*Expert Engagement:*
Type of Matter:         Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                        related to unlawful cellular telephone calls
Law Firm:               Potter Handy, LLP
Case Name:              Potter v. Bank of America Corporation
Services Provided:      Testifying expert, expert reports for plaintiff
Disposition:            Settled
Date:                   2014

*Expert Engagement:*
Type of Matter:         Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                        related to short message service (SMS) technology
Law Firm:               Lemberg & Associates LLC
Case Name:              Shiyan v. Lucille Roberts Health Clubs, Inc.
Services Provided:      Testifying expert, expert reports for plaintiff
Disposition:            Withdrawn
Date:                   2014

*Expert Engagement:*
Type of Matter:         Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                        related to unlawful cellular telephone calls
Law Firm:               Lemberg & Associates LLC
Case Name:              Meyer v. Receivables Performance Management LLC
Services Provided:      Testifying expert for plaintiff
Disposition:            Settled
Date:                   2014

*Expert Engagement:*
Type of Matter:         Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                        related to unlawful cellular telephone calls
Law Firm:               McGuire Law, P.C.
Case Name:              Murray v. Bill Me Later, Inc.
Services Provided:      Consulting expert for plaintiff
Disposition:            Settled
Date:                   2014

*Expert Engagement:*
Type of Matter:         Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                        related to unlawful cellular telephone calls
Law Firm:               Lemberg & Associates LLC

```
┌─────────────────────────────────┐
│      Randall A. Snyder          │
│      Curriculum Vitae           │
└─────────────────────────────────┘
```

Case Name:          Creel v. GC Services, L.P.
Services Provided:  Testifying expert, expert reports, depositions for plaintiff
Disposition:        Settled
Date:               2014

*Expert Engagement:*
Type of Matter:     Intellectual property (patents) related to short message service (SMS) technology
                    and communication protocols
Law Firm:           White & Case LLP
Case Name:          Nokia Corporation v. Google Inc.
Services Provided:  Testifying expert for defendant
Disposition:        Settled
Date:               2014

*Expert Engagement:*
Type of Matter:     Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                    related to short message service (SMS) technology
Law Firm:           McGuire Law, P.C.
Case Name:          Gomez v. Campbell-Ewald Company
Services Provided:  Consulting expert for plaintiff
Disposition:        Ongoing
Date:               2014

*Expert Engagement:*
Type of Matter:     Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                    related to short message service (SMS) technology
Law Firm:           Francis & Mailman, P.C.
Case Name:          Dominguez v. Yahoo! Inc.
Services Provided:  Testifying expert, expert reports, depositions for plaintiff
Disposition:        Ongoing
Date:               2013 – 2016

*Expert Engagement:*
Type of Matter:     Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                    related to short message service (SMS) technology
Law Firm:           McGuire Law, P.C.
Case Name:          Smith v. Microsoft Corporation
Services Provided:  Testifying expert, expert reports for plaintiff
Disposition:        Ongoing
Date:               2013 – 2016

*Expert Engagement:*
Type of Matter:     Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                    related to unlawful cellular telephone calls
Law Firm:           Lemberg & Associates LLC
Case Name:          Horton v. Cavalry Portfolio Services LLC
Services Provided:  Testifying expert, expert reports, depositions for plaintiff

<div align="center">

**Randall A. Snyder**
**Curriculum Vitae**

</div>

Disposition:            Ongoing
Date:                   2013 – 2014

*Expert Engagement:*
Type of Matter:         Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                        related to short message service (SMS) technology
Law Firm:               Law Office of Scott D. Owens, Esq. and Farmer, Jaffee, Weissing, Edwards,
                        Fistos & Lehrman, P.L.
Case Name:              Legg v. Voice Media Group, Inc.
Services Provided:      Testifying expert, expert reports for plaintiff
Disposition:            Dismissed
Date:                   2013 – 2014

*Expert Engagement:*
Type of Matter:         Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                        related to short message service (SMS) technology
Law Firm:               Edelson LLC
Case Name:              Sterk v. Path, Inc.
Services Provided:      Testifying expert, expert reports for plaintiff
Disposition:            Settled
Date:                   2013 – 2014

*Expert Engagement:*
Type of Matter:         Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                        related to short message service (SMS) technology
Law Firm:               Wooten, Kimbrough & Normand, PA
Case Name:              Murphy v. DCI Biologicals, LLC
Services Provided:      Testifying expert, expert reports for plaintiff
Disposition:            Settled
Date:                   2013 – 2014

*Expert Engagement:*
Type of Matter:         Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                        related to short message service (SMS) technology
Law Firm:               Kazerouni Law Group, APC
Case Name:              Sherman v. Yahoo! Inc.
Services Provided:      Testifying expert, expert reports for plaintiff
Disposition:            Dismissed
Date:                   2013 – 2014

*Expert Engagement:*
Type of Matter:         Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 and Fair Debt
                        Collection Practices Act (FDCPA) 15 U.S.C. 15 § 1692 related to unlawful
                        cellular telephone calls
Law Firm:               Collins & Story, PA
Case Name:              Keen v. Delta Outsource Group, Inc.
Services Provided:      Testifying expert, expert reports, depositions for plaintiff

<div style="border:1px solid black; text-align:center;">

**Randall A. Snyder**
**Curriculum Vitae**

</div>

---

Disposition:        Settled
Date:               2013 – 2014

*Expert Engagement:*
Type of Matter:     Intellectual property (patents) related to short message service (SMS) technology
                    and mobile banking
Law Firm:           Panovia Group LLP
Case Name:          N5 Technologies, LLC v. Capital One, N.A. et al
Services Provided:  Testifying expert, expert reports, depositions for plaintiff
Disposition:        Settled
Date:               2013 – 2014

*Expert Engagement:*
Type of Matter:     Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 and California's
                    Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 class action related to
                    short message service (SMS) technology
Law Firm:           Hartmann and Kananen
Case Name:          Baird v. Sabre, Inc.
Services Provided:  Testifying expert, expert reports for plaintiff
Disposition:        Dismissed
Date:               2013 – 2014

*Expert Engagement:*
Type of Matter:     Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                    related to short message service (SMS) technology and unlawful charging of
                    cellular telephone customers
Law Firm:           Edelson LLC
Case Name:          Lee v. Stonebridge Life Insurance Company
Services Provided:  Testifying expert, expert reports, depositions for plaintiff
Disposition:        Settled
Date:               2012 – 2014

*Expert Engagement:*
Type of Matter:     Intellectual property (patents) related to short message service (SMS) technology
                    and multimedia message service (MMS) technology
Law Firm:           Baker Botts LLP
Case Name:          Intellectual Ventures LLC v. AT&T Mobility LLC, T-Mobile USA, Inc., Sprint
                    Spectrum L.P., US Cellular Corporation
Services Provided:  Testifying expert, expert reports for defendants
Disposition:        Patent withdrawn from litigation
Date:               2012 – 2014

*Expert Engagement:*
Type of Matter:     Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                    related to short message service (SMS) technology
Law Firm:           Keogh Law, Ltd.
Case Name:          Wanca v. LA Fitness International, LLC

---

<div style="text-align:center">

**Randall A. Snyder**
**Curriculum Vitae**

</div>

Services Provided:     Testifying expert, expert reports, depositions for plaintiff
Disposition:           Settled
Date:                  2013

*Expert Engagement:*
Type of Matter:        Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                       related to unlawful cellular telephone calls
Law Firm:              Lemberg & Associates LLC
Case Name:             Penn v. NRA Group, LLC
Services Provided:     Consulting expert for plaintiff
Disposition:           Ongoing
Date:                  2013

*Expert Engagement:*
Type of Matter:        Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                       related to unlawful cellular telephone calls
Law Firm:              Lemberg & Associates LLC
Case Name:             Reed v. GC Services LP
Services Provided:     Consulting expert for plaintiff
Disposition:           Settled
Date:                  2013

*Expert Engagement:*
Type of Matter:        Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                       related to short message service (SMS) technology
Law Firm:              The Lavery Law Firm
Case Name:             Volpe v. Caribbean Cruise Line, Inc.
Services Provided:     Consulting expert for plaintiff
Disposition:           Dismissed
Date:                  2013

*Expert Engagement:*
Type of Matter:        Washington Consumer Protection Act, RCW 19.86 and RCW 80.36.400 related
                       to unfair business practices and unlawful cellular telephone calls
Law Firm:              Williamson and Williams Law
Case Name:             Kids Northwest v. First Data Corporation
Services Provided:     Consulting expert for plaintiff
Disposition:           Ongoing
Date:                  2013

*Expert Engagement:*
Type of Matter:        Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                       related to short message service (SMS) technology
Law Firm:              George Rikos Law
Case Name:             Van Patten v. Vertical Fitness
Services Provided:     Testifying expert, expert reports for plaintiff
Disposition:           Ongoing

| Randall A. Snyder |
| Curriculum Vitae |

Date:                2013

*Expert Engagement:*
Type of Matter:      Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 and California
                     Business and Professions Code § 17200 class action related to short message
                     service (SMS) technology
Law Firm:            Milberg LLP
Case Name:           D'Agostino v. Jesta Digital, LLC (dba Jamster)
Services Provided:   Testifying expert, expert reports for plaintiff
Disposition:         Settled
Date:                2013

*Expert Engagement:*
Type of Matter:      Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 and Restrictions
                     on Telemarketing, Telephone Solicitation, and Facsimile Advertising 47 C.F.R.
                     § 64.1200(d)(3) class action related to unlawful cellular telephone calls
Law Firm:            Burke Law Offices, LLC
Case Name:           Benzion v. Vivint, Inc.
Services Provided:   Testifying expert, expert reports, depositions for plaintiff
Disposition:         Settled
Date:                2013

*Expert Engagement:*
Type of Matter:      Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                     related to unlawful cellular telephone calls
Law Firm:            Lemberg & Associates LLC
Case Name:           Rutigliano v. Convergent Outsourcing, Inc.
Services Provided:   Testifying expert, expert reports for plaintiff
Disposition:         Ongoing
Date:                2013

*Expert Engagement:*
Type of Matter:      Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                     related to short message service (SMS) technology
Law Firm:            Kazerouni Law Group, APC
Case Name:           Emanuel v. The Los Angeles Lakers, Inc.
Services Provided:   Testifying expert, expert reports for plaintiff
Disposition:         Dismissed
Date:                2013

*Expert Engagement:*
Type of Matter:      Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                     related to short message service (SMS) technology
Law Firm:            Kazerouni Law Group, APC
Case Name:           Barani v. Wells Fargo Bank, N.A.
Services Provided:   Consulting expert for plaintiff
Disposition:         Settled

> ### Randall A. Snyder
> ### Curriculum Vitae

Date:                        2013

*Expert Engagement:*
Type of Matter:       Intellectual property (patents) related to wireless calling party identification
                        technology
Law Firm:             K&L Gates LLP
Case Name:            Cequint Inc. v. Apple Inc.
Services Provided:    Consulting expert for plaintiff
Disposition:          Settled
Date:                 2013

*Expert Engagement:*
Type of Matter:       Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                        related to unlawful cellular telephone calls
Law Firm:             Donald A. Yarbrough, Esq.
Case Name:            Mais v. Gulf Coast Collection Bureau, Inc.
Services Provided:    Testifying expert, expert reports for plaintiff
Disposition:          Dismissed on appeal
Date:                 2013

*Expert Engagement:*
Type of Matter:       Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                        related to unlawful cellular telephone calls
Law Firm:             Donald A. Yarbrough, Esq.
Case Name:            Manno v. Healthcare Revenue Recovery Group, LLC
Services Provided:    Testifying expert, expert reports, depositions for plaintiff
Disposition:          Settled
Date:                 2013

*Expert Engagement:*
Type of Matter:       Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                        related to short message service (SMS) technology and unlawful charging of
                        cellular telephone customers
Law Firm:             Law Office of Scott D. Owens, Esq.
Case Name:            Wojcik v. Buffalo Bills, Inc.
Services Provided:    Testifying expert, expert reports for plaintiff
Disposition:          Settled
Date:                 2012 – 2013

*Expert Engagement:*
Type of Matter:       Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                        related to short message service (SMS) technology and unlawful charging of
                        cellular telephone customers
Law Firm:             Law Office of Scott D. Owens, Esq.
Case Name:            Keim v. ADF Midatlantic, LLC (Pizza Hut)
Services Provided:    Testifying expert for plaintiff
Disposition:          Ongoing

| | |
|---|---|
| **Randall A. Snyder** | |
| **Curriculum Vitae** | |

Date:                          2012 – 2013

*Expert Engagement:*
Type of Matter:          Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                               related to unlawful cellular telephone calls
Law Firm:                  Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP
Case Name:               Connelly v. Hilton Grand Vacations Company, LLC
Services Provided:      Testifying expert, expert reports, depositions for defendant
Disposition:              Dismissed
Date:                          2012 – 2013

*Expert Engagement:*
Type of Matter:          Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                               related to short message service (SMS) technology
Law Firm:                  Kirby Law Group
Case Name:               Agne v. Papa John's International, Inc. et al
Services Provided:      Consulting expert for plaintiff
Disposition:              Settled
Date:                          2012

*Expert Engagement:*
Type of Matter:          Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action and
                               NY GBL 399-P class action related to unlawful calls
Law Firm:                  Bellin and Associates LLC
Case Name:               Tipoo v. Enhanced Recovery Company, LLC
Services Provided:      Testifying expert for plaintiff
Disposition:              Undisclosed
Date:                          2012

*Expert Engagement:*
Type of Matter:          Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                               related to unlawful calls
Law Firm:                  Burke Law Offices, LLC
Case Name:               Bailey v. Household Finance Corporation et al
Services Provided:      Testifying expert, expert reports for plaintiff
Disposition:              Undisclosed
Date:                          2011 – 2012

*Expert Engagement:*
Type of Matter:          Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action
                               related to short message service (SMS) technology
Law Firm:                  Burke Law Offices, LLC
Case Name:               Annoni v. FYISMS.com, LLC
Services Provided:      Testifying expert, expert reports for plaintiff
Disposition:              Undisclosed
Date:                          2011 – 2012

┌─────────────────────────────────┐
│ **Randall A. Snyder**           │
│ **Curriculum Vitae**            │
└─────────────────────────────────┘

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers |
| Law Firm: | KamberEdelson, LLC |
| Case Name: | Schrock v. Wenner Media LLC |
| Services Provided: | Consulting expert for plaintiff |
| Disposition: | Undisclosed |
| Date: | 2011 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers |
| Law Firm: | Summit Law Group |
| Case Name: | Kramer v. Autobytel, Inc. and B2Mobile, LLC |
| Services Provided: | Consulting expert for defendant |
| Disposition: | Settled |
| Date: | 2011 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Intellectual property (patents) related to wireless location based services (LBS) |
| Law Firm: | Mintz, Levin, Cohn, Ferris, Glovsky and Popeo PC |
| Case Name: | Emsat Geolocation Technology, LLC v. CellCo Limited Partnership (dba Verizon Wireless) et al |
| Services Provided: | Testifying expert, USPTO affidavits for patent reexamination for plaintiff |
| Disposition: | Undisclosed |
| Date: | 2010 – 2011 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful calls |
| Law Firm: | Keogh Law, Ltd. |
| Case Name: | Griffith v. Consumer Portfolio Services, Inc. |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Undisclosed |
| Date: | 2010 – 2011 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful calls |
| Law Firm: | Keogh Law, Ltd. |
| Case Name: | Dobbin v. Wells Fargo Auto Finance, Inc. |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Dismissed |
| Date: | 2010 – 2011 |

<div style="border: 2px solid black; text-align: center;">

**Randall A. Snyder
Curriculum Vitae**

</div>

---

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Intellectual property (patents) related to short message service (SMS) technology |
| Law Firm: | Nelson Bumgardner Casto PC |
| Case Name: | Celltrace LLC v. AT&T Inc. et al |
| Services Provided: | Consulting expert for plaintiff |
| Disposition: | Undisclosed |
| Date: | 2010 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | California Constitution, Article VI, § 10, class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers |
| Law Firm: | KamberEdelson, LLC |
| Case Name: | VanDyke v. Media Breakaway, LLC |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Settled |
| Date: | 2009 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful calls |
| Law Firm: | Gordon & Rees LLP |
| Case Name: | Allen v. Rickenbacker Collection Services |
| Services Provided: | Consulting expert for defendant |
| Disposition: | Undisclosed |
| Date: | 2009 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Intellectual property (trademarks) related to short message service (SMS) technology |
| Law Firm: | Fish & Richardson P.C. |
| Case Name: | Cricket Communications, Inc. v. HipCricket, Inc. |
| Services Provided: | Testifying expert, expert reports, depositions for plaintiff |
| Disposition: | Undisclosed |
| Date: | 2008 – 2009 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | California Constitution, Article VI, § 10, class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers |
| Law Firm: | KamberEdelson, LLC |
| Case Name: | Albrecht v. mBlox, Inc. et al |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Settled |
| Date: | 2008 – 2009 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology |
| Law Firm: | Blim & Edelson, LLC |

<div align="center">

**Randall A. Snyder**
**Curriculum Vitae**

</div>

Case Name:            Satterfield v. Simon & Schuster, Inc.
Services Provided:    Testifying expert, expert reports for plaintiff
Disposition:          Settled
Date:                 2007 – 2009

*Expert Engagement:*
Type of Matter:       Class action related to short message service (SMS) technology and unlawful
                      charging of cellular telephone customers
Law Firm:             KamberEdelson, LLC
Case Name:            Walker v. Motricity, Inc.
Services Provided:    Testifying expert, expert reports, depositions for plaintiff
Disposition:          Settled
Date:                 2008

*Expert Engagement:*
Type of Matter:       Class action related to short message service (SMS) technology and unlawful
                      charging of cellular telephone customers
Law Firm:             KamberEdelson, LLC
Case Name:            Rynearson v. Motricity, Inc.
Services Provided:    Testifying expert, expert reports, depositions for plaintiff
Disposition:          Settled
Date:                 2008

*Expert Engagement:*
Type of Matter:       California Constitution, Article VI, § 10, class action related to short message
                      service (SMS) technology and unlawful charging of cellular telephone customers
Law Firm:             KamberEdelson, LLC
Case Name:            Reed v. Sprint Nextel Corporation
Services Provided:    Testifying expert, expert reports for plaintiff
Disposition:          Settled
Date:                 2008

*Expert Engagement:*
Type of Matter:       Class action related to short message service (SMS) technology and unlawful
                      charging of cellular telephone customers
Law Firm:             KamberEdelson, LLC
Case Name:            Paluzzi v. CellCo Limited Partnership (dba Verizon Wireless) and mBlox. Inc.
Services Provided:    Consulting expert for plaintiff
Disposition:          Settled
Date:                 2008

*Expert Engagement:*
Type of Matter:       Class action related to short message service (SMS) technology and unlawful
                      charging of cellular telephone customers
Law Firm:             KamberEdelson, LLC
Case Name:            Nava v. Predicto Mobile, LLC
Services Provided:    Consulting expert for plaintiff

> **Randall A. Snyder**
> **Curriculum Vitae**

Disposition:            Settled
Date:                   2008

*Expert Engagement:*
Type of Matter:         Class action related to short message service (SMS) technology and unlawful
                        charging of cellular telephone customers
Law Firm:               KamberEdelson, LLC
Case Name:              McFerren v. AT&T Mobility, LLC
Services Provided:      Consulting expert for plaintiff
Disposition:            Settled
Date:                   2008

*Expert Engagement:*
Type of Matter:         California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 class
                        action related to short message service (SMS) technology and unlawful charging
                        of cellular telephone customers
Law Firm:               KamberEdelson, LLC
Case Name:              Guerrero v. MobileFunster, Inc.
Services Provided:      Consulting expert for plaintiff
Disposition:            Settled
Date:                   2008

*Expert Engagement:*
Type of Matter:         Computer Fraud and Abuse Act, 18 U.S.C. Article § 1030, class action related to
                        short message service (SMS) technology and unlawful charging of cellular
                        telephone customers
Law Firm:               KamberEdelson, LLC
Case Name:              Gray v. Mobile Messenger Americas, Inc.
Services Provided:      Consulting expert for plaintiff
Disposition:            Settled
Date:                   2008

*Expert Engagement:*
Type of Matter:         Class action related to short message service (SMS) technology and unlawful
                        charging of cellular telephone customers
Law Firm:               KamberEdelson, LLC
Case Name:              Goddard v. Google, Inc.
Services Provided:      Consulting expert for plaintiff
Disposition:            Settled
Date:                   2008

*Expert Engagement:*
Type of Matter:         Class action related to short message service (SMS) technology and unlawful
                        charging of cellular telephone customers
Law Firm:               KamberEdelson, LLC
Case Name:              Duffy v. Nevis Mobile, LLC
Services Provided:      Consulting expert for plaintiff

**Randall A. Snyder**
**Curriculum Vitae**

Disposition:        Settled
Date:               2008

*Expert Engagement:*
Type of Matter:     Class action related to short message service (SMS) technology and unlawful
                    charging of cellular telephone customers
Law Firm:           KamberEdelson, LLC
Case Name:          Criswell v. MySpace, Inc.
Services Provided:  Testifying expert, expert reports for plaintiff
Disposition:        Undisclosed
Date:               2008

*Expert Engagement:*
Type of Matter:     Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332, 1453 and 28 U.S.C. §
                    1367(a) class action related to short message service (SMS) technology and
                    unlawful charging of cellular telephone customers
Law Firm:           KamberEdelson, LLC
Case Name:          Bradberry v. mBlox, Inc.
Services Provided:  Consulting expert for plaintiff
Disposition:        Settled
Date:               2008

*Expert Engagement:*
Type of Matter:     California Constitution, Article VI, § 10, class action related to short message
                    service (SMS) technology and unlawful charging of cellular telephone customers
Law Firm:           KamberEdelson, LLC
Case Name:          Ayers v. Media Breakaway, LLC
Services Provided:  Testifying expert, expert reports for plaintiff
Disposition:        Settled
Date:               2008

*Expert Engagement:*
Type of Matter:     Intellectual property (patents) related to wireless location based services (LBS)
Law Firm:           Hahn Loeser & Parks, LLC
Case Name:          Emsat Geolocation Technology, LLC v. CellCo Limited Partnership (dba
                    Verizon Wireless) et al
Services Provided:  Consulting expert for plaintiff
Disposition:        Undisclosed
Date:               2008

*Expert Engagement:*
Type of Matter:     Class action related to short message service (SMS) technology and unlawful
                    charging of cellular telephone customers
Law Firm:           Blim & Edelson, LLC
Case Name:          Valdez v. Sprint Nextel Corporation
Services Provided:  Consulting expert for plaintiff
Disposition:        Settled

**Randall A. Snyder**
**Curriculum Vitae**

Date:                         2007

*Expert Engagement:*
Type of Matter:         Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 201 class action
                              related to short message service (SMS) technology and unlawful charging of
                              cellular telephone customers
Law Firm:                Blim & Edelson, LLC
Case Name:             Bradberry v. T-Mobile USA, Inc.
Services Provided:    Testifying expert, expert reports for plaintiff
Disposition:             Settled
Date:                      2007

*Expert Engagement:*
Type of Matter:         California Computer Crime Law, Cal. Pen. Code § 502 and California's Unfair
                              Competition Law, Cal. Bus. & Prof. Code § 17200 class action related to short
                              message service (SMS) technology
Law Firm:                KamberEdelson, LLC
Case Name:             Abrams v. Facebook, Inc.
Services Provided:    Testifying expert, expert reports for plaintiff
Disposition:             Settled
Date:                      2007

*Expert Engagement:*
Type of Matter:         Intellectual property (patents) related to short message service (SMS) technology
Law Firm:                Paul Hastings LLP
Case Name:             TeleCommunication Systems, Inc. v. Mobile365, Inc.
Services Provided:    Testifying expert, expert reports, depositions, trial testimony for defendant
Disposition:             Settled
Date:                      2007



*Wireless Research Services*

Wireless Research Services, LLC
Rate Sheet January 1, 2015

# Wireless Research Services, LLC

## 2015 Rate Sheet

*5931-1*

| ITEM | FEE |
|------|-----|
| Non-refundable Retainer at Time of Engagement | $4,000 |
| Expert Witness Consulting, Expert Reports | $450 per hour |
| Depositions, In-court Testimony | $500 per hour |
| Required Travel, Lodging, Board and Administrative Expenses | $1,000 per airline travel day plus actual incurred expenses |
| Invoicing | Payment due upon receipt |
| Penalty for Late Payments | 10% of total invoice added after each 30 days late until full payment is received |

By signing below and returning an executed copy to Wireless Research Services, LLC along with payment of the non-refundable retainer, you agree to the payment terms contained on this rate sheet.

Agreed to by: _____

Law firm/Company: __Mazie Slater Katz & Freeman, LLC__

Case Name: __Meyer v. Bebe__

Date: __7/6/15__

Page 1 of 1

# EXHIBIT B



Send SMS with BulkSMS.co.uk

# Velti Buys Air2Web for $19m

David Murphy | 26th September 2011

Deals

Mobile marketing firm Velti is buying Air2Web, which provides mobile CRM (mCRM) solutions in the US and India, for $19m (£12.3m) in cash. Velti has also signed a definitive agreement to consummate the previously announced acquisition of the remaining interest in Chinese mobile ad exchange and network, CASEE, for $8.4m.

Velti says it expects to keep in excess of $12m of annualized revenue from the Air2Web acquisition, the majority of which is derived from recurring platform licensing, usage and performance fees. Velti anticipates that Air2Web will generate approximately $3m in revenue and $1m in EBITDA during the fourth quarter of 2011.

Velti will pay an up-front consideration of approximately $8.4m for the remaining interest in CASEE, made up of $3.9m in cash, and, at Velti's discretion at close, $4.5m in cash or common shares of Velti plc. In addition, based upon CASEE's financial performance, Velti may be required to pay total contingent consideration of up to $20.7m. Velti anticipates that CASEE will generate approximately $1.5m in revenue during the fourth calendar quarter of 2011.

"Air2Web's mobile CRM platform is attracting and retaining many of the most marketing-savvy Fortune 1000 brands, including, among others, AT&T, Comcast, American Express, HSBC, Barclays Bank and Citigroup" notes Velti CEO, Alex Moukas. "Through this acquisition, Air2Web's customers can now leverage Velti's comprehensive mobile marketing platform and global capabilities to increase the scope, scale, geographic reach and overall effectiveness of their mobile marketing strategies."

Velti believes that Air2Web's technology and data reach are very complementary to its own mGage platform. The transaction deepens Velti's US footprint, and gives it improved access to carriers and verticals such as the financial services industry. In India, Air2Web expands Velti's footprint in the second largest mobile market by subscribers, providing Velti with a stronger foundation to continue to service the Indian market.

"The lasting partnerships we've built with trusted global brands have proven the strength, reliability and innovation of our mobile CRM platform and carrier-grade messaging infrastructure," says Air2Web president and CEO, Jay Sheth. "Together with Velti, I'm excited to say we now have the industry's leading end-to-end mobile marketing solution."

CASEE, founded in 2006, is the largest mobile ad exchange and mobile ad network in China. Velti acquired 33 per cent of CASEE in 2008, giving the company the ability to execute campaigns for global brands in China. CASEE CEO and co-founder, Xin Ye, will continue to lead Velti's efforts in China through CASEE.

## Latest Jobs in Mobile

Partner Manager

Mobile Solutions Manager – Data Locator Group

Payments Manager – Mobile (Cross Platform) – Social Network

# EXHIBIT C

INTERNET ARCHIVE
WaybackMachine

18 captures
24 Jul 13 – 15 Apr 16

NOV **DEC** FEB
◀ **7** ▶
2012 **2013** 2015

Close ✖
Help ?

http://www.velti.com/mgagemobilemarketing.php   Go

International Sites :



velti

SOLUTIONS   PRODUCTS   RESOURCES   NEWS & EVENTS   INVESTORS   CONTACT US



# TAKING MARKETING FULL FUNNEL

**Mobile-powered marketing, from awareness to customer retention**

mGage   5ML

# TECHNOLOGY THAT KEEPS PACE WITH MOBILE
Easy-to-use tools that put marketing in motion.

http://www.velti.com/mgagemobilemarketing.php Go

NOV **DEC** FEB
◀ **7** ▶
2012 **2013** 2015

Close ✕

Help ?

INTERNET ARCHIVE
WayBack Machine

18 captures
24 Jul 13 – 15 Apr 16

Case 4:17-cv-00287-YGR Document 126 Filed 12/26/16 Page 76 of 185



# The mGage®
# Mobile Marketing Platform

Velti's mGage empowers brands to use mobile to transform their business. Whether it's ad delivery and measurement, cross-channel messaging campaigns, or mobile site development, our secure and scalable platform allows marketers to execute highly personalized, enterprise mobile marketing campaigns. Contact us now to get mGage'd.



# Advanced Ad Serving and Conversion Tracking

Mobile marketing effectiveness has been difficult for marketers to quantify. With a seemingly infinite numbers of apps, sites and networks, not to mention devices and screen resolutions, it can be hard to know what is working. mGage Advertise simplifies conversion tracking and provides insight into campaign performance beyond the impression and click.





# Personalized Customer
# Communication Messaging Platform

With 98% of text messages opened, mobile messaging is one of the most effective methods for engaging today's consumers. Three quarters of consumers prefer to receive offers and coupons via text rather than Mobile Apps and Web. mGage Communicate Pro, a robust, cloud-based carrier-grade messaging platform, offers real-time communication between you and your customers. It enables you to initiate a conversation via SMS, MMS, push notification, Passbook, email and social media channels. For more info, download our Data Sheet or get in touch.



### Multi-Modal Messaging

Use SMS, MMS, email or out-dial to effectively reach your customers. Send push notifications to anyone with your app installed on their phone.



### Passbook & Microsites

Build Passbook passes and microsites for coupons with your brand elements that reach smartphones on all operating systems.



### Multi-Step Programs

A powerful yet simple GUI allows you to build complex, intelligent interactions that deliver personalized and relevant responses to each mobile user.









http://www.velti.com/mgagemobilemarketing.php    Go

INTERNET ARCHIVE
WayBack Machine
18 captures
24 Jul 13 – 15 Apr 16
NOV DEC FEB
2012 7 2015
2013
Close ✖
Help ?



# Massively Mobile Promotions

Velti mGage Excite enables operators, agencies, media groups and brands to conduct robust and scalable mobile promotions on a massive scale. Manage your entire campaign lifecycle from inception to execution, complemented with best practices and unmatched scalability. Encourage customer participation and generate incremental revenue via communications based on your customers behavior and attributes. mGage Excite automatically leverages results to deploy a holistic promotional strategy for brands and operators worldwide. Contact us to take your promotions massively mobile.





### Gamification

Spike user engagement, loyalty and stickiness via fun game mechanics with achievements, appointments, community collaboration, leaderboards, points, status and more.



### Mutli-Channel Opt-In

Maximize efficiency and customer experience by spanning multiple communication channels including SMS, traditional and mobile web, apps, IVR and more.



### Automatic Optimization

Automatically identify and serve the best performing messages to increase playability while improving relevancy, uptake and redemption through intelligent targeting.

# EXHIBIT D



MMA MEMBER LOGIN ? Username Password LOGIN ⚡ JOIN THE MMA

FOLLOW US

Search the site

| About us | Events | Education | Resources | Contact us | Member Center |

home

# Air2Web

**Company Name**
Air2Web

**Logo**

**Address**
Promenade II, 1230 Peachtree Street N.E., 12th Floor
Atlanta, GA 30309

**Business Phone**
+1.404.942.5300

**Business Fax**
+1.404.815.7708

**Website Address**
www.air2web.com

**Company Information**
Air2Web is the leading provider of wireless applications and gateway services, with wireless deployments in over 140 countries on more than 470 carrier networks. Air2Web customers are protected from the complexities of writing multiple applications for multiple devices and networks and benefit from Air2Webs direct connections into carrier networks for creating and executing cross-carrier mobile marketing campaigns. Sample customers include UPS, ABN AMRO, CSX Intermodal, CitiBank, ICICI, InterContinental Hotels Group, and the Weather Channel. For more information see www.air2web.com.

| Home | Events | Education | Resources | Contact us |
| About us | Best Practice | Market Data & Insight | Case Studies | Join us |

FOLLOW US

© 2016 Mobile Marketing Association

Privacy Policy | Press | Site Map | Sponsorships



# Velti

**Company Name**
Velti

**Logo**


**Address**
Steuart Tower, 1 Market St Suite #600
San Francisco, CA 94105

**General Inquiry Email Address**
marketers@velti.com

**Business Phone**
415.315.3400

**Website Address**
www.velti.com

**Company Information**
Velti is the leading global provider of mobile marketing and advertising technology and solutions that enable brands, advertising agencies, mobile operators and media to implement highly targeted, interactive and measurable campaigns by communicating with and engaging consumers via their mobile devices. The Velti platform, called Velti mGage™, allows customers to use mobile and traditional media to reach targeted consumers, engage the consumer through the mobile Internet and applications, convert them into customers and continue to actively manage the relationship through the mobile channel. Velti is a publicly held corporation based in Jersey, and trades on the NASDAQ Global Select Market under the symbol VELT. For more information, visit www.velti.com.

**Additional Office**
44 Kifissias Avenue
Athens, GR 151 25
Greece

**Additional Office**
One Broadway, 14th Floor
Cambridge, MA 02142
United States

Home · Events · Education · Resources · Contact us
About us · Best Practice · Market Data & Insight · Case Studies · Join us

FOLLOW US


  



ABOUT   MEMBER CENTER   PROGRAMS   EVENTS   EDUCATION
RESEARCH & INSIGHTS   CASE STUDIES   JOIN THE MMA   Q

# Velti releases "Mobile Whitebook 2013: Data, trends and best practice", in partnership with Econsultancy

    

**June 26, 2013**

Velti in partnership with Econsultancy publish their latest free mobile whitebook with truly actionable insight, assisting marketers to formulate an effective and accountable mobile strategy to target today's consumers.



Combined research from leading industry statistics, primary data and analytics from Velti's own platforms provides the latest insight into consumer preference, consumer habits and consumer devices. Also included:

·       Latest insight into the changing business landscape.
·       Best practice advice to mobile success.
·       Case studies for Walkers, Samsung, and Vodafone.

Download a free copy now.

## ABOUT

The MMA is the world's leading global non-profit trade association comprised of more than 800 member companies, from nearly fifty countries

    

# EXHIBIT E

G GUIDELINES





# Global Code of Conduct

JULY 15, 2008

**mma**
mobile marketing
association

## Introduction

The Mobile Marketing Association ("MMA") believes that strong consumer privacy standards are essential to the success of mobile marketing by protecting mobile users from unwanted communications on their mobile devices.

It is only through industry support of strong privacy guidelines that the power of mobile marketing can reach its full potential.

Current internet marketing and privacy standards do not adequately address the specific challenges faced by marketers when marketing through the mobile channel. Strong mobile industry privacy principles will protect the mobile channel from abuses by unethical marketers, and limit consumer backlash and additional regulatory scrutiny.

Therefore, the following privacy principles (this "MMA Global Code of Conduct", or "the Code") are intended to guide companies within the mobile ecosystem, including but not limited to: advertisers, aggregators, application providers, carriers, content providers, and publishers, (collectively, "Mobile Marketers"), so that they can effectively, and responsibly, leverage the mobile channel for marketing purposes. The Code is designed to provide guidelines that all Mobile Marketers should consider and build their mobile programs around.

*Note: The Code is not intended to regulate a wireless carrier's ongoing proprietary communication with its current base of subscribers which are already regulated by the applicable national and local law.*

### Summary

This MMA Global Code of Conduct updates the U.S. MMA Code of Conduct created in 2007, with support from the MMA APAC, LATAM and EMEA Board of Directors, and aligns the Code with generally accepted global privacy principles.

The Code describes privacy principles for Mobile Marketers that choose to use user information to market their products and services to those users via mobile devices.

The Code has five categories: Notice, Choice & Consent, Customization & Constraint, Security, and Enforcement & Accountability.

### Notice

Mobile Marketers provide users with Notice. Notice is an easily understandable and quickly discoverable description of the terms and conditions of a marketing program. Notice should include information sufficient to permit a user to make an informed decision about his or her choices on how that information is used for that marketing program.

Notice is the fundamental principle in the MMA Privacy Code of Conduct. Mobile Marketers must inform the user of both the marketers' identity or products and services offered, and the key terms and conditions that govern an interaction between the marketer and the user's mobile device.

### Choice & Consent

Mobile Marketers respect the right of the user to control which mobile messages they receive.

Mobile Marketers ask for and obtain consent by obtaining an explicit opt-in from the user for all mobile messaging programs. This can be accomplished via an SMS or MMS opt-in process, a voice response, website registration, other MMA recognized methods or other legitimate methods.

Mobile Marketers must implement consent (opt-in) for a specific messaging program. Consent is not carried into other programs unless the user has consented to such communications either 1) when they consented to the initial program or 2) upon the commencement of a subsequent messaging program.

Mobile Marketers must implement a simple termination (opt-out) process so that users can stop receiving messages, and users must be able to exercise their opt-out choice from any message. This opt-out must be functionally equivalent to the method used to obtain the opt-in and must be easily discoverable by users. Explanations on how to opt-out of multiple messaging programs must be provided on a reasonably frequent basis.

### Customization & Constraint

#### Customization

Mobile Marketers ensure that mobile marketing reflects broad customer expectations in any applicable national marketplace. Marketing through the mobile channel is most effective when appropriately targeted, and user information collected for marketing purposes should be used to tailor such marketing to the interests of the user when available.

Mobile Marketers must take reasonable steps to ensure that user information they collect for the purpose of delivering targeted advertising is handled responsibly, sensitively and in compliance with applicable law.

#### Constraint

Mobile Marketers should target and limit mobile messages to that which users have requested. Mobile messages should provide value to the user. Value may be delivered in multiple ways, including: product and service enhancements, reminders, sweepstakes, contests, requested information, entertainment, or discounts.

### Security

Mobile Marketers must implement reasonable technical, administrative and physical procedures to protect user information collected in connection with mobile marketing programs from unauthorized use, alteration, disclosure, distribution, or access.

### Enforcement & Accountability

The MMA expects its members to comply with the MMA Global Code of Conduct and has incorporated the Code into

© 2008 Mobile Marketing Association • USA 1670 Broadway, Suite 850, Denver, CO 80202

# EXHIBIT F



# U.S. Consumer Best Practices for Messaging

**Version 7.0**
**V7.0 Publication Date: October 16, 2012**

**Effective Date: October 16, 2012**



# Table of Contents

INTRODUCTION: US CONSUMER BEST PRACTICES FOR MESSAGING........................................4
  Scope: Standard Rate, Premium Rate, and Free to End User...............................................5
  CTIA Audit Standards.................................................................................................5
  References: MMA documents and links for reference purposes..........................................5
  Recent Changes .......................................................................................................6

CROSS CARRIER STANDARDS....................................................................................7

**Section 1: Standard Rate**..........................................................................................7
  *Standard Rate Cross Carrier Guidelines*........................................................................7
    1.0 General Guidelines............................................................................................7
    1.1 Messaging Frequency Guidelines...........................................................................7
    1.2 Guidelines for Advertising Messaging Programs .......................................................7
    1.3 Advertising to Children.......................................................................................8
    1.4 Opt-In..............................................................................................................8
    1.4.1 Program Messages ..........................................................................................9
    1.5 Program Termination, STOP and Opt Out................................................................10
    1.6 Program Short Code Transfer ..............................................................................11
    1.7 Customer Care and HELP Guidelines .....................................................................11
    1.8 Customer Record Maintenance ............................................................................12
    1.9 Terms and Conditions .......................................................................................12
    1.10 Tobacco & Alcohol Programs .............................................................................13
    1.11 Sweepstakes & Contests ..................................................................................13
  *Standard Rate Examples* .......................................................................................15
    Advertising (Call to Action) Examples ........................................................................15
    Opt-In Examples ...................................................................................................16
    STOP Message Examples .......................................................................................19
    HELP Message Examples ........................................................................................20
    Change of Short Code Example Messages...................................................................21

**Section 2: Premium Rate** .......................................................................................22
  *Premium Rate Cross Carrier Guidelines* .....................................................................22
    2.0 General Guidelines...........................................................................................22
    2.1 Messaging Frequency Guidelines .........................................................................22
    2.2 Tobacco & Alcohol Programs ..............................................................................22
    2.3 Guidelines for Advertising Messaging Programs .....................................................23
    2.4 Advertising to Children ......................................................................................23
    2.5 Opt-In Guidelines .............................................................................................24
    2.6 Program Termination and Opt Out........................................................................28
    2.7 Customer Care and HELP Guidelines .....................................................................29
    2.8 Customer Record Maintenance ............................................................................31
    2.9 Sweepstakes & Contests ...................................................................................31
    2.10 Terms & Conditions .........................................................................................32
    2.11 Affiliate Marketing ..........................................................................................32
    2.12 Premium WAP Sites ........................................................................................33
    2.13 Subscription Programs .....................................................................................34
  *Premium Rate Examples* .......................................................................................36
    EXAMPLE: STOP Messages (CCS-EG-02)....................................................................37
    EXAMPLE: PREMIUM Rate IVR (Initial Opt In IVR) (CCS-EG-04 )......................................38
    EXAMPLE: Premium Rated Double Opt In– Alert Subscription (CCS-EG-05)........................39
    EXAMPLE: Premium Rated Opt In for WAP (CCS-EG-06)................................................40
    EXAMPLE: Billing Renewal Message (CCS-EG-10) ........................................................41



# Table of Contents

**Section 3: Free To End User (FTEU)** ................................................................................................42

*Free to End User Cross Carrier Guidelines*................................................................................42

   3.0 General Guidelines ...............................................................................................................42

   3.1 Guidelines for Advertising Messaging Programs.................................................................42

   3.2 Opt In ..................................................................................................................................43

   3.3 Opt Out ...............................................................................................................................43

   3.4 Terms & Conditions ...........................................................................................................44

   3.5 HELP Guidelines ...............................................................................................................45

   FTEU Examples ........................................................................................................................47



# Introduction: US Consumer Best Practices for Messaging

The Mobile Marketing Association (MMA) is the premier global non-profit trade association representing all players in the mobile marketing value chain. With more than 700 member companies, the MMA is an action-oriented organization with global focus, regional actions and local relevance. The MMA's primary focus is to establish mobile as an indispensable part of the marketing mix. The MMA works to promote, educate, measure, guide and protect the mobile marketing industry worldwide. The MMA's global headquarters are located in the United States and it has regional chapters including North America (NA), Europe, Middle East and Africa (EMEA), Latin America (LATAM), and Asia Pacific (APAC) branches.

The MMA Consumer Best Practices (CBP) for Messaging, for the United States market, provides a guide to implementing short code programs. This guideline document is a compilation of accepted industry practices, common wireless carrier policies, and regulatory guidance that have been agreed upon by representative member companies from all parts of the off-deck ecosystem.

The US Consumer Best Practices Committee for Messaging developed these guidelines in collaboration with representatives from the following member companies:

**4INFO, Inc.**

**Cincinnati Bell Wireless**

**CTIA**

**Mobile Messenger**

For more information, please contact:

Mobile Marketing Association

Email: mma@mmaglobal.com

www.mmaglobal.com



# Introduction: US Consumer Best Practices for Messaging

## Scope: Standard Rate, Premium Rate, and Free to End User

From a pricing perspective, there are three categories of short code programs.  This document groups the standards according to these categories:

- Standard Rate – The consumer is charged standard messaging fees (per message, or decremented from their messaging bundle) when participating in the program. Premium fees are not charged.

- Premium Rate – The consumer is charged premium fees in addition to standard messaging fees applying.

- Free to End User (FTEU) – The consumer incurs no charges at all for participating in the program. The carrier waives standard message fees for these programs.

## CTIA Audit Standards

CTIA Audit Standards were developed by a cross-carrier team in support of the CTIA Compliance Assurance Program. This Program has evolved to take a significant role in channeling common cross-carrier policies and defining compliance in the mobile market. The goal of the CTIA Audit Standards is to outline clear, objective, and executable rules against which program compliance can be evaluated. Rules are designed to meet the obligation of legal settlements entered into by the carriers, as well as to target deceptive practices that represent consumer harm.

## References: MMA documents and links for reference purposes

The following documents provide additional sources of information and reference:

MMA Code of Conduct
http://www.mmaglobal.com/codeofconduct.pdf
MMA Glossary of Terms
http://www.mmaglobal.com/glossary.pdf
Mobile Marketing Association Website
http://www.mmaglobal.com
Telephone Consumer Protection Act (TCPA)
http://www.the-dma.org/guidelines/tcpa.shtml
CAN-SPAM
http://www.fcc.gov/cgb/policy/canspam.html
Common Short Code Administration
http://www.usshortcodes.com
COPPA
http://www.ftc.gov/ogc/coppa1.htm
CTIA Common Short Code Monitoring Playbook
http://www.wmcglobal.com/images/CTIA_playbook.pdf



# Introduction: US Consumer Best Practices for Messaging

## Recent Changes

**Version 7.0**

Below is a list of changes modified between version 6.1 of this document and the previous version 7.0

Alignment of MMA Consumer Best Practices with the CTIA Audit Standards

Removal of Cross Carrier Matrix for both Standard & Premium

Removal of Carrier specific playbooks





# Cross Carrier Standards

## Section 1: Standard Rate

Standard Rate Cross Carrier Guidelines

### 1.0 General Guidelines

|  | Guideline |
|---|---|
| 1.0-1 | At a minimum, programs (including short code, IVR and WAP) should be run in a manner that is congruous with the letter and spirit of the MMA Global Code of Conduct for Mobile Marketing. The Code of Conduct is located at: http://www.mmaglobal.com/codeofconduct.pdf |
| 1.0-2 | At all times, programs must be in accordance with applicable federal and state laws, rules and regulations.  In addition, all programs must be in compliance with the CTIA Audit Standards. http://www.wmcglobal.com/images/CTIA_playbook.pdf |
| 1.0-3 | Wireless subscribers have a right to privacy. |
| 1.0-4 | Short codes are approved and provisioned based on the specific program submitted to the aggregator and carrier. |
| 1.0-5 | If the content provider wishes to run new, modified, or additional programs on the short code, they must submit the additional or modified program for approval to the aggregator/carrier. |
| 1.0-6 | For programs that use MMS, all keywords in this document should be supported via both SMS and MMS. |

### 1.1 Messaging Frequency Guidelines

|  | Guideline |
|---|---|
| 1.1-1 | A "one-time" message program results in only one or two messages being delivered to the user at the time the interaction is initiated. |
| 1.1-2 | A "recurring" message program results in multiple messages being delivered to the user.  This is also called a standard rate subscription program or an alert program. |

### 1.2 Guidelines for Advertising Messaging Programs

|  | Guideline |
|---|---|
| 1.2-1 | When promoting programs, content providers should ensure that their advertising in all forms is clear and conspicuous regarding all terms and conditions associated with offers and adheres to all state and federal regulations. |
| 1.2-2 | CTIA audit standards do not permit use of the term free except for cross-carrier free-to-end-user programs. However, when there are no fees or charges other than standard messaging and data charges, synonyms (i.e. complimentary, promotional, no charge) are supported by all carriers and must be used with the phrase "Msg & Data Rates may apply". The communication stating that "Msg&Data Rates May Apply" should be added at the lower third of the commercial or advertisement when "free" appears in the audio or visual. The verbiage around the placement of "Msg&Data Rates May Apply" should be clear and conspicuous on the call to action/promotion/advertising and should NOT be deceptive in any nature nor lead to an indirect subscription of services. Illegible font sizes, font color, or presentment (including scrolling or moving graphics) and obscuring of the disclaimer "Msg&Data Rates May Apply" are prohibited. |





# Cross Carrier Standards

| 1.2-3 | Program advertising or its placement must not be deceptive about the functionality, features, or content of the underlying program. |
|---|---|
| 1.2-4 | All advertising (print, TV, online, and radio) must include:<br>• Product description<br>• Program name<br>• Product quantity<br>• Link to full T&Cs containing privacy policy and help info<br>• STOP instructions (in bold, for recurring only)<br>• Additional carrier costs disclosure (Message and data rates may apply) |
| 1.2-5 | Instructions on using the HELP keyword (i.e. Text HELP for help) may be provided in lieu of full customer service contact information in advertising materials. |
| 1.2-6 | If space is not available for the full terms and conditions, the location where the full terms and conditions may be accessed without charge to the consumer must be disclosed (e.g. via a website address and/or toll free phone number). |

### 1.3 Advertising to Children

| | Guideline |
|---|---|
| 1.3-1 | Industry participants must comply with all applicable laws and industry standards that apply to advertising and marketing to children. This includes compliance with the FCC's Children's Television Act as it applies to the promotion of commercial websites, the FTC's Children's Online Privacy Protection Act (COPPA), FTC advertising regulations, Children's Advertising Review Unit (CARU) guidelines and various trade organization regulations such as those set forth by the MPAA and ESRB. |
| 1.3-2 | All industry participants are also expected to ensure that the products being marketed are appropriate for the intended audience. As such, products that would be considered "mature" or might be considered dangerous or harmful to children (including, for example, alcohol, Rx and OTC medication, household cleaners, etc.) should not be marketed to children. |

### 1.4 Opt-In

| | Guideline |
|---|---|
| 1.4-1 | Content providers must obtain opt-in approval from subscribers before sending them any SMS or MMS messages or other content from a short code. |
| 1.4-2 | Program flow and information must not be misleading in any way. |
| 1.4-3 | Recurring standard rate programs require a single opt-in. |
| 1.4-4 | When opt-in to a recurring program occurs via the web or other non-mobile point of origination, the content provider must obtain verification that the subscriber is in possession of the handset being opted-in to the service. |
| 1.4-5 | For recurring standard rate programs, subscribers should indicate their willingness to participate in a program and receive messages from the program as follows: |
| 1.4-6 | 1. Subscriber initiates opt-in to a recurring Standard Rate Program by responding to a call to action (CTA):<br>    i.) Subscriber may send a Mobile Originated (MO) message from their handset to the short code.<br>    ii.) Subscriber may initiate opt-in from a web interface<br>    iii.) Subscriber may initiate opt-in from a WAP interface<br>    iv.) Subscriber may initiate opt-in from an IVR system<br>2. Program responds with pertinent phone, program, and contact information and handset verification steps, if required. |

Proprietary & Confidential





# Cross Carrier Standards

| 1.4-7 | If web-based opt-in is used for a standard rated campaign, the use of a PIN code, although not required, is suggested to confirm possession of the handset. |
|---|---|
| 1.4-8 | Requirements for the PIN code (or Reply Yes) MT, in cases where it is used are:<br>• Program sponsor (Defined as the program name, company name or brand associated with the campaign.)<br>• the PIN code sent to the subscriber for confirmation, which may be placed anywhere in the message<br>• Customer support information (HELP)<br>• Frequency of messaging<br>• Additional carrier costs (e.g. Msg&Data Rates May Apply)<br>• Opt-out information (STOP) does not need to be in the initial PIN (or Reply Y) MT message. |
| 1.4-9 | After opt-in to a recurring program, a confirmation Mobile Terminating (MT) message must be sent to the subscriber containing, at minimum, the following information:<br>a)   Service description<br>b)   Program Sponsor<br>c)   Additional carrier costs (e.g. Msg&Data Rates May Apply)<br>d)   Frequency of messaging<br>e)   Customer support information (HELP)<br>f)   Opt-Out information (STOP) |
| 1.4-10 | This opt-in applies only to the specific program a subscriber is subscribed to and should not be used as a blanket approval to promote other programs, products, and services. However, after the subscriber has been given the complete details about the opt-in scope, the subscriber may opt-in to receive other messages. A content provider may, however, communicate with existing opted-in subscribers through non-premium messages that a) notify subscribers of updates to their existing service or b) are part of a retention program for that particular service. Directions to unsubscribe from these messages must be clearly available with the delivery of each message. |
| 1.4-11 | Selling mobile opt-in lists is prohibited. |
| 1.4-12 | When a subscriber ports his/her telephone number between carriers, he/she is required to re-opt-in to all short code programs. |

## 1.4.1 Program Messages

|  | Guideline |
|---|---|
| 1.4.1-1 | For both recurring and one-time message programs, no compliance language is required in program content MTs.  (STOP, HELP, Msg&Data Rates May Apply are not required to be in program content messages.) |
| 1.4.1-2 | Reminder messages are not required for one-time message programs. |
| 1.4.1-3 | When used, reminder messages must include the following:<br>• Identity of program sponsor<br>• Short description of program—For example, Giants Score Alerts.<br>• Frequency of messaging<br>• HELP information – For example, Reply HELP for HELP<br>• Opt-Out information – For example, Reply STOP to Cancel<br>• Pricing terms for the program—Msg&Data Rates May Apply |
| 1.4.1-4 | Within MMS messages, the following types of third party ads are allowed: text, picture, audio, and video. Ads may be inserted prior to, within the content being sent or following the content of the MMS Message. |





# Cross Carrier Standards

### 1.5 Program Termination, STOP and Opt Out

|  | Guideline |
|---|---|
| 1.5-1 | Content providers must offer subscribers the opportunity to cancel the service at any time.  The following rules govern program opt-out: |
| 1.5-2 | A subscriber must be able to stop participating and receiving messages from any program by sending STOP to the short code used for that program.<br>• END, CANCEL, UNSUBSCRIBE or QUIT should also be opt-out key words for all programs; however, content providers should feature the word STOP in their advertising and messaging.  Messaging content providers must process a stop message from a subscriber regardless of the keyword STOP's case sensitivity<br>• The STOP keyword must work in the native language of the program. In a non-English program, the English keyword must not return an error message.<br>• Short code programs must ignore subsequent non-keyword text included in STOP MOs.<br>• Short codes running MMS programs should handle the STOP keyword correctly, regardless whether the subscriber sends the keyword via MMS or SMS.<br>• When sent, these words cancel the subscriber's previous opt-in for messaging. |
| 1.5-3 | If the subscriber is participating in multiple programs on the short code, there are two options for the content provider when a subscriber sends an opt-out request:<br>1) The content provider sends a menu of the programs the subscriber is subscribed to and the subscriber has the responsibility to reply with the specific keyword to the specific program they would like to be opted out of. To ensure subscribers also have a way to opt-out of all programs within this menu, STOP ALL must be added to the menu choices. The stop menu message does NOT need to contain<br>    i)  "Msg&Data Rates May Apply"<br>    ii) Sponsor contact information.<br>2) Or if the subscriber sent STOP or STOP ALL to the short code, they are opted-out of all programs they were enrolled in on that short code. |
| 1.5-4 | When STOP, or any of the opt-out keywords above, is sent to a program, the program must respond with an MT message, whether or not the subscriber is subscribed to the program. |
| 1.5-5 | When the user is subscribed to a recurring program, an MT message confirming the opt-out must be sent to the subscriber. This must not be a premium message. This message should reference the specific program the subscriber has opted-out from and indicate that no further messages will be sent. No further messages should be sent to the subscriber from this program, including marketing messages for any related or unrelated programs. |
| 1.5-6 | When the user is not currently subscribed to a recurring program, or the program is a one-time program where the subscriber will not receive additional messages, then an MT message may be sent that only confirms that the user is not subscribed to any programs on this short code and indicates that no further messages will be sent. |
| 1.5-7 | This STOP command functionality requirement applies to all programs, including one-time use programs where the subscriber will not receive additional messages. This is to avoid subscriber confusion around the use of the STOP command. |
| 1.5-8 | The STOP command should never result in an error being sent back to the subscriber. |





# Cross Carrier Standards

| 1.5-9 | Any IVR system that offers the possibility to opt-in to a mobile service must also offer the possibility to opt-out. This should be available through the IVR, customer service, a web site, or SMS. |
|---|---|
| 1.5-10 | The content provider must record and store all opt-out transactions. |
| 1.5-11 | If a user is inactive (no program MTs or MOs exchanged) in any recurring message program for eighteen months, the opt-in should expire. At that time, it is permissible to send the subscriber one final MT message notifying them that his/her username and other subscription information will be deleted from the program. No messages to the subscriber after the expiration are permitted unless the subscriber re-opts-in to the program. |

### 1.6 Program Short Code Transfer

| | Guideline |
|---|---|
| 1.6-1 | A subscriber to a recurring program may be transferred to a new short code without a new opt-in, as long as the content and purpose of the alerts remain the same as what the subscriber opted-in to receive and the content provider has not changed.  Under these circumstances, the following notifications must be provided: |
| 1.6-2 | The subscriber must receive notice on the short code they originally opted into that the program will be moving to a new short code. This message must include instructions on how to opt-out of the program. This should be the last message sent by the program on the old short code. |
| 1.6-3 | When the program initiates on the new short code, the first alert the subscriber receives must remind subscribers of the short code change and include instructions on how to opt-out of the program. |
| 1.6-4 | Any alert list transferred or sold to a new content provider for the purposes of remarketing is considered SPAM and is grounds for short code de-provisioning. |

### 1.7 Customer Care and HELP Guidelines

| | Guideline |
|---|---|
| 1.7-1 | Help messaging commands, phone numbers, URLs, and email addresses should result in the subscriber receiving help with his issue. Dead ends that do not provide a manner in which the subscriber may resolve his issue are not acceptable. |
| 1.7-2 | A subscriber can receive help information by sending the keyword HELP to any program. The HELP keyword should work on all short code programs. HLP is optional for HELP, but not required.<br>• The HELP keyword sent by the consumer cannot be case sensitive<br>• For short codes running MMS programs, a help response should be returned whether the subscriber sends in HELP to the short code via MMS or SMS<br>• The HELP keyword must work in the native language of the program. In a non-English program, the English keyword must not return an error message. |
| 1.7-3 | To help subscribers understand their participation, each program should respond with the program details listed below when the subscriber sends the keyword HELP to the program short code. |
| 1.7-4 | • Identity of program sponsor—This is defined as the program name, company name, or brand associated with the campaign. |
| 1.7-5 | • Customer support info — Either a toll-free number, Web address, or e-mail address. Note that Sprint requires a toll free number for all programs and T-Mobile requires a URL for all programs. |
| 1.7-6 | • Service description of program — For example, Fun Stuff Trivia. |





# Cross Carrier Standards

| 1.7-7 | • Opt-out information |
|---|---|
| 1.7-8 | • Program frequency |
| 1.7-9 | • Pricing Information – Msg&Data Rates May Apply |
| 1.7-10 | If the short code has multiple programs (keywords) on the same short code, the application should respond in one of two ways:<br>1) If the subscriber has opted in to only one program, the application should supply the information for the program the subscriber is opted-in to.<br>2) If the subscriber has opted-in to multiple programs, the application should present a multiple-choice question asking the subscriber what program they would like help on.<br>The first help menu does NOT need to include:<br>• "Msg&Data Rates May Apply"<br>• STOP, Or Sponsor Contact Information<br><br>The menu should contain a question asking what the subscriber seeks help with and a list of options for the user to get help on. Once the user has identified the program they want help with, the appropriate help information must be in the subsequent MT. |
| 1.7-11 | When HELP is sent to a program, the program must respond with an MT message, whether or not the subscriber is subscribed to the program, and whether the program is a subscription program or not. HELP must always result in a response. |
| 1.7-12 | Subscribers must be able to reach customer service through the IVR for assistance with an IVR mobile program. |

## 1.8 Customer Record Maintenance

| | Guideline |
|---|---|
| 1.8-1 | To the extent that carriers supply deactivation and recycled number information, content providers and aggregators are required to have appropriate and effective systems and processes for managing deactivation and recycled number information. These systems and processes should be designed to ensure that mobile content programs subscribed to by previous holders of a specific phone number do not continue to be delivered or billed to a subsequent holder of that number when it is reassigned. Content providers and aggregators must process deactivation information within three business days of receipt. |
| 1.8-2 | Independent of method of entry (SMS, MMS, Web, WAP, IVR) opt-in and opt-out records - including single, double and triple opt-in records – should be retained from the time the subscriber opts-in until a minimum of six months after the subscriber has opted-out of the program (minimum opt-in archiving period is one calendar year). These records should be made available to the aggregator or carrier upon request. |
| 1.8-3 | The content provider is responsible for tracking program opt-in information by subscriber. |

## 1.9 Terms and Conditions

| | Guideline |
|---|---|
| 1.9-1 | Terms and Conditions at a minimum must contain the following: |
| 1.9-2 | • STOP instructions in BOLD lettering |
| 1.9-3 | • HELP instructions in BOLD lettering |





# Cross Carrier Standards

| 1.9-4 | • Program sponsor information, defined as the program name, company name, or brand associated with the campaign |
|---|---|
| 1.9-5 | • For standard rate programs: "Msg&Data Rates May Apply". The text "standard rates may apply" is no longer being used.  To better inform consumers that message and data changes may be applicable the new terminology above has been adopted. Different forms of the above text include: Message and Data Rates May Apply, Msg&data rates may aply, Msg&data rates may apply, Msg&DataRatesMayAply. |
| 1.9-6 | • Customer Service Contact Information: either a toll-free number, a web submission form or an email address. |
| 1.9-7 | • Guidance on the frequency with which the subscriber may expect to receive messages for the duration of the program. Note that for many applications, this cannot be precisely predetermined by the content provider. In this case, the guidance should relate to the expected message frequency under normal circumstances. Note that CTIA audit standards accept "recurring" or "periodic" for product quantity for standard rate. |
| 1.9-8 | All material terms and conditions of the program should be clearly communicated. |
| 1.9-9 | If a checkbox is used to indicate a consumers' acceptance of the terms and conditions, it is not permissible for the checkbox to be pre-checked. |

## 1.10 Tobacco & Alcohol Programs

| | Guideline |
|---|---|
| 1.10-1 | Hard alcohol programs should only be marketed in locations that have age verification (bars, nightclubs). |
| 1.10-2 | Alcohol marketing should not directly promote the use of or consumption of alcohol. |
| 1.10-3 | Any reference to the abuse of alcohol, drugs, tobacco or other controlled substances is strictly prohibited. This includes verbal and non-verbal actions in which a person could conclude that promotion of drug use is intended. |
| 1.10-4 | Tobacco companies engaging in promotional mobile marketing programs, defined as programs that DO NOT directly advocate or promote the use or consumption of tobacco, must maintain their commitment to responsible marketing via age verification practices compatible with mobile program opt-in methods. |
| 1.10-5 | Any program brief submitted for carrier approval on behalf of a tobacco brand must illustrate the integration of electronic age verification methods (use of third party vendors to confirm legal age and identity) into the program opt-in process. |
| 1.10-6 | Program opt-in is only completed once the mobile subscriber has been verified as an adult tobacco consumer. |

## 1.11 Sweepstakes & Contests

*Sweepstakes and contests, including those conducted on the mobile platform, are among the most regulated of marketing tactics.*

**Mobile Sweepstakes and Contests definitions:**
<u>Sweepstakes</u> *- A sweepstakes is a legal game that includes a prize, and a game of chance. No consideration is allowed.*
<u>Contest</u> *- A contest is a promotional mechanism that includes a prize, and a game of skill. Consideration is allowed, but there cannot be any element of chance.*





# Cross Carrier Standards

**_Lottery_** - *A lottery is a game that includes a prize, a game of chance, and consideration. Federal legislation and State laws govern (and disallow) all lotteries for promotional purposes.*

**_Consideration_** - *Although the definition of consideration varies from state to state, generally, consideration means that a willing participant is required to purchase something or pay for access to be eligible to enter a game.*

|        | Guideline |
|--------|-----------|
| 1.11-1 | Consideration may be monetary or non-monetary (an example of non-monetary consideration is a sweepstakes where the participant is required to provide detailed consumer information to be eligible). |
| 1.11-2 | All sweepstakes must offer a free Alternative Method Of Entry (AMOE). Allowing participants to enter via mail, internet, fax or IVR via a toll free number are all forms of AMOE, but are not the only forms of free AMOE. |
| 1.11-3 | Anyone running a sweepstakes should seek legal guidance when drawing up rules. |





# Standard Rate Examples

## Advertising (Call to Action) Examples



*Cross Carrier Examples: Legend*

| | |
|---|---|
| Web, TV, In-Store, Promotional Poster | Text Message |
| Mobile Web/ WAP | |

### CCS-SR-EG- 1 Standard Rate Print Advertising Example

Get Daily Recipes via text message from Bonjour Farms!

Get a link to a recipe of the day, featuring fresh, seasonal, local foods.  Text FOOD to 12345 to subscribe.

Additional costs → Message and Data Rates May Apply

Terms & Conditions → Terms & Conditions at www.text123.com/terms

Opt-Out Info → To stop text STOP to 12345

### CCS-SR-EG- 2 Standard Rate Television, Radio, or Audio Advertising Example

"Get breaking news alerts from KGO Radio, just text NEWS to 12345. Message and data rates may apply."

### CCS-SR-EG- 3 Standard Rate Web Advertising Example

Get Daily Recipes via text message from Bonjour Farms!

Get a link to a recipe of the day, featuring fresh, seasonal, local foods. One message per day.

Frequency → 

Enter your phone number to subscribe now:

Additional costs → Msg&Data Rates May Apply

Terms & Conditions → Terms & Conditions at www.text123.com/terms

Opt-Out Info → To stop text STOP to 12345.

Support Information → For help, reply HELP to 12345.





# Standard Rate Examples

**Opt-In Examples**



*Cross Carrier Examples: Legend*

| | |
|---|---|
| Web, TV, In-Store, Promotional Poster | Text Message |
| Mobile Web/ WAP | |

*CCS-SR-EG- 4 Standard Rate Single Opt In – Recurring Alert Subscription*

**Call to Action:**                    The following is advertised:

Program sponsor →
Service Description →

Frequency of Messaging →
Customer Support Info →
Opt Out Info →
Additional Carrier Costs →
Terms & Conditions →

> Upmobile Ski Alerts!
> Send us the resort name, we'll send you the snow conditions. Txt 'Mammoth' to 12345 to receive ongoing alerts for Mammoth resort.
> Get 10 msgs/month.
> Text HELP for help.
> To stop text STOP.
> Msg&Data Rates May Apply.
> T&Cs avail at www.mammoth.com/mobile.

**Step 1:**                    User responds to Call to Action and sends an MO "Mammoth"

**Step 2:** Confirmation MT         User receives the following MT Message:

Service description →
Additional carrier costs →
Frequency of messaging →
Customer Support Info →
Opt Out Info →

> Welcome to Upmobile: Mammoth Ski Alerts!
> Msg&Data Rates May Apply.
> Get 2 msgs/week.
> Reply HELP for help.
> Reply STOP to cancel.

**Step 3:** Alert MT              User receives the following MT Message:

Alert →

> UpMobile: Mammoth Ski Alert @ 5pm PST! 12" of fresh powder fell! Roadways are open with light traffic.

**Step 4:** Renewal Reminder
(OPTIONAL, except Sprint)         User receives the following MT Message:

Service description →
Additional carrier costs →
Customer Support Info →
Opt Out Info →

> REMINDER: Subscribed to Upmobile: Mammoth Ski Alerts!
> No Charge, but Msg&Data Rates May Apply.
> Reply HELP for help
> Reply STOP to cancel.





# Standard Rate Examples

*CCS-SR-EG- 5 Standard Rate Single Opt In – One Time Message*

**Call to Action:**                    The following is advertised:

Program sponsor →   Upmobile Ski Alerts!

Service Description →   Send us the resort name, we'll send you the snow conditions. Txt
'Mammoth' to 12345 to receive an alert for Mammoth Resort.

Additional Carrier Costs →   Msg&Data Rates May Apply.

Terms & Conditions →   T&Cs avail at www.mammoth.com/mobile.

**Step 1:**   User responds to Call to Action and sends an MO
"Mammoth"

**Step 2:** Alert MT   User receives the following MT
Message:

Program sponsor →   UpMobile / Mammoth Mountain:

Content→   12" of fresh powder fell! Roadways are
open with light traffic.


*CCS-SR-EG- 6 Invalid Keyword Example Message*

Example of optional response message to be sent when an invalid keyword MO is received.

User receives the following
Mobile Terminating (MT)
Message:

Program sponsor →   Farm League Baseball Alerts

Unrecognized keyword,
HELP→   Sorry, we did not recognize that
keyword. Text HELP for HELP.

Opt-Out Info→   Reply STOP to cancel receiving Farm
League Baseball Alerts.





# Standard Rate Examples

**CCS-SR-EG- 7 Reminder Example Message**

Example of reminder message for recurring message programs. *NOTE: This message may be required by some carriers while optional for others.*

User receives the following Mobile Terminating (MT) Message:

| | |
|---|---|
| Sponsor & description→ | Reminder! You are subscribed to Farm League Baseball Alerts. |
| Frequency→ | Up to 30 messages per month. |
| HELP→ | Text HELP for HELP. |
| Opt-Out Info→ | Reply STOP to cancel. |
| Pricing→ | Msg&Data Rates May Apply |

**CCS-SR-EG- 8 Standard Rate IVR Opt In**

**Call to Action**                    The following is advertised:

| | |
|---|---|
| Program sponsor → | WOD: Weather on Demand. |
| Service Description → | Call 888-222-2222 to get current weather for your area sent to your phone. Dial 0 for help. |
| Customer Support Info → | Txt HELP for help to 12345. |
| Opt Out Info → | To stop txt STOP to 12345. |
| Additional Carrier Costs → | Msg&Data Rates May Apply. |

**Step 1:** User responds to Call to Action

User calls 888-222-2222 [Mobile subscriber calls and is prompted to select SMS to phone]

**Step 2:** Mobile Content MT

User receives the following MT Message:

| | |
|---|---|
| Mobile Content → | WOD: Partly sunny with chance of showers in late afternoon. Highs in the 70 during the day, and 62 at night. |





# Standard Rate Examples

## STOP Message Examples

### *CCS-SR-EG- 9 Stop (Single Service)*

User receives the following Mobile Terminating (MT) Message:

Program sponsor →

Discontinuation of Service →

> Farm League Baseball Alerts.
>
> You have opted out. You will not receive additional messages.

### *CCS-SR-EG- 10 Stop (Multiple Services)*

**Step 1:** User sends STOP Mobile Originating (MO) Msg

**Step 2:** Help menu MT response to a STOP MO from a user

Program sponsor →

STOP ALL →

Option  A →

Option  B →

> Farm League Baseball: which service to stop?
>
> STOP ALL or
>
> For Sports Reply STOP SPORT to cancel
>
> For Horo Reply STOP HORO to cancel

**Step 3:** User responds STOP SPORT.

Program sponsor →

Discontinuation of Service →

> You will receive no more messages from Farm League Baseball:
>
> Sports service.
>
> You have canceled the service.

**Step 4:** User responds STOP HORO.

Program sponsor →

Discontinuation of Service →

> You will receive no more messages  from Farm League
>
> Baseball: horoscope service.
>
> You have canceled services.





# Standard Rate Examples

## HELP Message Examples

### CCS-SR-EG- 11 HELP Message, Single Service

**Step 1:**   User sends HELP Mobile Originating (MO) Msg

**Step 2:**   Help MT response:

| | |
|---|---|
| Program sponsor → | Farm Baseball Alerts! |
| Service Description → | Text us your zip, we send local game day weather. |
| Additional Carrier Costs → | Msg&Data Rates May Apply. |
| Frequency of Messaging → | 4 msgs/mo |
| Customer Support Info → | Contact: flb.com/help or 800 888-8888. |
| Opt Out Info → | Reply STOP to cancel. |

### CCS-SR-EG- 12 Help Message, Multiple Services

**Step 1:**   User sends HELP Mobile Originating (MO) Msg

**Step 2:**   Help menu MT response to a HELP MO from a user

| | |
|---|---|
| Program sponsor → | Farm Baseball: which service would you like help on? |
| Option  A → | For Sports Reply HELP SPORT for help. |
| Option  B → | For Horo Reply HELP HORO for help |

**Step 3:**   User responds HELP SPORT. Help menu MT response is:

| | |
|---|---|
| Program sponsor → | Farm Sports service: |
| Service Description → | Txt us your zip, we send local scores and news. |
| Additional Carrier Costs → | Msg&Data Rates May Apply. |
| Customer Support Info → | Contact: flb.com/help or 800-888-8888. |
| Opt Out Info → | Reply STOP to cancel. |

**Step 4:**   User responds HELP HORO. Help menu MT response is:

| | |
|---|---|
| Program sponsor → | Farm Horoscope svc: |
| Service Description → | Txt us your bday, we send ur horoscope |
| Additional Carrier Costs → | Msg&Data Rates May Apply. |
| Customer Support Info → | Contact: flb.com/help or 800-888-8888. |
| Opt Out Info → | Reply STOP to cancel. |





# Standard Rate Examples

## Change of Short Code Example Messages

*CCS-SR-EG- 13 Last Alert on Old Short Code*

User receives the following
Mobile Terminating (MT)
Message:

Program sponsor →

Change to new code →

Opt-Out Information →

| |
|---|
| Farm League Baseball Alerts<br><br>are moving to short code 12345. Future alerts will come from that code.<br><br>Reply STOP to cancel receiving Farm League Baseball Alerts. |

*CCS-SR-EG- 14 First Alert on New Short Code*

User receives the following
Mobile Terminating (MT)
Message:

Program sponsor →

Notification of new code →

Opt-Out Info →

| |
|---|
| Farm League Baseball Alerts.<br><br>will now be delivered on short code 12345.<br><br>Reply STOP to cancel receiving Farm League Baseball Alerts. |





# Cross Carrier Standards

## Section 2: Premium Rate

Premium Rate Cross Carrier Guidelines

### 2.0 General Guidelines

|  | Guideline |
|---|---|
| 2.0–1 | At a minimum, programs (including short code, IVR and WAP) should be run in a manner that is congruous with the letter and spirit of the MMA Global Code of Conduct for Mobile Marketing. The Code of Conduct is located at: http://www.mmaglobal.com/codeofconduct.pdf |
| 2.0-2 | At all times, programs must be in accordance with applicable federal and state laws, rules and regulations. In addition, all programs must be in compliance with the CTIA Audit Standards. http://www.wmcglobal.com/images/CTIA_playbook.pdf |
| 2.0-3 | Wireless subscribers have a right to privacy. |
| 2.0-4 | STOP and HELP keywords must work in the native language of the program and English. |
| 2.0-5 | For programs that use MMS, all keywords in this document should be supported via both SMS and MMS. |

### 2.1 Messaging Frequency Guidelines

|  | Guideline |
|---|---|
| 2.1-2 | A "one-time" message program results in only one or two messages being delivered to the user at the time the interaction is initiated. |
| 2.1-3 | A "recurring" message program results in multiple messages being delivered to the user. |

### 2.2 Tobacco & Alcohol Programs

|  | Guideline |
|---|---|
| 2.2-1 | Hard alcohol programs should only be marketed in locations that have age verification (bars, nightclubs). |
| 2.2-2 | Alcohol marketing should not directly promote the use of or consumption of alcohol. |
| 2.2-3 | Any reference to the abuse of alcohol, drugs, tobacco or other controlled substances is strictly prohibited. This includes verbal and non-verbal actions in which a person could conclude that promotion of drug use is intended. |
| 2.2-4 | Tobacco companies engaging in promotional mobile marketing programs, defined as programs that DO NOT directly advocate or promote the use or consumption of tobacco, must maintain their commitment to responsible marketing via age verification practices compatible with mobile program opt-in methods. |
| 2.2-5 | Any program brief submitted for carrier approval on behalf of a tobacco brand must illustrate the integration of electronic age verification methods (use of third party vendors to confirm legal age and identity) into the program opt-in process. |
| 2.2-6 | Program opt-in is only completed once the mobile subscriber has been verified as an adult tobacco consumer. |





# Cross Carrier Standards

## 2.3 Guidelines for Advertising Messaging Programs

|  | Guideline |
|---|---|
| 2.3-1 | When promoting programs, content providers should ensure that their advertising in all forms is clear and conspicuous regarding all terms and conditions associated with offers and adheres to all state and federal regulations. |
| 2.3-2 | All rules delineated below also apply to any affiliate marketing sites used to promote the service with the exception of web carrier-select jump pages. |
| 2.3-3 | CTIA audit standards do not permit use of the term free with respect to premium programs. |
| 2.3-4 | All advertising must clearly disclose in the audio and visual that you must be 18 years or older or have permission from the account holder. |
| 2.3-5 | All advertising must clearly disclose the subscription term, billing interval and information on how the charges will be applied (i.e., that the charges will be billed on the customer's wireless phone bill or deducted from the customer's prepaid balance). |
| 2.3-6 | All advertising must clearly disclose all methods of canceling the service. |
| 2.3-7 | Advertising must include a resource (such as a website or phone number) where subscribers can reference all terms and conditions. |
| 2.3-8 | Program advertising or its placement should not be deceptive about the functionality, features, or content of the underlying program. |
| 2.3-9 | If a checkbox is used to indicate a consumers' acceptance of the terms and conditions, it is not permissible for the checkbox to be pre-checked. |

## 2.4 Advertising to Children

|  | Guideline |
|---|---|
| 2.4-1 | Industry participants must comply with all applicable laws and industry standards that apply to advertising and marketing to children. This includes compliance with the FCC's Children's Television Act as it applies to the promotion of commercial websites, the FTC's Children's Online Privacy Protection Act (COPPA), FTC advertising regulations, Children's Advertising Review Unit (CARU) guidelines and various trade organization regulations such as those set forth by the MPAA and ESRB. |
| 2.4-2 | All industry participants are also expected to ensure that the products being marketed are appropriate for the intended audience. As such, products that would be considered "mature" or might be considered dangerous or harmful to children (including, for example, alcohol, Rx and OTC medication, household cleaners, etc.) should not be marketed to children. |
| 2.4-3 | Marketing should not contain language that minimizes the price of a product or service (such as "only" or "just"). |
| 2.4-4 | Advertisements should not contain language that exhorts children to buy or obtain a product or service. |
| 2.4-5 | Advertisements should not contain language that conveys a sense of urgency about an offer or service that does not expire. |
| 2.4-6 | Advertising must contain clear disclaimers in the audio and visual explaining the cost of premium or other fees. |





# Cross Carrier Standards

## 2.5 Opt-In Guidelines

|  | Guideline |
|---|---|
| 2.5-1 | Premium rate programs require double opt-in |
| 2.5-2 | Premium subscribers must positively acknowledge the acceptance of a premium charge before premium charges are applied to their account. |
| 2.5-3 | There are three mechanisms for acceptable opt-in activity: Web-based, IVR, and handset-based. In all instances, however, the subscriber must take affirmative action to signify acceptance of the program criteria, and the content provider or aggregator should record and store the acceptance (i.e. the IVR system must store the opt-in).<br>While there are different methods of subscriber opt-in and many ways to say the same thing, the basic tenet should be that all of the required information listed below is delivered to the subscriber in a clear and unambiguous manner. |
| 2.5-4 | Regardless of type, the goal of any opt-in is to clearly communicate to the subscriber the financial obligation they are about to incur by entering the program. |
| 2.5-5 | Separate programs, even if they are offered on the same short code, require a separate opt-in. |
| 2.5-6 | If a match notification service is offered as part of a **chat** program, and the service generates premium charges, an additional opt-in should be obtained from the subscriber for this service. |
| 2.5-7 | Within the double opt-in flow, the following information (at a minimum) must be provided to the subscriber: |
| 2.5-8 | • Identity of program sponsor—Defined as the program name, company name or brand associated with the campaign. |
| 2.5-9 | • Contact details for the program sponsor— Either a toll free number, HELP via text message or a website address. |
| 2.5-10 | • Short description of program—For example, Fun Stuff Premium Chat. |
| 2.5-11 | • Pricing terms for the program—For example, $0.99 per mobile originated message; $3.99 per month. |
| 2.5-12 | Content providers should not redirect subscribers from one type of program (i.e. Ringtone subscription) to another type of program (i.e. Horoscope alert subscriptions) due to handset or account limitations. The two offers cited above are materially different and should be treated as such in all advertising and promotion. |
| 2.5-13 | In all materials (advertising, opt in, terms and conditions) the price must be in numerical format including the "$" sign. |
| 2.5-14 | Selling mobile opt-in lists is prohibited |
| 2.5-15 | When a subscriber ports his/her telephone number between carriers, he/she is required to re-opt-in to all short code programs. |

## 2.5.1 Premium Rate Double Opt In via SMS

|  | Guideline |
|---|---|
| 2.5.1-1 | Affirmative double opt-in confirmation via handset is required. |
| 2.5.1-2 | Examples of affirmative double opt-in responses include these: YES, Y, GO, OKAY, OK, K, O.K., SURE, YEP, YEAH |





# Cross Carrier Standards

| 2.5.1-3 | Content providers must provide the following information to users before applying any premium charges:<br>• Identity of the program sponsor<br>• Contact details for the program sponsor<br>• Short description of program<br>• Pricing and terms for the program<br>• Opt-out information.  Opt-out information does not need to be in the initial PIN (or Reply Y) MT message.<br>• In replacement of STOP, HELP must be included in the initial PIN (Or Reply Y) MT message.<br>• Message and Data Rates May Apply<br>Sample Language:<br>   Msg&Data Rates May Apply. Call 888-888-8888/Text Help to XXX/www.XXX.com for terms.<br>   You will be charged $X.XX. Call 888-888-8888/Text HELP to XXX.www.XXX.com for terms.<br>   Msg&Data Rates May Apply. Call 888-888-8888/Text HELP to XXX/www.XXX.com for terms. [Disclose additional charges in message chain]<br>   "You must be 18 or older or have a parent or guardian's permission before downloading."<br>   "Call 888-888-8888 or text STOP to cancel." |
|---|---|
| 2.5.1-4 | Confirmation message after affirmative acceptance of opt-in must disclose the premium charge has been billed or deducted from the users account. |

## 2.5.2 Premium Rate Double Opt In from Internet-MIN and PIN Entry Page

| | Guideline |
|---|---|
| 2.5.2-1 | Many consumers prefer to provision and interact with SMS programs using the Internet. Initial opt in may be performed at the content provider hosted web MIN entry page. MIN and PIN entry pages must only be controlled by content providers. |
| 2.5.2-2 | If the second opt-in is from the Internet, the content provider must positively confirm that the authorized subscriber is acknowledging the opt-in. This can be done by the user inputting (on website)a PIN code sent via an MT message to the mobile phone number that the consumer has provided on the website ("PIN Confirmation Msg"), or the consumer responding via an MO message, such as replying Y or YES, to an MT message that is sent to the mobile phone number the consumer provided. |
| 2.5.2-3 | This PIN message must also include program pricing and terms. |
| 2.5.2-4 | For premium campaigns the PIN code, or "reply Yes" type text, must be after the program pricing information. |
| 2.5.2-5 | In addition, the content provider should use this channel to provide more detailed information about the program. Regardless of the web opt-in details, the goal is that the entire terms of the offer must be clear to the subscriber through the process. |





# Cross Carrier Standards

| | |
|---|---|
| 2.5.2-6 | The following guidelines apply to MIN and PIN entry pages:<br>• Display pricing within 125 pixels directly above or below cell-submit field<br>• Display pricing font size to at least size 12 point font<br>• Pricing color scheme must have a minimum color contrast of 125<br>• Display full pricing clearly as numerals with dollar sign ($)<br>• The total price must be shown as it will appear on the customer's bill.<br>• The price and term must not contain any other text besides the price and term.<br>The page must include:<br>• Disclosure of actual product/service, quantity, whether it is a subscription service and renewal term must be present as part of the main offer;<br>• Display only carrier logos distributed from or approved by carriers;<br>• The word 'free' must not be used<br>• Privacy policy or clearly labeled link to privacy policy.<br>• Indication that games/applications are not available for specific carriers, as applicable<br>• Do not promote binary programs for non-binary carriers |
| 2.5.2-7 | The following guidelines apply to the Terms and Conditions on the MIN and PIN entry pages:<br>• Wording should be identical if both pages are used in the purchase flow<br>• Website MIN and PIN entry pages must display at least the first three lines above the fold of the screen as viewed on a 1024x768 resolution monitor.  If the full terms of service are not displayed, then there must be a link to them as part of the summary T&Cs.<br>   (Some carriers/audit agencies measure 1024 x 632 pixels within the browser to equal resolution of 1024x768" using the Firefox web browser.)<br>• Information must apply to the specific product(s) being sold<br>• Carrier compatibility should be stated<br>• If not all content is compatible with all handsets, that should be stated<br>• Give notice that a would-be participant is the account holder or has the account holder's permission to participate<br>• T&Cs cannot be in scrolling box<br>• State price, billing frequency and "message and data rates may apply"<br>• If the service is a subscription, indicate the billing term, that renewal occurs automatically and that charges continue until cancelled by the customer<br>• Disclose that the premium charge will be added to the subscriber's wireless phone bill or deducted from their prepaid balance account<br>• Give help instructions and toll free customer care number where available |

 Proprietary & Confidential





# Cross Carrier Standards

*2.5.3 Premium Rate Double Opt In via IVR*

|  | Guideline |
|---|---|
| 2.5.3-1 | Some consumers prefer to initiate new SMS services from an IVR (Interactive Voice Response) platform. The IVR phone number is used in the provider's call to action. After the details of the program have been relayed to the subscriber via the IVR system, the subscriber is prompted to press a key to enter into the IVR program. This key press is recorded by the system and constitutes the caller's second opt-in to the program. Regardless of the opt-in process, the goal is that the entire terms of the offer must be clear to the subscriber through the process. An example of Opt-in via IVR can be found at CCS-EG-04. |
| 2.5.3-2 | Some mobile related services are initiated from an IVR platform. An IVR phone number (800 number, local number, premium rate number, pound (#) code or other) is used in the provider's call to action. |
| 2.5.3-3 | When the consumer dials into the IVR system and responds to acceptance prompt (initial opt-in), the IVR should outline the service and offer details |
| 2.5.3-4 | The IVR system should then subsequently ask the consumer to confirm their purchase with a key press (secondary opt-in). |
| 2.5.3-5 | The user's input must be captured to record his/her consent of the purchase (double opt-in). |
| 2.5.3-6 | The IVR should then send a confirmation MT message to the user's handset. |
| 2.5.3-7 | In cases where the number the user is calling from differs from the number the service will be billed to (for example in the case of land-line callers); a PIN verification message has to be sent out by the IVR to the mobile number the service will be billed on. |
| 2.5.3-8 | The consumer must input the PIN into the IVR system prior to the provider initiating and billing the service |
| 2.5.3-9 | The above confirmation step should be recorded and stored by the IVR system. See 2.9.2 for storage length of Opt-ins. |
| 2.5.3-10 | In the case where content is purchased, users should be informed of the next steps to download and install their new content on their phone. |
| 2.5.3-11 | Consumers should be re-informed of how to call back and get help in case of problems downloading or installing their content. |

*2.5.4 Premium Rate Double Opt In via Mobile Web/ WAP*

|  | Guideline |  |
|---|---|---|
| 2.5.4-1 | Best practice includes ensuring that the consumer is advised of any failures in the WAP payment flow. A payment failure page should be presented in the event that the billing request is unsuccessful. |  |
| 2.5.4-2 | The page should contain the text set out in the items below:<br>• Clicking "Continue" from this failure page should take the user back to the content provider site. |  |



# Cross Carrier Standards

| 2.5.4-3 | • There is an optional field to provide more detail on the reasons for failure (out of funds, unsuccessful connection, etc.) where the billing platform provides this information in real-time. |
|---|---|
| 2.5.4-4 | • Carrier ability to waive double opt-in—In certain instances, carriers may waive the double opt-in on a program-by-program basis. |
| 2.5.4-5 | Because opt-in and opt-out messages are administrative in nature, they should not result in any premium charges for the subscriber. |

## 2.6 Program Termination and Opt Out

| | Guideline |
|---|---|
| 2.6-1 | Directions on how to unsubscribe from the program should be included in program messaging on a regular basis. |
| 2.6-2 | Content providers must offer subscribers the opportunity to cancel the service at any time. Charges for services that are billed daily may only be applied for services received up to the date of cancellation. |
| 2.6-3 | Content providers must offer subscribers the opportunity to cancel the service at any time.  The following rules govern program opt-out: |
| 2.6-4 | A subscriber can stop participating and receiving messages from any program by sending STOP to the short code used for that program.<br>• END, CANCEL, UNSUBSCRIBE or QUIT must also be supported opt-out key words for all programs; however, content providers should feature the word STOP in their advertising and messaging.<br>    Note: Programs can support additional opt-out key words.<br>• The STOP keyword must work in the native language of the program. In a non-English program, the English keyword must not return an error message. |
| 2.6-5 | If the subscriber is participating in multiple programs on the short code, there are two options for the content provider when a subscriber sends an opt-out request:<br>• The content provider sends a menu of the programs the subscriber is subscribed to and the subscriber has the responsibility to reply with the specific keyword to the specific program they would like to be opted out of. To ensure subscribers also have a way to opt-out of all programs within this menu, STOP ALL must be added to the menu choices. The stop menu message does NOT need to contain<br>    i)   "Msg&Data Rates May Apply"<br>    ii)   Pricing<br>    iii)   Sponsor contact information.<br>• Or if the subscriber sent STOP ALL to the short code, they are opted-out of all programs they were enrolled in on that short code. |
| 2.6-6 | This STOP command functionality requirement applies to all programs, including one-time use programs where the subscriber will not receive additional messages. This is to avoid subscriber confusion around the use of the STOP command. |
| 2.6-7 | Short codes running MMS programs should handle the STOP keyword correctly, regardless whether the subscriber sends the keyword via MMS or SMS. |
| 2.6-8 | Short code programs must support mixed case opt-out commands and ignore subsequent non-keyword text. |
| 2.6-9 | An MT message confirming the opt-out should be sent to the subscriber. This must not be a premium message. This message should reference the specific program the subscriber has opted-out from. No further messages should be sent to the subscriber from this program, including marketing messages for any related or unrelated programs. |
| 2.6-10 | When STOP, or any of the opt-out keywords above, is sent to a program, the program must respond with an MT message, whether or not the subscriber is subscribed to the program. |





# Cross Carrier Standards

| | |
|---|---|
| 2.6-11 | Content providers should periodically scan their MO logs for subscribers that are clearly trying to unsubscribe to a service, but are not following the programmed rules and then take the action to end their subscription based on those MO logs. |
| 2.6-12 | The content provider must record and store all opt-out transactions. |
| 2.6-13 | If a subscriber is inactive in any program for six months, the opt-in should expire. At that time, it is permissible to send the subscriber one final MT message notifying them that his/her username and other subscription information will be deleted from the program. No messages to the subscriber after the expiration are permitted. This provision does not apply to programs where the subscriber may have stored value (i.e., remaining credits) with the content provider. |
| 2.6-14 | Subscribers should be able to terminate their participation in a subscription program as specified in the opt-out section. Below are additional requirements for terminations of subscription programs: |
| 2.6-15 | • When a subscriber opts-out of a program, no further premium charges should be submitted or applied to the subscribers account by that program for that subscriber. |
| 2.6-16 | • There should be no minimum subscription periods for any program. For clarity, this does not mean that pro-ration is required. |
| 2.6-17 | • For subscription services that do not originate from an MO text message, but originate for example from a direct URL entry or search link to a WAP site, the payment advice page must clearly and conspicuously present the following program details: |
| 2.6-18 | • Identification of the program as a subscription and the billing interval. |
| 2.6-19 | • Contact details for the program sponsor—Either a toll-free number or a Web site address for opt-out details. |
| 2.6-20 | This includes use of the STOP command or its variants, as set out above, and a mobile or PC website where the user can list live subscriptions and cancel any or all of these. |
| 2.6-21 | **For chat programs**, the subscriber should be opted-out after 90 days of inactivity. An informational message informing the subscriber of the opt-out may be sent. |
| 2.6-22 | Regardless of the subscriber's status, he/she should be able to opt-out of the program at any time. |

## 2.7 Customer Care and HELP Guidelines

| | Guideline |
|---|---|
| 2.7-1 | It is important for subscribers to understand and be in control of their participation in short code programs; therefore, program information should be transparent. Regardless of manner of entry for a subscriber, help messaging commands, phone numbers, URL's, and email addresses should result in the subscriber receiving help with their issue. Dead ends that do not the result in the ability for subscribers to resolve their issues are not acceptable. |
| 2.7-2 | Subscribers must be able to reach customer service through the **IVR** for assistance with the IVR mobile program. |
| 2.7-3 | A subscriber can receive help information by sending the keyword HELP to any program. HELP or HLP keywords should work for all subscriber requests. HLP is optional for HELP, but not required.<br>• The HELP keyword sent by the consumer cannot be case sensitive and should ignore subsequent non-keyword text<br>• The HELP keyword must work in the native language of the program. In a non-English program, the English keyword must not return an error message. |





# Cross Carrier Standards

| 2.7-4 | For short codes running MMS programs, a help response should be returned whether the subscriber sends in HELP to the short code via MMS or SMS. |
|---|---|
| 2.7-5 | HELP messages should not result in premium charges to the subscriber's bill. |
| 2.7-6 | Responses to HELP requests should be available to anyone who requests help information from the short code via SMS. |
| 2.7-7 | To help subscribers understand their participation, each program should respond with the program details listed below when the subscriber sends the keyword HELP to the program short code. |
| 2.7-8 | • Identity of program sponsor—This is defined as the program name, company name, or brand associated with the campaign. |
| 2.7-9 | • Customer support info — Either a toll-free number, Web address, or e-mail address. Note that Sprint requires a toll free number for all programs and T-Mobile requires a URL for all programs. |
| 2.7-10 | • Service description of program — For example, Fun Stuff Premium Chat. |
| 2.7-11 | • Service price—For example, $0.99 per mobile originated message; $3.99 per month. |
| 2.7-12 | • Opt-out information |
| 2.7-13 | • Frequency |
| 2.7-14 | • Must include "Msg&Data Rates May Apply" |
| 2.7-15 | • Privacy statement, if applicable. |
| 2.7-16 | Help messages do not need to contain renewal date information. (Sprint carrier rules apply.  Requires the renewal date as well as any credits remaining.) |
| 2.7-17 | If the short code has multiple programs (keywords) on the same short code, the application should respond in one of two ways:<br>1) If the subscriber has opted in to only one program, the application should supply the information for the program the subscriber is opted-in to.<br>2) If the subscriber has opted-in to multiple programs, the application should present a multiple-choice question asking the subscriber what program they would like help on.<br>The first help menu does NOT need to include:<br>·    "Msg&Data Rates May Apply"<br>·    STOP, Or Sponsor Contact Information<br><br>The menu should contain a question asking what the subscriber seeks help with and a list of options for the user to get help on. Once the user has identified the program they want help with, the appropriate help information must be in the subsequent MT. |
| 2.7-18 | Where there is no short code initiating access to the service, help must be provided as a link from WAP payment presentation pages. This page containing help should, at a minimum, identify services that are currently opted into, opt-out information, pricing and payment terms. It is recommended that a PC-accessible web site be provided into which a user entering their cell phone number can retrieve detailed information on all live services provided by that program sponsor. |



 **Cross Carrier Standards**

**2.8 Customer Record Maintenance**

|  | Guideline |
|---|---|
| 2.8-1 | To the extent that carriers supply deactivation and recycled number information, content providers and aggregators are required to have appropriate and effective systems and processes for managing deactivation and recycled number information. These systems and processes should be designed to ensure that mobile content programs subscribed to by previous holders of a specific phone number do not continue to be delivered or billed to a subsequent holder of that number when it is reassigned. Content providers and aggregators should process deactivation information within three business days of receipt. |
| 2.8-2 | Independent of method of entry (SMS, MMS, Web, WAP, IVR) opt-in and opt-out records - including single, double and triple opt-in records – should be retained from the time the subscriber opts-in until a minimum of six months after the subscriber has opted-out of the program (minimum opt-in archiving period is one calendar year). These records should be made available to the aggregator or carrier upon request. |
| 2.8-3 | The content provider/aggregator is responsible for tracking program opt-in information by subscriber. |

**2.9 Sweepstakes & Contests**

*Sweepstakes and contests, including those conducted on the mobile platform, are among the most regulated of marketing tactics.*

**Mobile Sweepstakes and Contests definitions:**

> <u>**Sweepstakes**</u> - *A sweepstakes is a legal game that includes a prize, and a game of chance. No consideration is allowed. (Sprint's definition of sweepstakes includes anything with a prize component regardless of the method of prize delivery.)*

> <u>**Lottery**</u> - *A lottery is a game that includes a prize, a game of chance, and consideration. Federal l egislation and State laws govern (and disallow) all lotteries for promotional purposes.*

> <u>**Contest**</u> - *A contest is a promotional mechanism that includes a prize, and a game of skill. Consideration is allowed, but there cannot be any element of chance.*

> <u>**Consideration**</u> - *Although the definition of consideration varies from state to state, generally, consideration means that a willing participant is required to purchase something or pay for access to be eligible to enter a game.*

|  | Guideline |
|---|---|
| 2.9-1 | Consideration may be monetary or non-monetary (an example of non-monetary consideration is a sweepstakes where the participant is required to provide detailed consumer information to be eligible). |
| 2.9-2 | All sweepstakes must offer a free Alternative Method Of Entry (AMOE). Allowing participants to enter via mail, internet, fax or Interactive Voice Recognition (IVR) via a toll free number are all forms of AMOE, but are not the only forms of free AMOE. |
| 2.9-3 | Anyone running a sweepstakes should seek legal guidance when drawing up rules. This is especially important if premium SMS is being considered as part of the sweepstakes. |





# Cross Carrier Standards

## 2.10 Terms & Conditions

|  | Guideline |
|---|---|
| | **Guideline** |
| 2.10-1 | Terms and Conditions must contain the following:<br>• Pricing and billing frequency |
| 2.10-2 | • Product description and quantity |
| 2.10-3 | • Program identification including billing shortcode |
| 2.10-4 | • Opt-out instructions (must be displayed in bold typeface) |
| 2.10-5 | • Message and Data Rates may apply |
| 2.10-6 | • Links to privacy policy and comprehensive terms and conditions. |
| 2.10-7 | • Customer Care Contact info (#800, email address, or website) |
| 2.10-8 | • Billing method. Information disclosing that the premium charge will be added to the subscriber's wireless phone bill or deducted from their prepaid account |
| 2.10-9 | • Account holder authorization |
| 2.10-10 | • Customer cancellation (ie. notice that charges will recur until cancelled; subscriptions/recurring programs only) |
| 2.10-11 | • If the service is a subscription |
| 2.10-12 | The above terms apply to WAP sites IF the subscriber is charged for accessing the WAP site home (or landing) page. Otherwise, all advice of charges must be clearly and conspicuously presented within the site, as shown in the example **CCS-EG-06.** |
| 2.10-13 | Comprehensive terms and conditions must be hosted on a static Website to which a user may return. Comprehensive terms and conditions must contain all disclosures present in the abbreviated terms and conditions. |

## 2.11 Affiliate Marketing

**_Affiliate Marketing_** *is a process whereby a content provider provides financial consideration to one or more persons or entities in exchange for their agreement to offer content providers' products and/or services to consumers.*

|  | Guideline |
|---|---|
| | **Guideline** |
| 2.11-1 | To ensure that advertising of mobile products and services offered via Affiliate Marketing is clear and accurate, content providers engaging in Affiliate Marketing agree that:<br>• Marketing via the email channel shall comply with the CAN-SPAM Act of 2003 (Controlling the Assault of Non-Solicited Pornography & Marketing Act) and any and all implementing regulations promulgated by the Federal Trade Commission and the Federal Communications Commission, and; |
| 2.11-2 | • Mobile Identification Number (MIN) entry, and Personal Identification (PIN) entry pages (including but not limited to pages that provide a mechanism for users to make a purchase of content providers' products and services) must be controlled and monitored by the applicable content provider or Application Service Provider for compliance to applicable state laws and MMA Guidelines. |

### 2.11.1 Affiliate Marketing Web-based Carrier Select Page

|  | Guideline |
|---|---|
| | **Guideline** |
| 2.11.1-1 | Content providers should terminate their relationship with any party engaged in Affiliate Marketing on their behalf that is found to be non-compliant. Web pages used for affiliate marketing are commonly known as Jump Pages.  Jump pages, which are third party hosted pages that redirect a consumer to one or more content provider's websites, are known as Carrier-Select Jump Pages. |





# Cross Carrier Standards

| 2.11.1-1 | The following describes what is required and not allowed on Carrier-Select Jump Pages:<br><br>**Required**<br><br>• If any alternative wireless content is being advertised it must be disclosed in a font no smaller than 1/2 the font size of the primary offer description and no further than 20 pixels from the primary offer description with a minimum of 25 point font size<br>• Carrier logos distributed from or approved by carriers<br><br>**Not allowed**<br><br>• Purchase flow<br>• Request/take MIN or PIN information<br>• Inappropriate or unapproved content per individual carrier guidelines<br>• Inappropriate use of the word 'free' (CCS-30)<br>• Use of carrier logo or name if advertising any service when that service is not supported by that carrier |

## 2.12 Premium WAP Sites

|  | Guideline |
|---|---|
| 2.12-1 | Access to content presented in the form of browse-able WAP sites may be initiated by SMS short code, by WAP push from a PC website, by direct entry of a URL, by clicking a search link, etc. While opt-in may not originate through an SMS short code, subscribers are still billed "on-net" through PSMS or direct carrier billing connections, placing such sites under the governance of these Consumer Best Practice Guidelines. |
| 2.12-2 | The same opt-in rules apply for WAP sites as for SMS programs. Double opt-in is required IF there is any charge associated with accessing the first page of a WAP site presented when the subscriber selects a service message (embedded link or WAP push message), or browses to that page by any other means. |
| 2.12-3 | There is no requirement for opt-in text messages IF the first page of a WAP site presented to the user does not incur a charge, and any subsequent charges are clearly set out, requiring an explicit user action as described below. |
| 2.12-4 | Before any billing events can be generated, the advice of charge must be presented clearly to the customer, in substantially the same format as the payment flow shown below. |
| 2.12-5 | There must be an explicit "Buy" button visible to the user on the first screen of the payment details page. Only when the user clicks this button should a billing event be generated. "Buy" may be replaced with "Subscribe" or "Purchase" terminology. |
| 2.12-6 | There must be an explicit "Cancel" button available to the user on the first screen of the payment details page immediately below the Buy button and visible without requiring the user to scroll down the screen. |
| 2.12-7 | There must be an explicit "Terms and conditions" link available to the user, listed directly after the "Cancel" button. The Terms and conditions page shown to the user should contain at a minimum the following information: |
| 2.12-8 | That the payment will be made to the subscriber's wireless phone bill. |
| 2.12-9 | • That the user will be advised of all charges before being billed. |
| 2.12-10 | • The description that will appear on the subscriber's phone bill or deducted from their pre-paid balance. |
| 2.12-11 | • There should be a link providing customer care contact information and advising that other ancillary charges, such as carrier data charges, that may be incurred. |





# Cross Carrier Standards

## 2.13 Subscription Programs

*A __subscription program__ is any program the subscriber opts-in to where the result is that the subscriber passively incurs premium charges over time for content delivery. There are two kinds of subscription programs:*
*1) A program for a set period of time, such as one month.*
*2) A program for a set number of uses, after which the subscriber may be charged for another "bucket" of uses.*

| | Guideline |
|---|---|
| 2.13-1 | In addition to the information required in the double opt-in mechanisms in sections 2.6 & 2.6.1 Premium Rate Double Opt In via SMS, the opt-in flow for a subscription program must also include the following:<br>• Identification of the program as a subscription and the billing interval. |
| 2.13-2 | • The word "subscription" or equivalent must be used in the advertising and T&Cs. |
| 2.13-3 | • Contact details for the program sponsor—Either a toll free number or a Web site address for opt-out details. |
| 2.13-4 | Subscription periods should not be longer than one month. |
| 2.13-5 | Regardless of the subscription period (daily, weekly, monthly, for example), the subscriber should be notified of the subscription pricing in conjunction with the subscription period. |
| 2.13-6 | Before the program is renewed, or at a minimum of once per month, a renewal message must be sent to the participating subscriber's handset containing these details: |
| 2.13-7 | • The name of program |
| 2.13-8 | • The fact that the program is a subscription and is being renewed |
| 2.13-9 | • Billing period and advice of charge for the program |
| 2.13-10 | • Opt-out details |
| 2.13-11 | • Must include "Msg&Data Rates May Apply" and customer support information. |
| 2.13-12 | This information may be supplied in other program-related messaging to the handset but should coincide with the subscription anniversary. |
| 2.13-13 | Each subscription service must be renewed independently of when the subscription was originally ordered. |

### 2.13.1 Subscription Double Opt In via Mobile Web/ WAP

| | Guideline |
|---|---|
| 2.13.1-1 | For subscriptions opted-in to through the WAP flow, the advice of charge page shown below must be presented to the subscriber by the content provider. This page describes the purchase terms of the subscription, including the billing frequency, and the purchase link name is changed from "Buy" to "Subscribe" |
| 2.13.1-2 | The payment advice page should include the following content:<br>• Click <Subscribe> to confirm your purchase of <content description> for <price> per <billing period>. |
| 2.13.1-3 | • A link or button that activates the subscription. The name of this link should clearly convey to the subscriber that clicking on the link will activate the subscription. e.g. "Subscribe", "Buy Now", "Charge my phone bill" |
| 2.13.1-4 | • A link or button directly below the activation link that says "Cancel". |





# Cross Carrier Standards

| | |
|---|---|
| 2.13.1-5 | • A link saying "Terms & Conditions". This link must lead to a page listing detailed terms and conditions of the service, including at a minimum the name and contact details of the content provider. |
| 2.13.1-6 | • A link saying "Msg&Data Rates May Apply". This link must lead to a page describing the standard rate data and messaging charges that may apply, depending on a subscriber's plan |
| 2.13.1-7 | When the subscriber clicks the "Subscribe" or subscription activation link, the page to which they are re-directed containing the content for download should display the following confirmation text:<br>• Thank you for your payment of <price>. Your subscription has been activated |
| 2.13.1-8 | This confirmation page must also state how to use the HELP and STOP text commands to the relevant short code. |
| 2.13.1-9 | Once a subscriber has successfully opted into the program via a Mobile Web browser, an MT message should be sent notifying the subscriber of the purchase, serving as the notice of charge for the transaction. This message should be sent to the subscriber within twelve hours of opting in and should include the following information: program name, price of subscription, billing period, HELP to receive help, and STOP to opt-out. |
| 2.13.1-10 | Example of WAP Subscription<br><br>First Opt-in      Second Opt-In      Confirmation Page |





# Premium Rate Examples

**EXAMPLE: HELP Messages (CCS-EG-01)**

**Help (Single Service)**

| | | |
|---|---|---|
| **Step 1:** | User sends HELP Mobile Originating (MO) Msg | |
| **Step 2:** | Help MT response: | |

Program sponsor →

Service Description & Frequency →

Customer Support Info →

Additional Carrier Costs →

Opt Out Info →

Sprint family requires: Renewal date/credits remaining →

> *AcmeMobileRingtonesClub:*
>
> *Subscribed for 5 Ringtones for $5.99/mo.*
>
> *800-000-0000.*
> *www.HELPURL.com.*
>
> *Msg&Data Rates May Apply*
>
> *Reply STOP to cancel,*
>
> *Renews:10/10*

*Cross Carrier Examples: Legend*

| Web, TV, In-Store, Promotional Poster | Text Message |
|---|---|
| Mobile Web/ WAP | |

**Help (Multiple Services)**

| | |
|---|---|
| **Step 1:** | User sends HELP Mobile Originating (MO) Msg |
| **Step 2:** | Help menu MT response to a HELP MO from a user |

Program sponsor →

Option  A →

Option  B →

> *AcmeMobileRingtonesClub:*
>
> *Send HELP TONE1 for Poly club or*
>
> *HELP TONE2 for Truetone club*
>
> *STOP to cancel*

**Step 3:** User responds HELP TONE1.

Program sponsor →

Service Desc & Freq →

Customer Support Info →

Additional Carrier Costs →

Opt Out Info →

Sprint family requires: Renewal date/credits remaining →

> *AcmeMobileRingtonesClub:*
>
> *Subscribed for 5 Polytones for $5.99/mo.*
>
> *800-000-0000.*
> *www.HELPURL.com.*
>
> *Msg&Data Rates May Apply*
>
> *Reply STOP to cancel,*
>
> *Renews:10/10*

**Step 4:** User responds HELP TONE2.

Program sponsor →

Service Desc & Freq →

Customer Support Info →

Additional Carrier Costs →

Opt Out Info →

Sprint family requires: Renewal date/credits remaining →

> *AcmeMobileRingtonesClub:*
>
> *Subscribed for 5 Truetones for $5.99/mo.*
>
> *800-000-0000.*
> *www.HELPURL.com.*
>
> *Msg&Data Rates May Apply*
>
> *Reply STOP to cancel,*
>
> *Renews:10/10*





# Premium Rate Examples

**EXAMPLE: STOP Messages (CCS-EG-02)**

## Stop (Single Service)

User receives the following
Mobile Terminating (MT)
Message:

Program sponsor →

Discontinuation of Service →

Discontinuation of Charges →

Additional Carrier Costs →

Customer Support Info →

> *AcmeMobileRingtonesClub:*
>
> *Your Ringtone subscription is cancelled.*
>
> *You will get no more messages or charges.*
>
> *Msg&Data Rates May Apply.*
>
> *www.HELPURL.com*

## Stop (Multiple Services)

**Step 1:**  User sends STOP Mobile
Originating (MO) Msg

**Step 2:**  Help menu MT response to a
STOP MO from a user

Program sponsor →

Option  A →

Option  B →

> *AcmeMobileRingtonesClub:*
>
> *Send STOP TONE1 for Polytone club or*
>
> *STOP TONE2 for Truetone club*

**Step 3:**  User responds STOP
TONE1.

Program sponsor →

Discontinuation of Service →

Discontinuation of Charges →

Additional Carrier Costs →

Customer Support Info →

> *AcmeMobileRingtonesClub:*
>
> *Your Polytone subscription is cancelled.*
>
> *You will get no more messages or charges.*
>
> *Msg&Data Rates May Apply.*
>
> *www.HELPURL.com*

**Step 4:**  User responds STOP
TONE2.

Program sponsor →

Discontinuation of Service →

Discontinuation of Charges →

Additional Carrier Costs →

Customer Support Info →

> *AcmeMobileRingtonesClub:*
>
> *Your Truetone subscription is cancelled.*
>
> *You will get no more messages or charges.*
>
> *Msg&Data Rates May Apply.*
>
> *www.HELPURL.com*





# Premium Rate Examples

**EXAMPLE: PREMIUM Rate IVR (Initial Opt In IVR) (CCS-EG-04 )**

| | |
|---|---|
| Call to Action | The following is advertised on web, television, in-store promotional poster, etc.: |
| Program sponsor → | WOD: Weather on Demand. |
| Service Description → | Call 888-222-2222 to get current weather for your area sent to your phone. Dial 0 for help. |
| Price and Frequency → | $5.99/mo for daily info (7 per week) |
| Customer Support Info → | Text HELP for help. |
| Opt Out Info → | To stop text STOP. |
| Additional Carrier Costs → | Msg&Data Rates May Apply. |
| Step 1: User responds to Call to Action | User calls 888-222-2222 [Mobile subscriber calls and is prompted to select SMS to phone] |
| Step 2: Mobile Content MT | User receives the following MT Message: |
| Mobile Content → | WOD: Partly sunny with chance of showers in late afternoon. Highs in the 70 during the day, and 62 at night. Reply Help for Help. |





# Premium Rate Examples

**EXAMPLE: Premium Rated Double Opt In– Alert Subscription (CCS-EG-05)**

Call to Action

The following is advertised on web, television, in-store promotional poster, etc.:

Program sponsor → | Farm league baseball!
Service Description → | Txt us your farm town zip code. Txt <Your Zip Code> to 12345.
Service Cost → | We send game day reminder for $3.99/month, charged to your wireless bill.
Frequency of Messaging → | Get 4 msg/month.
Customer Support Info → | Txt HELP for help.
Opt Out Info → | To stop txt STOP.
Additional Carrier Costs → | Msg&Data Rates May Apply.

**Step 1:** User responds to Call to Action

Text '44521' to 12345.

**Step 2:**

User receives the following MT Message:

Program sponsor → | Farm League Baseball Alerts!
Service price → | To confirm $3.99 monthly alerts, reply YES.
Frequency of messaging → | Get 4 msgs/month.
How to get help → | Reply HELP for help
Additional carrier costs → | Msg&Data Rates May Apply.

**Step 3:** Double Opt In

User sends MO message "YES"

**Step 4:** Initial MT

Service description → | Thanks for subscribing to Farm League
Service price → | Baseball alerts for $3.99/month!
Frequency of messaging → | Get 4 msgs/month.
How to get help → | Reply HELP for help.
How to stop → | Reply STOP to cancel.
Additional carrier costs → | Msg&Data Rates May Apply.

**Step 5:** MT Alert

User receives the following MT Message:

Alert → | Farm League Baseball Alert! Crosstown Rebels battle the Lakeview Titans on 11/11/08 @ 6pm in Dolores Park. Support your local team. Reply Help for Help.





# Premium Rate Examples

**EXAMPLE: Premium Rated Opt In for WAP (CCS-EG-06)**

*\*Please refer to specific carrier guidelines on Mobile Web and Premium WAP detailed requirements.*

Call to Action | The following is advertised on web, television, in-store promotional poster, etc.:

Program sponsor → | CheckMyRide Tones!
Service Description → | Visit wap.checkmyride.com on your phone microbrowser. Visit HELP for help.
Customer Support Info → | Txt HELP for help.
Opt Out Info → | To stop txt STOP.
Additional Carrier Costs → | Msg&Data Rates May Apply.

**Step 1:** User responds to Call to Action | User visits wap.checkmyride.com

**Step 2:** WAP Opt In 1 | User sees the following WAP/ xHTML page with product offer:

Program sponsor → | Checkmyride.com!
Service Description → | The hottest ringtones sent to your phone every month.
Service price → | Get 5 ringtones for $9.99/month.
Link to terms→ | Terms and Conditions
Additional Carrier Costs → | Msg&Data Rates May Apply.

**Step 3:** WAP Opt In 2 | Mobile subscriber sees the following WAP/xHTML page after selecting subscription.

Program sponsor → | Checkmyride.com!
Service Description → | Click "Subscribe" to confirm your purchase of "Check my Ride" tones for $9.99 per month.
| **Subscribe**          **Cancel**
Link to terms→ | Terms and Conditions
Additional Carrier Costs → | Msg&Data Rates May Apply.

**Step 4:** WAP Confirmation | Mobile subscriber sees the following WAP/xHTML page after being billed.

Service Description & cost → | Thank you for your payment of $9.99 per month. Your subscription has been activated.
Frequency of messaging → | Get 5 ringtones per month.
How to get help→ | Text HELP  for help to 12345.
How to Stop → | Text STOP to cancel to  12345





# Premium Rate Examples

**Step 5:** Confirmation MT

User receives the following MT Message:

Service Description & cost →

| |
|---|
| Thank you for your payment of $9.99 per month for Check my Ride tones. |

How to get help→

Reply HELP for help.

How to Stop →

Reply STOP to cancel

**EXAMPLE: Billing Renewal Message (CCS-EG-10)**

| | Sample Billing Renewal Message | |
|---|---|---|
| **Type** | **Sample Text** | **Charge** |
| MT | Your XYZ Alerts Subscription Renewed, 5 msg/month for $5.99/mo.800-000-0000 Msg&Data Rates May Apply.www.HELPURL.com.Reply HELP for help, STOP to cancel | Std |





# Cross Carrier Standards

## Section 3: Free To End User (FTEU)

Free to End User Cross Carrier Guidelines

### 3.0 General Guidelines

|  | Guideline |
|---|---|
| 3.0–1 | At a minimum, programs should be run in a manner that is congruous with the letter and spirit of the MMA Global Code of Conduct for Mobile Marketing. The Code of Conduct is located at: http://www.mmaglobal.com/codeofconduct.pdf |
| 3.0-2 | At all times, programs must be in accordance with applicable federal and state laws, rules and regulations. |
| 3.0-3 | Wireless subscribers have a right to privacy. |
| 3.0-4 | An individual program may be set up as FTEU on carriers which support the functionality and standard rate (SR) on carriers who do not support FTEU, provided that the application does not inherently have to be delivered as FTEU (for example, for legal reasons), and further provided that Content Providers ensure that all advertising, marketing and other consumer materials regarding the program clearly indicate on which carriers the program is offered as a standard rate program. The guidelines for FTEU programs and SR programs should apply on each carrier as appropriate. |
| 3.0-5 | Charging Disclosure: FTEU Mobile Terminated (MT) messages sent to subscribers by the program should be disclosed as such.  The text message must start with "FREE" and the text message must include wording so that it's clear to a consumer that it's a free message, but the text message no longer must start with the words "Free Msg". These examples are acceptable: "Free Mammoth Ski Alert", "Free Lender's Bank Msg", "Free Msg: WOD alerts". |
| 3.0-6 | FTEU programs are approved based on the following information submitted by the content provider through the carrier: |
| 3.0-7 | • The information submitted to the carrier for program approval should include the estimated frequency with which end users will receive FTEU messages. |
| 3.0-8 | • A formal restriction should not be placed on the number of messages, which may be sent as part of an individual FTEU program. However, carrier approval may be given on a case-by-case basis for programs where the estimated number and frequency of FTEU messages is determined by the carrier to be appropriate for the application and approved by carrier.<br>Note that many potential FTEU applications will involve event-triggered alert messages, the frequency of which cannot precisely be predetermined. |
| 3.0-9 | Not all carriers support FTEU messaging |

### 3.1 Guidelines for Advertising Messaging Programs

|  | Guideline |
|---|---|
| 3.1-1 | When promoting programs, content providers should ensure that their advertising in all forms is clear and conspicuous regarding all terms and conditions associated with offers and adheres to all state and federal regulations. |
| 3.1-2 | Program advertising or its placement must not be deceptive about the functionality, features, or content of the underlying program. |
| 3.1-3 | Print and Web Advertising must include:<br>• Language outlining that the service is free<br>• A resource (such as a website or phone number) where subscribers can reference all terms and conditions.<br>• The frequency of the messaging |





# Cross Carrier Standards

| 3.1-3 | • Instructions for obtaining help (HELP)<br>• If the program is recurring, instructions on cancelling or opting-out of the service must be included. If the program being advertised is non-recurring, then STOP messaging is not required. |
|---|---|
| 3.1-4 | Instructions on using the HELP keyword (i.e. Text HELP for help) may be provided in lieu of full customer service contact information in advertising materials. |
| 3.1-5 | If space is not available for the full terms and conditions, the location where the full terms and conditions may be accessed without charge to the consumer must be disclosed (e.g. via a website address and/or toll free phone number). |

## 3.2 Opt In

|  | Guideline |
|---|---|
| 3.2-1 | Content providers must obtain opt-in approval from subscribers before sending them any SMS or MMS messages or other content from a short code. |
| 3.2-2 | FTEU programs require single opt-in |
| 3.2-3 | As with standard rate programs, FTEU programs should be subject to single opt-in mechanisms. The mechanism should be sufficient to establish the subscriber's willingness to participate in the program and possession of the handset. The opt-in applies to the specific program and should not be used as a blanket approval to promote other programs, products or services. |
| 3.2-4 | Frequency of messages: For programs whereby the user defines the rate of message occurrence, a confirmation MT or Help MT does not need to include a defined frequency. All other frequency requirements will follow the standard rate frequency guidelines. |

## 3.3 Opt Out

|  | Guideline |
|---|---|
| 3.3-1 | Subscribers should be able to stop participation in a FTEU program when desired, except for messages related to their underlying mobile service. |
| 3.3-2 | Content providers must offer subscribers the opportunity to cancel the service at any time.  The following rules govern program opt-out: |
| 3.3-3 | A subscriber must be able to stop participating and receiving messages from any program by sending STOP to the short code used for that program.<br>• END, CANCEL, UNSUBSCRIBE or QUIT should also be opt-out key words for all programs; however, content providers should feature the word STOP in their advertising and messaging.<br>•  A content provider must process a stop message from a subscriber regardless of the keyword STOP's case sensitivity. The STOP keyword must work in the native language of the program. In a non-English program, the English keyword must not return an error message.<br>• Short code programs must ignore subsequent non-keyword text included in STOP MOs.<br>• Short codes running MMS programs should handle the STOP keyword correctly, regardless whether the subscriber sends the keyword via MMS or SMS.<br>• When sent, these words cancel the subscriber's previous opt-in for messaging. |





# Cross Carrier Standards

| 3.3-4 | If the subscriber is participating in multiple programs on the short code, there are two options for the content provider when a subscriber sends an opt-out request:<br>1) The content provider sends a menu of the programs the subscriber is subscribed to and the subscriber has the responsibility to reply with the specific keyword to the specific program they would like to be opted out of. To ensure subscribers also have a way to opt-out of all programs within this menu, STOP ALL must be added to the menu choices. The stop menu message does NOT need to contain<br>   i) "Free Msg"<br>   ii) Sponsor contact information.<br>2) Or if the subscriber sent STOP ALL to the short code, they are opted-out of all programs they were enrolled in on that short code. |
|---|---|
| 3.3-5 | When STOP, or any of the opt-out keywords above, is sent to a program, the program must respond with an MT message, whether or not the subscriber is subscribed to the program or not. |
| 3.3-6 | When the user is a subscribed to a recurring program, an MT message confirming the opt-out must be sent to the subscriber. This must be a free message. This message should reference the specific program the subscriber has opted-out from. No further messages should be sent to the subscriber from this program, including marketing messages for any related or unrelated programs. |
| 3.3-7 | When the user is not currently subscribed to a recurring program, or the program is a one-time program where the subscriber will not receive additional messages, then an MT message may be sent that only confirms that the user is not subscribed to any programs on this short code and indicates that no further messages will be sent. |
| 3.3-8 | This STOP command functionality requirement applies to all programs, including one-time use programs where the subscriber will not receive additional messages. This is to avoid subscriber confusion around the use of the STOP command. |
| 3.3-9 | The STOP command should never result in an error being sent back to the subscriber. |
| 3.3-10 | The content provider must record and store all opt-out transactions. |

## 3.4 Terms & Conditions

| | Guideline |
|---|---|
| 3.4-1 | Terms and Conditions at a minimum must contain the following: |
| 3.4-2 | •    STOP instructions in BOLD lettering |
| 3.4-3 | •    HELP instructions in BOLD lettering |
| 3.4-4 | •    Program sponsor information, defined as the program name, company name, or brand associated with the campaign |
| 3.4-5 | •    For free to end user programs: Disclose that standard carrier messaging charges do not apply to messages received as part of the service (where relevant, list on a carrier-by-carrier basis whether this applies). |
| 3.4-6 | •    Customer Service Contact Information: either a toll-free number, a web submission form or an email address. |
| 3.4-7 | •    Guidance on the frequency with which the subscriber may expect to receive messages for the duration of the program. Note that for many applications, this cannot be precisely predetermined by the content provider. In this case, the guidance should relate to the expected message frequency under normal circumstances. |
| 3.4-8 | All material terms and conditions of the program should be clearly communicated. |
| 3.4-9 | Carrier compatibility - clearly and conspicuously disclose that content is not available on all carriers, as applicable. Include list of supported carrier names whilst excluding all other carrier names. |





# Cross Carrier Standards

| 3.4-10 | If the content provider offers multiple services, separate T&C's per service should be provided instead of generic T&C's that cover all offered services. |
|---|---|
| 3.4-11 | If a checkbox is used to indicate a consumer's acceptance of the terms and conditions, it is not permissible for the checkbox to be pre-checked. |

## 3.5 HELP Guidelines

| | Guideline |
|---|---|
| 3.5-1 | Help messaging commands, phone numbers, URL's, and email addresses should result in the subscriber receiving help with his issue. Dead ends that do not provide a manner in which the subscriber may resolve his issue is not acceptable. |
| 3.5-2 | A subscriber can receive help information by sending the word HELP to any program. The HELP keyword should work on all short code programs. HLP is optional for HELP, but not required.<br>• A content provider must process a help message from a subscriber regardless of the keyword's case sensitivity.<br>• For short codes running MMS programs, a help response should be returned whether the subscriber sends in HELP to the short code via MMS or SMS<br>• The HELP keyword must work in the native language of the program. In a non-English program, the English keyword must not return an error message. |
| 3.5-3 | To help subscribers understand their participation, each program should respond with the program details listed below when the subscriber sends the keyword HELP to the program short code. |
| 3.5-4 | • Identity of program sponsor—This is defined as the program name, company name, or brand associated with the campaign. |
| 3.5-5 | • Customer support info — Either a toll-free number or Web address, or e-mail address |
| 3.5-6 | • Service description of program — For example, ABC Bank Alerts. |
| 3.5-7 | • Opt-out information |
| 3.5-8 | If the short code has multiple programs (keywords) on the same short code, the application should respond in one of two ways:<br>1) If the subscriber has opted in to only one program, the application should supply the information for the program the subscriber is opted-in to.<br>2) If the subscriber has opted-in to multiple programs, the application should present a multiple-choice question asking the subscriber what program they would like help on. The first help menu does NOT need to include:<br>"Free msg", STOP, Or Sponsor Contact Information<br>The menu should contain a question asking what the subscriber seeks help with and a list of options for the user to get help on. Once the user has identified the program they want help with, the appropriate help information must be in the subsequent MT. |
| 3.5-9 | When HELP is sent to a program, the program must respond with an MT message, whether or not the subscriber is subscribed to the program, and whether the program is a subscription program or not. HELP must always result in a response. Help responses can vary dependent on whether you're signed up for the program or not. |



 # FTEU Examples

**EXAMPLE: FTEU Single Opt In**

*Cross Carrier Examples: Legend*

| Web, TV, In-Store, Promotional Poster | Text Message |
|---|---|
| Mobile Web/ WAP | |

**Call to Action**    The following is advertised on web, television, in-store promotional poster, etc.:

| | |
|---|---|
| Program sponsor → | Lenders Bank daily bank balance alerts. |
| Service Description/Cost → | Txt 'balance' to 43210 to get daily bank balance. |
| Customer Support Info → | Txt HELP for help. |
| Opt Out Info → | To stop txt STOP. |
| Frequency of messaging → | Get 1 msg/day. |

**Step 1:**    User responds to call of action and sends MO "balance".

**Step 2:** Confirmation MT    User receives the following MT Message:

| | |
|---|---|
| Free message declaration & Service description → | Free  Lenders Bank balance alerts |
| Frequency of messaging → | Get 1 msg/day. |
| How to get help → | Reply HELP for help. |
| How to stop → | Reply STOP to cancel. |

**Step 3:** MT Alert    User receives the following MT Message:

| | |
|---|---|
| Free message declaration → | Free Lenders Bank alert - The balance for account #009221 is $12,998.23. |
| Alert → | |



# EXHIBIT G



# EXHIBIT H



Air2Web, Inc.
1230 Peachtree Street, NE
Suite 1200
Atlanta, Georgia 30309
Telephone: (404) 942-5300
Facsimile: (404) 815-7708

# AIR2WEB APPLICATION AND
## SERVICES AGREEMENT
("Agreement").

| | |
|---|---|
| Company Name: Bebe Stores Inc | Contract Date: 3/30/07 |
| Company Address: 400 Valley Drive | Effective Date: 4/2/07 |
| City: Brisbane   State: CA   Zip Code: 94005 | Telephone: 415 657 4513 |
| Company Authorized Representative: Marc Viale   Title: Director Database Marketing | Facsimile: 415 657 4247 |
| Company Primary Contact: Diana Palmer  Marc Viale | Email Address: Mviale@bebe.com |
| Accounts Payable Contact: Diana Palmer   Phone Number: 415 657 4238 | Email Address: dpalmer@bebe.com |
| Salesperson: Mark Emery   Phone Number: 404 942 5350 | Email Address: |

Air2Web, Inc. ("Air2Web") and the above-listed company ("Company") hereby agree that all products and services provided to Company by Air2Web shall be furnished only in accordance with the terms and conditions of this Agreement. The parties agree that this Agreement consists of the General Terms and Conditions contained on the following page, and any Schedule that is applicable. The parties further agree that this Agreement constitutes the complete and exclusive Agreement between them regarding the matters described herein and shall supersede and prevail over any prior proposals, purchase orders or other communications between them, oral or written, relating to the subject matter hereof, or any subsequent purchase orders or other standardized business forms.

**Schedule A**   **Application License Agreement.** Air2Web shall license the computer software described in Schedule A to the Company on the terms and conditions set forth therein.

**Schedule B**   **Customization and Setup Services.** Air2Web shall perform the Services described in Schedule B on the terms and conditions set forth therein.

**Schedule C**   **Content Delivery Services.** Air2Web shall transmit Content between the Company and Carriers on the terms and conditions set forth in Schedule C.

**Schedule D**   **Air2Web Fees.** The Company shall be obligated to pay Air2Web fees for all software licensed to the Company and services performed by Air2Web as set forth on Schedule D.

**Schedule E**   **Carrier Mandated Content Standards.** Written standards set by Carriers which describe the type of Content that they will not transmit over their networks are set forth in Schedule E.

**Schedule F**   **List of Current Carriers.** The providers of wireless messaging services with which Air2Web has contracted as of the Effective Date are set forth in Schedule F.

**Schedule G**   **Service Level Standards.** Air2Web's Service Level Standards for Delivery Services are set forth in Schedule G.

[Important additional terms contained on Page 2 and Attachments attached hereto]

**Air2Web, Inc.**                                  **bebe Stores, Inc.**

By: _____      By: _____
Tom Williams, Chief Financial Officer             Signature of above-listed Authorized Representative

[SEAL]                                            [SEAL]

BEBE-A-CGW-001-0-0307

CONFIDENTIAL                                      bebe000001

# GENERAL TERMS AND CONDITIONS

**Definitions.**

Air2Web Gateway Platform. Air2Web's scalable proprietary wireless platform containing a core infrastructure and computer programs enabling the delivery of Content between the Company and the Interactive Wireless Devices of Subscribers through the Carriers.

Carriers. Providers of wireless messaging services to Subscribers via wireless telecommunications networks. The Carriers with whom Air2Web has contracted for connectivity as of the Effective Date are listed in Schedule F.

Content. All data, information, and other content provided by Company to be sent to Interactive Wireless Devices of Subscribers via the Air2Web Gateway Platform, including SMS.

Content Standards. Written standards set by the Carriers from time to time which describe the type of Content that they will not transmit to Subscribers. For purposes of this Agreement, the Content Standards include the Content Standards established by the Carriers as of the Effective Date which are set forth on Schedule B attached hereto, and any additions, deletions or changes to such Content Standards that are hereafter announced by the Carriers from time to time.

Customization Services. Customization Services shall have the meaning defined in Schedule B hereto.

Delivery Services. The service of delivering the Company's Content to Carriers over the Air2Web Gateway Platform.

Documentation. The standard user documentation published by Air2Web describing the use of the Application, including any tutorial presentation of the capabilities of the Application and any technical documentation that describes the design of the Application.

Hosting Services. Hosting Services shall have the meaning defined in Schedule A hereto.

Interactive Wireless Devices. Any and all wireless devices capable of sending and receiving SMS or displaying Content sent by the Company.

Party(ies). The parties to this Agreement are collectively referred to herein as the Parties and each a Party.

Premium Content Services. Delivery Services pertaining to Content delivered to Subscribers for a fee payable by the Subscriber, which fee will be shared by the Carrier, Air2Web and the Company in the manner described in Schedule D hereto.

Services. The Hosting Services, Customization Services and Delivery Services, collectively.

SMS. A short message service text message with up to one hundred sixty (160) characters.

Subscribers. Any and all persons who have Interactive Wireless Devices capable of receiving Content and who have subscribed to send and receive Content via the Air2Web Gateway Platform through the Carrier(s).

Third Parties. Any and all Persons not a Party to this Agreement.

**Requirements to Use Services.** Company agrees: (a) to provide true, accurate, current, and complete information about the Company and any Authorized User, including Company's e-mail address, either directly to Air2Web or through the Services, (b) to maintain and promptly update the information to keep it true, accurate, current, and complete, (c) to accept communications from Air2Web at its e-mail address. Company agrees that Air2Web may provide notices, statements, and other communications to Company through e-mail (however, if such notice, statement or other communication is related to the warning notice of renewal (See Section entitled "Term"), breach of this Agreement or any legal related matters, including but not limited to indemnification matters, then it shall be accompanied by notice in writing sent via US Mail), posting on the Services interface, or other electronic transmission. Company agrees to obtain access to the internet, either directly or through devices that access web-based content, and pay any service fees associated with such access. Company will provide all equipment necessary to make such connection to the Internet, including a computer and modem or other access device, as well as a web browser. The web browser must support SSL encryption in order for the security features of the Services to function.

**Access to Services, Access Security and Passwords.** The Services may be accessed only by the Company's employees, agents or representatives of the Company who are authorized by the Company to use the Services pursuant to this Agreement (hereinafter, an "Authorized User"). A unique login ID and password will be issued by the Air2Web to each Authorized User

CONFIDENTIAL

bebe000002

designated in writing by the Company from time to time. Each Authorized User may only access the Services using the login ID and password assigned to the Authorized User, and no person may access the Services using a login ID and password other than the Authorized User to which the login ID and password are assigned. Company is responsible for the confidentiality and use of login ID(s), password(s), and account number(s) provided to the Company and any Authorized User. Company will be responsible for all electronic communications, including account registration and other account holder information, e-mail and financial, and other data ("Electronic Communications") entered through or under Company's or an Authorized User's access number(s), password(s) or account number(s). Air2Web will act as though any Electronic Communications it receives under Company's or an Authorized User's access number(s), password(s) or account numbers(s) will have been sent by Company. Air2Web may disclose Electronic Communications if required to by law or in the good faith belief that such disclosure is reasonably necessary to: (a) comply with a legal process, (b) enforce this Agreement, or (c) respond to claims that any Electronic Communications violate the rights of third parties. Company agrees to notify Air2Web immediately of any loss or theft or unauthorized use of any login ID(s), password(s) and/or account number(s). As a further condition to use of the Services, the Air2Web may require that each Authorized User agree to use the Services in accordance with this Agreement and Air2Web's terms of service, as reasonably changed from time to time, which Agreement shall be in the form of written notice via US Mail containing the terms and conditions of service to which the Authorized User will have to consent in order to access the Services.

**Changes in Services.**  The Services pursuant to this Agreement shall be subject to reasonable modification in a manner applicable to all customers of the Services, including as a result of changes made by the relevant Carrier(s) to the corresponding services provided by the Carrier(s) to Air2Web. If any such change is made which has any effect on the rights and obligations of the Parties hereunder, then (i) Air2Web shall notify Company in writing of the relevant changes as soon as reasonably practicable.

**Payment Policy.**  Unless otherwise stated in writing in the attached Schedules, all invoices are due within thirty (30) days from receipt and will be invoiced on a monthly basis. Unless subject to a good faith dispute or legitimate case in controversy about which Company notifies Air2Web prior to the original due of the disputed amount, Air2Web has the right to suspend performance under this Agreement at any time that the Company is in default hereunder. In addition, in the event the Company fails to pay any past due amount hereunder, Air2Web may set off any other amounts that Air2Web owes the Company against such amount.

**Taxes.**  The Company agrees to pay any sales, use, or other tax (excluding any tax that is based on Air2Web's income), duty, or other charge of any kind or nature that is levied or imposed by any governmental authority or regulatory body in connection with this Agreement or the Services provided hereunder.

**Term.**  This Agreement shall remain in effect for a period of one (1) year after the Effective Date of the Services ("Initial Term") unless sooner terminated pursuant to the terms hereof. This Agreement shall automatically renew for successive one (1) year terms ("Renewal Terms") upon expiration of the Initial Term or any Renewal Term unless either Party hereto provides notice to the other Party of its intent not to renew this Agreement at least ninety (90) days in advance of the scheduled expiration of the Initial Term or any Renewal Term. Air2Web agrees to provide Company with notice in writing, via U.S. Mail, of the scheduled expiration of the then current term not less than one hundred twenty (120) days prior to the expiration of such term.

**Termination.**  This Agreement may be terminated by either Party upon breach by the other Party of the terms contained herein and failure to cure same within thirty (30) days after receipt of notice from the non-breaching Party describing the alleged breach. Upon expiration or termination of this Agreement for any reason, Company shall, upon receipt of an invoice, pay to Air2Web all undisputed amounts owed hereunder as of the effective date of termination within thirty (30) days of receipt of such invoice. Company may terminate this Agreement at any time upon thirty (30) days written notice to Air2Web and without incurring any penalty, obligation, or liability other than for those undisputed services previously rendered. In the event that Company terminates this Agreement without cause, it may do so without incurring any penalty, obligation, or liability if it notifies Air2Web thirty (30) days in advance and pays Air2Web for those undisputed services previously rendered. Air2Web shall not terminate without cause during any term.

**Confidential Information.**  Each Party (the "Receiving Party") undertakes to retain in confidence the terms of this Agreement and all other non-public information, pricing, business methods, technology, materials and know-how of the other Party disclosed or acquired by the Receiving Party pursuant to or in connection with this Agreement which is either designated as proprietary and/or confidential or, by the nature of the circumstances surrounding disclosure, ought in good faith to be treated as proprietary and/or confidential ("Confidential Information"); provided that each Party may disclose the terms and conditions of this Agreement to its parent, subsidiaries, and affiliates and to its immediate legal and financial

CONFIDENTIAL                                    bebe000003

consultants on a confidential basis in the ordinary course of its business. Neither Party shall use any Confidential Information with respect to which it is the Receiving Party for any purpose other than to carry out the activities contemplated by this Agreement. Each Party agrees to use commercially reasonable efforts to protect Confidential Information of the other Party, and in any event, to take precautions at least as great as those taken to protect its own confidential information of a similar nature. Each Party shall also notify the other promptly in writing in the event such Party learns of any unauthorized use or disclosure of any Confidential Information that it has received from the other Party, and will cooperate in good faith to remedy such occurrence to the extent reasonably possible. The restrictions set forth in this Paragraph shall not apply to any information that: (i) was known by the Receiving Party without obligation of confidentiality prior to this Agreement; (ii) was in or entered the public domain through no fault of the Receiving Party; (iii) is disclosed to the Receiving Party by a Third Party legally entitled to make such disclosure without violation of any obligation of confidentiality; (iv) is required to be disclosed by applicable laws or regulations (but in such event, only to the extent required to be disclosed); or (v) is independently developed by the Receiving Party without reference to any Confidential Information of the other Party. Upon request of the other Party, each Party shall return to the other all materials, in any medium, which contain or reveal all or any part of any Confidential Information of the other Party. Each Party acknowledges that breach of this Section by such Party would result in irreparable harm to the other Party, for which money damages would be an insufficient remedy, and therefore that the other Party shall be entitled to seek injunctive relief to enforce the provisions of this Paragraph. Such restrictions shall remain in effect during the term hereof and for a period of ten (10) years after termination of this Agreement for any reason; provided, however, that if any such Confidential Information constitutes a trade secret (as defined in the Georgia Trade Secrets Act), such restrictions shall remain in effect for so long beyond such period as such Confidential Information continues to qualify as a trade secret as so defined. This Paragraph shall survive termination of this Agreement.

**Subscriber Information.** Both parties shall use and handle all Subscriber information subject to all laws, rules, regulations, codes, guidelines, Carrier policies and directives in force from time to time applicable to confidentiality and personal data protection. Company understands and agrees that Carrier(s) shall exclusively own all information that they and their affiliates collect directly from Subscribers, from Subscriber's usage of Interactive Wireless Devices on the Carriers' networks or roaming partner networks, or from Carriers' web site including, without limitation, personally identifiable information, such as name, home and e-mail address, wireless telephone number and residential telephone number. Company shall not authorize or encourage any Third Party to collect any Subscriber information in connection with any of the Services contemplated by this Agreement. If Company collects any such Subscriber information, Company may only use such information to the extent necessary to deliver Content to Subscribers. In no event may Company disclose Subscriber information to any Third Party. Air2Web shall not use Subscriber information in any manner other than for purposes set forth under this Agreement.

**Intellectual Property Rights of Company.** The Company represents that it owns and retains all right, title and interest in and to its trademarks, service marks, logos, images to be used hereunder, and other proprietary indicia. The Company shall have all rights, title and interest in and to all software, documentation, derivative works and other intellectual property rights that are acquired, developed, designed, created or contributed by Company in relation to the Company System.

**Intellectual Property Rights of Air2Web.** Air2Web represents that it owns all title and rights of ownership in the Application, the Documentation and Services, as well as enhancements, modifications, derivative works or changes made by Air2Web to the Application, the Documentation and the Services, and that they remain with Air2Web and are protected by trademark, copyright, patent and/or trade secret laws. Company agrees that it shall not acquire hereunder any right, title, or interest in the Application, the Documentation and Services, or any enhancements, modifications, derivative works or changes made thereto, except the right to use them in accordance with this Agreement. In addition, Air2Web retains all right, title and interest in and to its trademarks, service marks, logos and other proprietary indicia that are acquired, developed, designed, created or contributed by Air2Web in relation to the Application or Services. Company agrees to take all reasonable steps necessary to protect Air2Web's proprietary rights in the Application, Documentation and the Services. Air2Web represents and warrants that the Application and the Services do not infringe any United States patent, copyright, trademark, trade secret, or any other proprietary right of any Third Party, and hereby indemnifies and holds the Company, its affiliates and its customers harmless against any claim of infringement from a Third Party. In the event the continued use of the Application or the Services is held or is likely to be held to constitute an infringement, Air2Web, at its expense, may (i) modify the Application or Services so that they are non-infringing so long as the Application or Services, as modified, performs substantially the same functions that it performed before the modification, (ii) procure for the Company the right to continue using the Application or the Services, or (iii) allow the Company to terminate this Agreement without liability to Air2Web with a pro rata refund to Company for prepaid amounts for Services not rendered prior to the effective date of termination.

**DISCLAIMER OF WARRANTIES.** THE APPLICATION AND THE SERVICES ARE PROVIDED "AS IS" AND WITHOUT ANY WARRANTY OF ANY KIND WHATSOEVER, AND AIR2WEB DISCLAIMS ALL WARRANTEES, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THIS SECTION SHALL SURVIVE TERMINATION OF THIS AGREEMENT.

**LIMITATION OF LIABILITY.** THE PARTIES HAVE NEGOTIATED THIS AGREEMENT WITH DUE REGARD FOR THE BUSINESS RISK ASSOCIATED WITH THE ARRANGEMENTS DESCRIBED IN THIS AGREEMENT. EXCEPT FOR LIABILITIES SUBJECT TO THE INDEMNITY PROVISIONS OF THIS AGREEMENT OR FOR FEES DUE AIR2WEB BY COMPANY OR CLAIMS OF A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, UNDER NO CIRCUMSTANCES WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY IN ANY MANNER, UNDER ANY THEORY OF LIABILITY, WHETHER IN CONTRACT, TORT OR ANY OTHER THEORY, FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES ARISING FROM THE SERVICES. IN ANY CASE, THE CUMULATIVE AGGREGATE LIABILITY OF EACH PARTY FOR ALL LOSSES, CLAIMS, SUITS, CONTROVERSIES, BREACHES OR DAMAGES FROM ANY CAUSE WHATSOEVER (OTHER THAN CLAIMS SUBJECT TO THE INDEMNITY PROVISIONS OF THIS AGREEMENT OR FOR FEES DUE AIR2WEB BY COMPANY OR BREACHES OF CONFIDENTIALITY OR CLAIMS OF A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT) AND REGARDLESS OF THE FORM OF ACTION OR LEGAL THEORY SHALL BE LIMITED TO THE ACTUAL DIRECT OUT-OF-POCKET EXPENSES THAT ARE REASONABLY INCURRED BY THE NON-BREACHING PARTY AND SHALL NOT EXCEED THE GREATER OF (A) THE AMOUNT PAID BY COMPANY TO AIR2WEB DURING THE SIX (6) MONTHS IMMEDIATELY PRIOR TO THE DATE THE BREACH OCCURRED AND (B) ONE HUNDRED TWENTY THOUSAND DOLLARS ($120,000.00). COMPANY SPECIFICALLY UNDERSTANDS AND AGREES THAT AIR2WEB SHALL NOT BE LIABLE TO COMPANY OR THE CUSTOMERS OF COMPANY FOR ACTS OR OMISSIONS OF ANY THIRD PARTY (OTHER THAN THIRD PARTY SUBCONTRACTORS OF AIR2WEB OR THIRD PARTIES WITHIN AIR2WEB'S CONTROL), OR FOR INFORMATION PROVIDED THROUGH THE COMPANY SYSTEM, OR FOR CAUSES BEYOND THE REASONABLE CONTROL OF AIR2WEB. THIS SECTION SHALL SURVIVE TERMINATION OF THIS AGREEMENT.

**Company Indemnity.** Company, at its own expense, will indemnify, defend and hold harmless Air2Web, its Affiliates, and the Carrier(s) through whom Content is routed and their respective employees, representatives, agents, officers and directors against any claims, losses, liabilities, costs, expenses or damages (including reasonable attorney's fees) incurred by reason of any claim, demand, lawsuit or action initiated by Third Parties based on or relating to, or allegation of,: (i) any breach by Company of any of its representations and warranties in this Agreement; (ii) any services provided by Company or its subcontractors relating to the Services provided under this Agreement; or (iii) an allegation that all or any part of the Content actually provided by Company or a message transmission by a Subscriber to Company violates any local, state or federal law, rule, or regulation or the Content Standards ("Claims"). In this regard, Air2Web will promptly notify Company of Claims, and it will permit Company to assume and control the defense of Claims. Air2Web, however, will have the right to employ separate counsel and participate in the defense of Claims. Company shall have the sole authority to defend, compromise, settle or otherwise dispose of the Claims; provided that Company shall not agree to any disposition or settlement of a Claim that admits liability or imposes duties of performance or payment on Air2Web without Air2Web's prior written consent. In the event the Parties agree to settle Claims, Company agrees not to publicize the settlement without first obtaining Air2Web's written permission, which permission shall not be unreasonably withheld.

**Air2Web Indemnity.** Air2Web, at its own expense, will indemnify, defend and hold harmless Company and its Affiliates and their respective employees, representatives, agents, officers and directors against any claims, losses, liabilities, costs, expenses or damages (including reasonable attorney's fees) incurred by reason of any claim, demand, lawsuit or action initiated by Third Parties based on or relating to, or allegation of,: (i) any breach by Air2Web of any of its representations and warranties in this Agreement; (ii) any services provided by Air2Web or its subcontractors relating to the Services provided under this Agreement, (iii) intellectual property violations initiated by third parties as set forth in the Section titled "Intellectual Property Rights of Air2Web" above. In this regard, Company will promptly notify Air2Web of Claims, and it will permit Air2Web to assume and control the defense of Claims. Company, however, will have the right to employ separate counsel and participate in the defense of Claims. Air2Web shall have the sole authority to defend, compromise, settle or otherwise dispose of the Claims; provided that Air2Web shall not agree to any disposition or settlement of a Claim that admits liability or imposes duties of performance or payment on Company without Company's prior written consent. In the event the Parties agree to settle Claims, Air2Web agrees not to publicize the settlement without first obtaining Company's written permission, which permission shall not be unreasonably withheld.

CONFIDENTIAL          bebe000005

**Remedies.** Each Party acknowledges that breach by it of certain of the terms set forth herein, including any breach arising out of or relating to an alleged violation of the other Party's intellectual property rights, would result in irreparable harm to the other Party for which monetary damages alone would be an insufficient remedy. Thus, although nothing herein will prohibit pursuit of any remedies available against any Party under applicable law (which shall be cumulative with those remedies set forth herein), each Party specifically agrees that, in the event of any threatened or actual breach of any such terms by it, the other Party shall be entitled to injunctive relief or other similar remedy from a court of competent jurisdiction.

**Governing Law; Arbitration; Attorney's Fees.** This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to its principles of conflicts of laws. Nothing in this Agreement shall be deemed as preventing either Party from seeking relief, or any other remedy, from any court having jurisdiction of the Parties and/or the subject matter of dispute. Either Party shall be entitled to recover its attorney's fees and costs from the other Party in the event it utilizes the services of an attorney to enforce any provision of this Agreement or to collect any amounts due hereunder, and it is the prevailing Party.

**Mutual Representations and Warranties.** Each Party to this Agreement represents and warrants that: (a) it has the full corporate right, power and authority to enter into this Agreement and to perform the acts required; (b) its actions in connection with this Agreement will be performed in compliance with all applicable laws, rules and regulations; (c) its execution of this Agreement and performance of its obligations under this Agreement do not and will not violate any other agreement to which it is a Party; and (d) this Agreement will constitute the legal, valid and binding obligation of such Party when executed and delivered.

**Force Majeure.** Neither Party shall be liable for any delay or failure to perform per the terms of this Agreement caused by Acts of God or other causes beyond the parties' control and without fault or negligence. In such event, either Party may reasonably suspend this Agreement in whole or in part for the duration of the delaying cause, including delay of payment for services not yet rendered. Both parties shall resume performance under this Agreement immediately after the delaying cause ceases and the initial term of this Agreement shall be extended for a period of time equivalent to the length of time the excused delay occurred.

**Relationship of Parties.** Nothing contained in this Agreement shall be construed to create a partnership, agency, joint venture, or employer/employee relationship between the parties. Neither Party has the authority to assume or create any obligation or responsibility, express or implied, on behalf of, or in the name of, the other Party or to bind such other Party in any way. Each Party shall be responsible for wages, taxes, withholding, insurance, hours and conditions of employment of its personnel during the term hereof.

**Assignment.** Neither party may assign this Agreement without the written consent of the other party; provided, however, this Agreement may be assigned without the written consent of the other Party by either Party to any affiliate of such Party or any entity acquiring all or substantially all of assets of such Party. Either Party may also assign this Agreement as collateral to any entity providing financing to such Party. Any assignments to a financing Party shall not relieve Air2Web from its obligations under this Agreement. In the event of Assignment, the assignor shall remain liable under this Agreement. The assignee must be as competent and financially viable as Air2Web. This Agreement shall be binding upon and shall inure to the benefit of the successors and permitted assigns of Company and Air2Web.

**Miscellaneous Provisions.** This Agreement and the representations, warranties and covenants contained herein shall survive consummation of the transactions herein contemplated. If any provision of this Agreement is held invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions shall in no way be affected or impaired thereby. This Agreement may be executed in any number of counterparts, each of which shall constitute an original. Section headings have been inserted in this Agreement as a matter of convenience and for reference only and it is agreed that such section headings are not a part of this Agreement and shall not be used in the interpretation of any provision of this Agreement. Whenever used herein, the singular shall include the plural, the plural shall include the singular, and the use of any gender shall be applicable to all genders.

**Entire Agreement; Modifications.** This Agreement constitutes the entire agreement between the parties hereto and all prior agreements, understandings, obligations or statements by and between the parties concerning the subject matter hereof will be merged into and be superseded by this Agreement and shall be of no further force and effect. No failure or delay on the part of any Party in exercising any right, power, privilege or remedy arising hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power, privilege or remedy preclude any other or future exercise thereof or the exercise of any other right, power, privilege or remedy. No notice to or demand on any Party in any case shall entitle it to any other or further notice or demand in similar or other circumstances. No modification, amendment or waiver of any

CONFIDENTIAL                                                  bebe000006

provision of this Agreement, nor any consent to any departure by any Party from the terms hereof, shall be effective unless the same be in writing and signed by all parties hereto.

**Use of Name/Images.**   Air2Web shall not be permitted to use Company's name, logo, testimonials, images, and case studies in its advertising and marketing materials without Company's prior written consent, which consent may be revocable at any time.   Air2Web will not publish any advertising or marketing materials containing details of Company's business or this transaction with Air2Web without Company's prior written consent, which consent may be revocable at any time.

CONFIDENTIAL

bebe000007

SCHEDULE A

## SOFTWARE LICENSE AGREEMENT

1.   <u>Definition of Application.</u>   The Application is computer software owned by Air2Web known as *Campaign Manager and Mobility Engine,* which has the following features:

*a)   Connections to U.S. Carriers to supply bi-directional SMS messaging*

*b)   Web-based software for text campaign creation, management and reporting*

*c)   WAP hosting for binary content and optimization*

*d)   Company's access to mobile numbers acquired through bebe mobile marketing campaign*

2.   <u>Grant of License.</u>   Air2Web hereby grants Company a limited, nonexclusive, nontransferable license to use the Application to facilitate and manage the delivery of Content over the Air2Web Gateway Platform in accordance with the terms set forth herein. Unless otherwise specified in writing, Company shall not, nor shall it permit others to: (a) use the Application outside of the context set forth herein or for purposes other than those set forth herein; (b) download, copy, recreate, disassemble, modify, translate, reverse engineer or decompile the Application; or (c) assign, sell, sublicense, lease, or otherwise transfer Company's right to use the Application as set forth herein. The Company shall also be entitled, free of charge, to all updates and upgrades to the Application and Documentation that are produced from time to time by Air2Web in its sole discretion.

3.   <u>Access to Application.</u>   The Application shall reside on one or more computers hosted and managed by Air2Web that are accessible only by the internet (the "Hosting Services"). The Company shall be responsible for the acquisition, configuration, monitoring, maintenance and management of all hardware and software at the Company's location necessary to access the Application, including local area networks, computers, software, telecommunications, internet access and devices, except that Air2Web shall provide the Company with all client-side software (if any) necessary to access and operate the Application.

4.   <u>Setup Services.</u>   Air2Web shall provide basic training assistance on usage of the Application, including phone support and, if required, NetMeeting sessions to explain the use of the Application and review the Documentation provided in association with the Application.

5.   <u>Modifications to Application.</u>   Air2Web shall not be obligated to make any alteration, modification, customization or enhancement to the Application that is necessary or desired for the Company's internal purposes, and subject to Customer's prior written approval, any such alteration, modification, customization or enhancement shall only be made by Air2Web at the Company's expense on such terms that are set forth in Schedule B attached hereto or a separate writing between Air2Web and the Company.

6.   <u>Limited Warranty.</u>   Air2Web warrants that for a period of ninety (90) days after implementation of the Application, the Application shall substantially perform in accordance with the Documentation. Company's sole and exclusive remedy and Air2Web's sole liability shall be for Air2Web, at Air2Web's sole option, to (i) replace the Application that does not meet the limited warranty, (ii) attempt to correct any defects which Company finds in the Application during the warranty period, or (iii) refund the license fee for the Application. Any replacement Application received by Company shall be warranted for the remainder of the original warranty period or for thirty (30) days, whichever is longer. If Company discovers a defect in the Application during the warranty period, Company shall provide written notice to Air2Web that includes (i) a statement that the Application does not substantially perform in accordance with the Documentation, (ii) a list of defects in the Application, (iii) detailed information regarding each defect. The limited warranty shall be null and void if (i) Company modifies or changes its copy of the Application in any way, or if any failure of the Application resulted from accident, misuse, abuse, or misapplication by Company, or its employees or agents, (ii) errors or defects are attributable to equipment malfunction, products other than the Application, use of the Application in conflict or contravention of the Documentation or the terms of this Agreement, or accident, neglect, misuse, or abuse of the Application; or (iii) Company does not provide the written notice to Air2Web as provided herein.

CONFIDENTIAL                    bebe000008

## SCHEDULE B

## CUSTOMIZATION AND SETUP SERVICES

1.  Customization Services.  Air2Web offers certain developmental and professional services to design and develop modifications or enhancements (hereinafter, "Modifications") to current or future Applications that utilize the Air2Web Gateway Platform (hereinafter, the "Customization Services"). The ultimate scope of such Customization Services, whether for design development, custom programming or other agreed upon services, shall be based upon the needs and determinations of Company as reflected in an applicable statement of work ("Statement of Work") and shall only be undertaken by Air2Web pursuant to a prior written Statement of Work entered into separately by the parties or as set forth herein. The Statement of Work shall be a separate agreement and its terms will not apply to the Services provided under this Agreement until it is signed by both parties.

2.  Statement of Work.  Air2Web shall not be obligated to make any Modifications to an Application unless the Company and Air2Web execute a Statement of Work to evidence the terms and conditions under which the Modifications will be made. From time to time, either Company or Air2Web may initiate a draft Statement of Work for the others' consideration. Once finalized with authorized signatures, the Statement of Work shall be an addendum to and subject to the conditions and terms of this Agreement. Each Statement of Work shall, at a minimum, include the following before services begin:

a)  commencement date;
b)  scope and definition of services to be performed;
c)  staffing committed by both Air2Web and Company;
d)  deliverables and dependencies committed by both parties;
e)  interim milestones, if any, and final completion date;
f)  budget estimate, or firm price if explicitly agreed, and billing schedule;
g)  incorporation of this Agreement by reference; and
h)  authorized signatures.

The parties may specify any further terms and conditions that are to be made part of the Statement of Work. The deliverables under a Statement of Work shall be deemed accepted by Company when such deliverable(s) have been implemented or delivered by Air2Web and made ready for use in accordance with the installation and operating specifications of the Statement of Work and Air2Web has tested the deliverable to insure that it operates in accordance with the specifications contained in the Statement of Work. In event of conflicting terms with the Service Agreement, the Statement of Work shall govern.

3.  Ownership of Work Product of Customization Services.  The Company and Air2Web agree that Air2Web shall be the sole owner of any Modifications to an Application that are created as a result of any Statement of Work, and that the Company shall be entitled to use the Modifications on the same terms, and to the same extent, as the Company is authorized to use the Application. In addition, Air2Web shall retain the right to use the ideas, concepts, tools, templates, methods, processes, know-how, organization techniques and other intellectual property used by it in the development of the Modifications requested by the Company. Company acknowledges that Air2Web is in the business of licensing the Application and the Air2Web Gateway Platform to others, and providing Hosting and Delivery Services associated therewith, and that Air2Web may develop Modifications for other parties that are identical or similar to the Modifications developed for the Company. Nothing contained herein shall preclude or inhibit Air2Web from developing, marketing, using, licensing, providing or selling any products or services to third parties that are similar or identical in function, design or otherwise to those provided to the Company.

4.  Limited Warranty.  Any Modification to an Application shall be deemed a part of the Application, and Air2Web warrants the Modification only to the same extent that its warrants the Application, except that the time period during which Air2Web warrants the Modification shall be for ninety (90) days from the installation of the Modification.

CONFIDENTIAL

bebe000009

## SCHEDULE C

## CONTENT DELIVERY SERVICES

1. **SMS and Content Delivery Service.**

a) Air2Web Gateway Platform and Campaign Manager. Air2Web agrees to use commercially reasonable efforts to deliver Content provided by the Company to Carriers (for delivery to Subscribers) by means of the Air2Web Gateway Platform and Campaign Manager as described in this Agreement. Air2Web is responsible for obtaining and maintaining at its sole cost and expense the Air2Web Gateway Platform and Campaign Manager, and the Company shall not have any liability for the Air2Web Gateway Platform and Campaign Manager.

b) Compliance with Laws, Regulations and Carrier Guidelines. Both parties shall comply with all applicable laws, rules, regulations, directives, statements, codes of practice and applicable Carrier guidelines with respect to the Delivery Services, text messaging in general and otherwise in connection with performing its obligations under this Agreement.

c) Content Format. The Company shall provide Content to the Air2Web Gateway Platform in such format as Air2Web may require from time to time. Air2Web may reasonably amend the formats required for the Services by providing reasonable advance notice thereof. The Company shall provide at least thirty (30) days advance written notice to Air2Web for any change in the formatting of the Content.

d) Content Delivery Limitations. The Air2Web Gateway Platform forwards Content delivered by the Company to Carriers for forwarding to Subscribers of the Carrier. However, Air2Web is not obligated to ensure the delivery of Content by Carriers to Subscribers, and the Company agrees that the Air2Web bears no liability to the Company or any Third Parties in the event a Carrier does not forward Content to a Subscriber. Air2Web will provide its standard reports to the Company indicating whether Content has been delivered to Subscribers.

2. **Limitations on Content.**

a) Content Standards. The Company agrees to adhere to the Content Standards, and any changes to the Content Standards required by the Carriers from time to time, and agrees that no Content shall violate the Content Standards. In the event the Company fails to comply with the Content Standards, Air2Web, in addition to all other remedies available to it at law and equity, may suspend the Delivery Services after providing written notice of the breach, until such breach has been cured. If the Company fails to cure the breach within 30 days of Air2Web's written notification to the Company, Air2Web may terminate this Agreement without further liability, obligation or penalty.

b) Blacklisted Numbers. The Company acknowledges that some or all Carriers have implemented a "blacklist" that contains the mobile phone numbers for Subscribers that do not want to receive text messages. If and when Carriers provide this blacklist to Air2Web, Air2Web will provide the blacklist to the Company, in which case the Company will not send any Content to any number on the blacklist.

c) Content Disclaimer. The Company agrees that Air2Web and/or the Carriers, in their sole discretion, may reject sending all or part of any Content to Carriers. Air2Web will notify the Company in writing within five (5) business days if Content is being rejected by Air2Web and the reasons for the rejection. The Company agrees that Air2Web will not be liable for rejection of any Content. The Company is solely responsible for ensuring that the Content it supplies is accurate, complete and correct, and shall be solely responsible for all claims or liability arising from the distribution and publication of Content. Air2Web shall have no obligation to read, proofread or correct any Content supplied by the Company, nor shall have any responsibility for the accuracy, completeness or correctness of any Content supplied by the Company, nor shall it have any obligation to read any Content to determine whether it contains Confidential Information.

d) Filtering. Air2Web reserves the right to filter or have filtered Content without the prior written permission of the Company, without assuming any obligation to filter such Content, to ensure compliance with this Agreement, Air2Web agreements with Third Parties and applicable laws and regulations. However, if Content is altered or filtered, then Air2Web shall notify Company prior to sending or posting messages containing such Content and await Company's prior approval to use Content. Any blocked Content will not be deemed to have been delivered to Carriers for purposes of determining applicable fees.

CONFIDENTIAL     bebe000010

e) Third Party Consents for Content. The Company agrees not to send Content that requires a Third Party consent unless it has obtained that consent in writing. Air2Web may delay or suspend the delivery of any Content until the Company has provided Air2Web with evidence, reasonably satisfactory to Air2Web, that the Company is authorized to send the Content.

f) Suspension. Air2Web may, without terminating this Agreement and without any liability to the Company or any Third Party, immediately suspend part or all of the Delivery Services or the link between the Air2Web Gateway Platform and the Company System due to any of the conditions set forth below. Air2Web will notify the Company as soon as reasonably possible and if such suspension is a direct result of any action by the Company, the Company will take reasonable steps to fix such problems. The reasons for possible suspension include but are not limited to:

i) Air2Web's reasonable belief that it is obligated to comply with an order, instruction or request of any court, administrative tribunal, governmental or regulatory body;

ii) Air2Web's belief that the Content or any part thereof is, in Air2Web's reasonable opinion, in violation of the Content Standards or otherwise not in accordance with this Agreement;

iii) Unauthorized or fraudulent use of the Delivery Services, or if the Company's use of the Delivery Services causes or may reasonably be expect to cause damage to the Air2Web Gateway Platform or to a Carrier's system; or

iv) Any material breach by the Company of its obligations to Air2Web.

3. Forecast. If and when requested by Air2Web, the Company shall provide to Air2Web an estimate ("Forecast") of its usage of the Delivery Services. This Forecast will be for at least three (3) months, and thereafter a three (3) month Forecast shall be provided at the start of each calendar quarter (January 1st, April 1st, July 1st, October 1st) within at least the first ten (10) days of the applicable quarter. These Forecasts shall include the estimated number of total mobile originate and mobile terminate messages to be forwarded by Air2Web, Content traffic patterns, and peak messages per second. The Company shall inform Air2Web, as far in advance as possible, of any anticipated increase in the volume of messages to be transmitted or received by the Company. Air2Web shall have the right to regulate such volume or shut down the Delivery Services with written notice to the Company if Air2Web reasonably suspects or determines that the Air2Web Gateway Platform, the Delivery Services, any Air2Web services or any Carrier service will be materially impaired by such number of messages. Air2Web will work with the Company to develop a traffic pattern that will not impair the Air2Web Gateway Platform or Carrier systems as a result of increased traffic estimates.

4. Subscriber Opt-in/Opt-out Mechanism. Carriers currently require that a sender of Content have a means for a subscriber to "opt out" of receiving text messages. The Company shall provide a short code response, website, and customer care email in which Subscribers can indicate to the Company whether they wish to receive or cease receiving Content. For example, a response of "stop" to a text message would mean that the subscriber has "opted out" and should no longer receive test messages from the Company. The Company shall immediately comply with any Subscriber request to cease receiving Content. The Company shall provide contact information (at a minimum an email address) for the Company's customer service at the same time and in a noticeable location (i.e., on the same web page or in the same SMS) as Subscribers register for the Company's Delivery Services. The Company must include an obvious notice that "other charges may apply" at the same time and location (i.e., on the same web page or in the same SMS) as Subscribers register for the Company's Delivery Services.

5. Representations and Warranties of Company. Company represents, warrants and covenants to Air2Web that the Content (a) will not contain any material that is obscene, profane, libelous or defamatory; (b) will not violate or infringe any copyright, patent, trademark or trade secret or right of privacy or publicity or any other personal or proprietary right of Air2Web or any Third Parties; (c) will comply with the Content Standards; and (d) at the time of delivery to Air2Web, will not contain any viruses, worms, trap doors, back doors, timers, clocks, counter or other limiting routines, instructions or designs. Company further represents and warrants that it will not use the Delivery Services, or allow any Third Parties to use the Delivery Services, to engage in any spamming, mail-bombing, spoofing or any fraudulent, illegal, unauthorized or improper use.

6. Carrier Customer Service Costs. If any Carrier makes a charge to or deduction from payments to Air2Web for Premium Content Services, then Air2Web shall be entitled to recover from the Company the amount of any such charges or

CONFIDENTIAL     bebe000011

deductions.  Air2Web agrees to notify Company of any such charges or deductions and to provide the same level of detail (related to the charges) to the Company that is provided to Air2Web by the Carriers.

CONFIDENTIAL          bebe000012

## SCHEDULE D

## AIR2WEB FEES

*(Note: Air2Web reserves the right to change these fees at any time subject to Company's prior written consent)*

A.   SETUP SERVICES: $5,000  WAIVED

B.   SHORT/LONG CODE FEES:   Air2Web will obtain two vanity short code on behalf of Company for the period of one (1) year. Additional shortcode fees are collected in advance, for periods of three months, and automatically renewed in accordance with the term of the contract. Additional shortcodes are available in three month increments.  Vanity shortcodes are sold at the monthly rate of $1,000 each. Basic shortcodes are sold at the monthly rate of $500 each.

C.   SMS MESSAGE FEE AND CAMPAIGN MANAGEMENT HOSTING FEE:  The first two months of this Agreement shall be $5,500 U.S.D. per month; and thereafter, the fee shall be $7,500 per month. Each month's payment includes two (2) vanity short codes, unlimited access to Air2Web's Campaign Manager product and up to 100,000 standard SMS messages per month.  Up to six months' message rollover can be accumulated for any current month. For standard SMS messages delivered in excess of the 100,000 included monthly messages, Air2Web will charge Company $0.035 per Mobile Terminate (MT) and $0.015 Mobile Originate (MO) message delivered. The first monthly invoice will be issued on May 1, 2007.

D.   WALLPAPER CAMPAIGN FEE: If Company elects this Wallpaper Campaign Service, then the fee shall be $1,000 per wallpaper campaign (each campaign shall be limited to one (1) wallpaper image and three (3) months in duration) payable after each month in which a wallpaper campaign is executed.  Hosting of all wallpaper images shall include the creation and execution of up to three (3) campaigns per season.  SMS messages shall be with embedded URLs to wallpaper images.  Company will upload wallpaper images into Air2Web's mobility engine according to size and other requirements as specified by Air2Web from time to time.  Company will be issued an invoice at the start of each month in which Customer elects to choose the Wallpaper Campaign Service.

E.   DUE AT INCEPTION:   Upon execution of this Agreement and subject to an invoice, Company shall pay the following to Air2Web:  (1) $6,000 (representing 3 months' shortcode fees for two vanity shortcodes) due within thirty (30) days of receipt of invoice.

F.   PROFESSIONAL SERVICES FEE:  Except as set forth in a Statement of Work, professional services for custom development will be billed at the hourly rate of $225.00 U.S.D. In any event, any additional fees not stated in this Schedule D, including but not limited to professional service fees, shall be subject to Company's prior approval.

CONFIDENTIAL          bebe000013

## **SCHEDULE E**

## **CARRIER MANDATED CONTENT STANDARDS**

The Carriers prohibit the delivery of Content over their systems of the type listed below, and reserve the right to amend their list of prohibited Content at any time. Accordingly, Company may not submit Content to the Air2Web Gateway Platform of the type listed below. The list does not apply to Subscriber originated messages. Air2Web reserves the right, in its sole discretion, to modify the list upon written notice to Company, including as required by any Carrier.

- Unlawful, obscene, profane, threatening, libelous, slanderous, defamatory or otherwise objectionable.

- Facilitates an illegal activity.

- Sexually explicit content or language.

- False, misleading or likely to mislead or deceive (including, without limitation, information relating to the source or the author of the message).

- Violates any intellectual property rights or any other rights of any person or entity.

- Invades any person's privacy.

- Unlawfully promotes or incites hatred (including, without limitation, any transmissions constituting or encouraging conduct that would constitute a criminal offense, give rise to civil liability, or otherwise violate any applicable law).

- Contains any spamming or flooding element or any advertising, marketing or promotional materials or information, solicitations, chain letters, pyramid schemes, investment opportunities or schemes or other unsolicited messages, contents or information except with the prior consent of Air2Web, Carrier(s) and the Subscribers.

- Alcoholic beverage-related (beer, wine, liquor, etc.).

- Tobacco-related (cigarettes, cigars, pipes, chewing tobacco, etc.).

- Guns/weapons-related (firearms, bullets, etc.).

- Illegal drugs-related (marijuana, cocaine, etc.).

- Pornographic-related (adult themes, sexual content, etc.).

- Crime-related (organized crime, notorious characters, etc.).

- Violence-related (certain games, etc.).

- Death-related (funeral homes, mortuaries, etc.).

- Gambling-related (casinos, lotteries, etc.).

- Carrier competitor-related (*e.g.*, providers of telecommunication services, providers of comparison shopping for telecommunications services, etc.).

- Involves a copy or parody of current or past Carrier products or services.

- Involves an implied affiliation, association or endorsement by, or favored status with, any Carrier.

CONFIDENTIAL                                    bebe000014

## SCHEDULE F

## LIST OF CURRENT CARRIERS

Set forth below are the Carriers as of the Effective Date.  There can be no assurances that (i) the Company's service will be accepted by one or all of the foregoing Carriers, or (ii) that all or any of the Carrier's will maintain connectivity with Air2Web.

| Carrier | Non-Premium service | Premium service |
|---|---|---|
| Alltel | Yes | Yes |
| AT&T | Yes | Yes |
| Dobson Cellular | Yes | Yes |
| Sprint Nextel | Yes | Yes |
| SunCom | Yes | Yes |
| T-Mobile | Yes | Yes |
| US Cellular | Yes | Not currently available |
| Verizon Wireless | Yes | Yes |

Air2Web shall ensure that Company receives standard reporting per month as is made available from each Carrier at no additional charge.  Company understands that carrier standards differ and not all carriers make available similar data, and each may change their reporting policies without notice.  Air2Web will make commercially reasonable attempts to gather, document, and report all available data to Company.  A failure of Air2Web to attempt to deliver at least 80% of the Campaign messages to Carriers in any calendar month will be cause for Company to terminate this Agreement without incurring additional fees, obligation, or liability.  Company shall also be entitled to a pro rata refund of applicable pre-paid amounts (excluding short code fees).  The foregoing shall be Company's sole and exclusive remedy for Air2Web's failure to meet this delivery commitment.

CONFIDENTIAL                              bebe000015

## SCHEDULE G

### SERVICE LEVEL STANDARDS FOR DELIVERY SERVICES

Set forth herein are the terms and conditions by which Air2Web will deliver and Company will receive maintenance and support of the Air2Web Gateway Platform necessary for the continuous functioning and performance of the Delivery Services, and the Hosting Services for the continuous functioning and delivery of the Application.

1. *Uptime Monitoring and Reporting.* Air2Web will ensure that the performance and availability of the Services are monitored on a continuous basis. Air2Web employs commercially available fault monitoring systems to identify and act on failures realized in the Services. Air2Web will provide written root cause analysis for any Severity Level one outage.

2. *Uptime Commitment.* Air2Web guarantees the Services will be operating properly and available to Company and Subscribers at least ninety-eight percent (98%) of the time during each month, excluding Excusable Downtime ("**Uptime Commitment**"). If the Service Level guarantee is not met, then the Company may, as its sole and exclusive remedy, do any one (1) of the following: (a) request a credit equal to the Credit Percentage (as defined below) multiplied by the applicable month's SMS Message Fee and Campaign Management Hosting Fee (as set forth in Section C to Schedule D to this Agreement) to be applied against the next following month's invoice, or (b) if Air2Web fails to meet its Uptime Commitment in any three (3) consecutive months or if, during any single calendar month, the Services are not operating properly and available to Company and Subscribers at least seventy-five percent (75%) of the time during such month (excluding Excusable Downtime), terminate this Agreement upon written notice to Air2Web without incurring any liability, obligation, or penalty other than payment for those undisputed services previously rendered. "**Excusable Downtime**" includes the following: (i) scheduled downtime and maintenance set forth herein; (ii) the acts or omissions of Company or its customers, users, employees, agents, or contractors, or anyone gaining access to the Services by means of Company's passwords or equipment (except where such access was the result of an act or omission of Air2Web); (iii) suspension of Company's use of the Services as permitted in the Agreement; or (iv) a simultaneous failure of the primary and backup network connections between the Services and the Company System. If no backup network connections are in place at the time of the failure, the outage is not considered Excusable Downtime. "**Credit Percentage**" means the sum of ten percent (10%) plus one percent (1%) for each one percent (1%) of time below the ninety-eight percent (98%) Uptime Commitment above that the Services are not operating properly and available to Company and Subscribers during the applicable month (excluding Excusable Downtime); provided that the total Credit Percentage shall in no event exceed thirty-three percent (33%) (for illustration purposes only, if the Services are operating properly and available to Company eighty-five percent (85%) of the time during a particular month (excluding Excusable Downtime), then the applicable Credit Percentage shall be twenty-three percent (23%) (the 23% from the example was calculated as follows:  10% + (98% - 85%) = 23%)).

3. *Scheduled downtime and maintenance.* Scheduled downtime and maintenance is governed and dictated by the Carrier. As required by the Carriers, Air2Web reserves periods every week during which maintenance and service upgrades will be made to its data center and network environments. Air2Web represents that the Carriers currently require the following times be reserved for maintenance:

   a. Standard System Maintenance:   Tuesday and Thursday 0100-0300 EST (EDT)

   b. Enhanced System Maintenance:   Sunday 0100-0500 EST (EDT)

   Air2Web shall work with the Carriers and shall use its best efforts to minimize the downtime, taking into consideration any special events that may involve an increase in Company's message transactions, including but not limited to sports games or concert events that may result in Subscribers desiring more Content during times which are scheduled for downtime.

5. *Security.* Air2Web shall take commercially reasonable precautions to prevent unauthorized entry into computer and data systems comprising the Services and unauthorized access to the Company System. Air2Web shall notify Company of any such security breaches within two (2) hours of the time that Air2Web learns of their occurrence.

6. *Systems Monitoring & Escalation.* Air2Web shall use commercially reasonable efforts to provide systems monitoring and support described herein to Company in connection with the Services. The Air2Web Network Operations Center (NOC) is monitored 24 hours a day, seven days a week, during which it can be contacted for Service outages. The Air2Web NOC will only respond to messages from Company's technical personnel in Company's NOC.

CONFIDENTIAL                                    bebe000016

a. Company's requests will be prioritized as follows: Air2Web will investigate, determine the severity level of each reported error and respond to requests within the time frames indicated. Each such reported error will be classified as either a problem with the Services (a "Solution Error") or an external problem and, if a Solution Error, will be assigned a severity level according to the descriptions set forth below. After research by Air2Web, Air2Web may reclassify the error from one severity level to another after consultation with and approval by the Company. When a severity level is assigned, Air2Web will promptly designate appropriate management and engineering support personnel to investigate and take corrective action with respect to any error. Corrective action may initially include a temporary fix or work-around solution.

b. Solution Errors are separated into several severity levels depending upon the availability of the Services. The severity levels are as follows:

   i. <u>Severity Level 1</u> is a Solution Error that makes the general use of the Services impossible and that cannot be circumvented or avoided on a temporary basis. The condition requires an immediate solution that is not already available. Air2Web will initiate an effort to replicate and verify the reported Solution Error within one (1) hour of receiving the problem report, provide continuous effort to arrive at a fix or work-around, and will use commercially reasonable efforts to provide Company with a fix or work around within twenty-four (24) hours of receiving the problem report. Company shall be updated on the current status of Severity level 1 problems by telephone or email every two (2) hours during normal business hours.

   ii. <u>Severity Level 2</u> is a Solution Error that makes the general use of the Services difficult and that can be circumvented or avoided on a temporary basis. Air2Web will initiate an effort to replicate and verify the reported Solution Error within two (2) hours of receiving the problem report, and will provide Company with a fix or work-around within three (3) business days of receipt of the problem report.

   iii. <u>Severity Level 3</u> is all other reported Solution Errors that are not covered in Severity Levels 1 or 2. Air2Web will begin work on such problem identification and verification within two (2) business days of receipt of the report of the problem, and will provide Company with a proposed fix or work-around within 7 business days.

5. *Company Responsibilities.* Company is responsible for all initial frontline support to Subscribers relating to the use and functionality of the Content. In order for Air2Web to resolve any problem within the targeted resolution period, Company must use commercially reasonable efforts to make its appropriate technical personnel available to Air2Web in order to assist as needed with such resolution. All problem reports shall be in English unless otherwise agreed to in writing by the Parties. Company will supply its scheduled maintenance periods and escalation contacts upon execution of this agreement.

6. *Standard Support.* Air2Web shall provide standard technical support, including phone, email, and web support for Level 1, 2, and 3 issues as defined in Section 6 herein, from 8:00am to 12am (EST) at no additional charge.

### Air2Web Escalation Contact List

| Timetable | Contact Name/Title | Business Hours Contact | After Hours Contact |
|---|---|---|---|
| Within 1 hour of reporting the incident. | Network Operations Center | noc@air2web.com<br><br>Ph: 404-942-5404 | noc@air2web.com<br><br>Ph: 404-942-5404 |
| 1 hour after 1st level if no satisfaction from 1st level | Kirk VanDyke Manager Network Operations | Kirk.VanDyke@air2web.com<br><br>Ph: 404-942-5329 | noc@air2web.com<br><br>Ph: 770-331-4590 |

### Company Escalation Contact List

| Timetable | Contact Name/Title | Business | After Hours Contact |
|---|---|---|---|

CONFIDENTIAL      bebe000017

|  |  | Hours Contact |  |
|---|---|---|---|
| Within 1 hour of reporting the incident. | Company |  |  |
| 1 hour after 1st level if no satisfaction from 1st level | Company |  |  |

CONFIDENTIAL

bebe000018

## AMENDMENT NO. 1
## TO AIR2WEB APPLICATION AND SERVICES AGREEMENT

This AMENDMENT NO. 1 ("Amendment No. 1") is made and entered into effective as of March 1, 2009 ("Amendment No. 1 Effective Date") by and between Air2Web, Inc. ("Air2Web") and Bebe Stores Inc. ("Company").

WHEREAS, Air2Web and Company entered into that certain Air2Web Application and Services Agreement with an Effective Date of April 2, 2007 (the "Agreement"); and

WHEREAS, Air2Web and Company hereby desire to amend their business relationship as set forth herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      The preamble and recitals above are incorporated herein by this reference. Any terms not defined herein shall have the meanings set forth in the Agreement.

2.      The following is hereby added immediately before the section titled "Definitions" in the General Terms and Conditions of the Agreement:

"Territory. The Parties acknowledge and agree that this non-exclusive Agreement provides the terms and conditions pursuant to which Company may deliver Content via the Air2Web Gateway Platform to Subscribers of Carriers in the United States and in Canada, as the case may be, which Subscribers are also located in the United States or Canada, as the case may be. Any Content that Company intends to deliver via the Air2Web Gateway Platform to Subscribers of Carriers that service other geographic areas (and/or to Subscribers located in other geographic areas) shall be set forth in a mutually executed Addendum to this Agreement, which Addendum shall specifically reference this Agreement."

3.      The term "Carriers" in the section titled "Definitions" in the General Terms and Conditions of the Agreement is hereby deleted in its entirety and replaced with the following:

"Carriers. Providers of wireless messaging services to Subscribers via wireless telecommunications networks with whom Air2Web maintains connectivity (including via Third Party service entities that provide network connectivity services for message delivery to and from Carriers ("Third Party Aggregators")) from time to time. For purposes of this Agreement, the term "Carriers" shall include applicable Third Party Aggregators. As of the Effective Date, the Carriers within the United States include those listed in Schedule F and Carriers within Canada include: Bell Mobility, Microcell, MTS, Rogers, Sasktel, Telus and Virgin Mobile. There can be no assurances that (a) the Services will be accepted by any or all of the Carriers, or (b) that all or any of the Carriers will maintain connectivity with Air2Web."

4.      The following is hereby added to the end of the Section titled "Payment Policy" under the General Terms and Conditions of the Agreement:

"All amounts under this Agreement are stated and payable in United States Dollars. In addition to the fees otherwise set forth herein, Company shall be responsible for carrier rate increases arising after the Amendment No. 1 Effective Date (e.g., SMS message rate increases) and carrier-specific charges (e.g., program/campaign application fees), if any, which Air2Web will pass-through to Company at cost."

5.      The current Renewal Term shall be extended through and including March 31, 2010.

6.      Section 1(c) of Schedule C to the Agreement is hereby deleted in its entirety and replaced with the following:

"c)     Content Format. All messages must contain only characters within the standard GSM character set unless Air2Web consents in writing to permit Company to send messages containing characters not within the standard GSM character set which messages: (a) must be sent solely to a properly provisioned code which shall be the sole responsibility of Company; and (b) will be treated as an international SMS message and be subject to international messaging rates. Further, Company shall provide Content to the Air2Web Gateway Platform in such format as Air2Web may reasonably require from time to time. Air2Web may amend the formats required for the Services by providing reasonable advance notice thereof. The Company shall provide at least thirty (30) days advance written notice to Air2Web for any change in the formatting of the Content."

7.      The following are hereby added as new Sections 1(e) and 1(f) of Schedule C to the Agreement:

"e)     SMS Message Charges. Company will be charged (or, as applicable, Company's SMS message allowance or SMS message pre-paid allotment will be debited) for all SMS messages as follows: (a) for each mobile terminate ("MT") SMS message, upon Air2Web sending the SMS message from the Air2Web Gateway Platform to the relevant Carrier for delivery; and (b) for each mobile originate ("MO") SMS message, upon Air2Web's receipt of the SMS message from the Carrier. For clarity, Company agrees that

<div align="center">1</div>

Air2Web Confidential Information

BEBE-A-ORT 001-1-0409

04-14-'09 10:09  FROM-bebe stores, inc      6503465572          T-275  P002/002 F-440

the foregoing shall apply irrespective of whether the SMS message is ultimately delivered to the Subscriber or otherwise.

f)      Delivery Service Calculations.  All charges or payments for the Delivery Services shall be calculated by reference to data recorded by (i) the relevant Carrier(s), in respect of Premium Content Services and "free to end user" programs, and (ii) Air2Web, in relation to other Delivery Services."

8.      Section B of Schedule D to the Agreement applies solely to United States Short Codes.

9.      Section C of Schedule D to the Agreement applies solely to United States Short Codes, United States SMS messages, and hosting of the Campaign Manager application for use in the United States.

10.     Section E of Schedule D to the Agreement is hereby deleted in its entirety and replaced with the following:

"E.     CANADA-SPECIFIC FEES:

(a)     INITIAL IMPLEMENTATION SERVICES: $2,500.00 to be invoiced upon the Amendment No. 1 Effective Date.  This charge is inclusive of all set-up fees and includes three months of short code fees.  Air2Web has the right to charge Company for implementation services for each additional campaign/program beyond Company's initial Canadian campaign/program.

(b)     MONTHLY DirectTEXT SUBSCRIPTION:   Company shall pay the applicable DirectTEXT subscription fee set forth below; Air2Web will invoice Company for such fees monthly in advance beginning upon the Amendment No. 1 Effective Date.  The DirectTEXT subscription fee shall be: (i) $450.00 for months one (1) through three (3) immediately following the Amendment No. 1 Effective Date; and (ii) $750.00 for months four (4) through twelve (12) immediately following the Amendment No. 1 Effective Date.  The foregoing fees described in clause (ii) above include the monthly fee for one (1) Canadian Random Short Code.  Company acknowledges and agrees that it must maintain at least one (1) Canadian Short Code, separate and apart from any United States Short Code, for delivery of SMS messages into Canada.

(c)     STANDARD SMS MESSAGING: Air2Web will charge Company, on a monthly basis, for each non-premium (standard) Canadian SMS message sent according the following schedule:

| Standard Canadian SMS Message Fee Schedule | | |
|---|---|---|
| Range of Applicable SMS Message Type/Month | Fee Per Mobile Terminate (MT) SMS Message in Range | Fee Per Mobile Originate (MO) SMS Message in Range |
| 1 – 150,000 | $0.070 | $0.015 |
| 150,001 and above | $0.050 | $0.015 |

11.     Except as otherwise expressly modified or amended herein, all terms and conditions contained in the Agreement shall remain in full force and effect and shall not be altered or changed by this Amendment No. 1.  Furthermore, unless otherwise expressly stated herein, the terms set forth in this Amendment No. 1 shall control to the extent there is any conflicts or inconsistencies between such terms and the terms set forth in the Agreement.  This Amendment No. 1 may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Amendment No. 1 as of the Amendment No. 1 Effective Date set forth above.

**AIR2WEB, INC.**                                        **Bebe STORES Inc.**

By: _____                   By: _____
(signature)                                            (signature)

Name: Thomas McElroy Jr                     Name: Nate Bellmer

Title: President & CEO                        Title: Dir. Database Marketing

2                                           Air2Web Confidential Information

**CONFIDENTIAL**                                          bebe000020

## AMENDMENT NO. 2
## TO AIR2WEB APPLICATION AND SERVICES AGREEMENT

This AMENDMENT NO. 2 ("Amendment No. 2") is made and entered into effective as of December 0 1, 2010 ("Amendment No. 2 Effective Date") by and between Air2Web, Inc. ("Air2Web") and bebe Stores Inc. ("Company").

WHEREAS, Air2Web and Company entered into that certain Air2Web Application and Services Agreement with an Effective Date of April 2, 2007, as amended by Amendment No. 1 dated April 1, 2009 (collectively, the "Agreement"); and

WHEREAS, Air2Web and Company hereby desire to amend the Agreement as set forth herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      The preamble and recitals above are incorporated herein by this reference.  This Amendment No. 2 is made a part of, and shall be subject to the terms and conditions set forth in, the Agreement as further set forth herein.  Any terms not defined herein shall have the meanings set forth in the Agreement.

2.      The current Renewal Term shall be extended through and including January 31, 2012.  All amounts under this Agreement are stated and payable in United States Dollars.

3.      Section 1 of Schedule A to the Agreement is hereby deleted in its entirety and replaced with the following:

> "1.      Definition of Application.  The Applications are computer software owned by Air2Web known as DirectTEXT™ and CampaignPRO. DirectTEXT includes the following features:  (a) connections to U.S. Carriers to supply bi-directional SMS messaging; and (b) XML SOAP API for sending and receiving Content.  CampaignPRO includes the following features:  (a) connections to U.S. Carriers to supply bi-directional SMS messaging; (b) web-based software for text campaign creation, management and reporting; (c) WAP hosting for binary content and optimization; and (d) Company's access to mobile numbers acquired through Company's mobile marketing campaign."

4.      Section B of Schedule D to the Agreement is hereby deleted in its entirety and replaced with the following:

> "B.      SHORT CODE FEES.  Air2Web will maintain one (1) vanity short code on behalf of Company during the term.  If requested by Company, Air2Web will acquire additional short code on behalf of Company and will invoice Company for same.  The fees for short code are as follows:  $500.00 per random short code per month, and $1,000.00 per vanity short code per month.  All short code have a minimum commitment of three (3) months (both for initial acquisition and for each renewal and irrespective of whether this Agreement expires or terminated during any such period) and must be paid in advance.  Company acknowledges that Air2Web will not acquire or renew any short code unless and until Company pays for same."

5.      Section C of Schedule D to the Agreement is hereby deleted in its entirety and replaced with the following:

> "C.      MONTHLY DirectTEXT AND CampaignPRO SUBSCRIPTION FEES AND STANDARD SMS MESSAGING FEES.  $10,000.00 per month during the Term; provided, however, Air2Web will discount the foregoing fee amount to $6,500.00 solely for the period from the Amendment No. 2 Effective Date through January 31, 2011.  Air2Web will invoice Company for such fees monthly in advance beginning upon the Amendment No. 2 Effective Date.  The foregoing subscription fees include up to 350,000 non-premium (standard) domestic SMS messages (each a "Standard SMS message") per month (the "Monthly Messaging Allowance").  Any unused Standard SMS messages within the Monthly Messaging Allowance shall roll over to the subsequent month and be an addition to such month's Monthly Messaging Allowance; provided, however, if there are any unused Standard SMS messages within the Monthly Messaging Allowance (including all prior eligible roll over amounts) as of January 31 of any year other than 2011 (such amount of unused Standard SMS messages as of January 31 of such year the "Standard SMS Message Balance"), then (i) only an amount of Standard SMS messages equal to the Annual Roll Over Amount shall roll over to February of such year and be

1
Air2Web, Inc. – Confidential Information

CONFIDENTIAL                                                    bebe000021

[SIGNATURE PAGE TO AMENDMENT NO. 2]

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Amendment No. 2 as of the Amendment No. 2 Effective Date set forth above.

AIR2WEB, INC.                                    Bebe STORES, INC.

By:_____              By:_____
   (signature)                                          (signature)

Name:_____              Name: NATE BREMMER

Title:_____             Title: DIR. DATABASE MARKETING

3          Air2Web, Inc. – Confidential Information

**CONFIDENTIAL**                                 bebe000022

**AMENDMENT NO. 3**
**TO AIR2WEB APPLICATION AND SERVICES AGREEMENT**

This AMENDMENT NO. 3 ("Amendment No. 3") is made and entered into effective as of September *13*, 2013 ("Amendment No. 3 Effective Date") by and between Air2Web, Inc. ("Air2Web") and bebe Stores Inc. ("Company").

WHEREAS, Air2Web and Company entered into that certain Air2Web Application and Services Agreement with an Effective Date of April 2, 2007, as amended by Amendment No. 1 dated April 1, 2009 and by Amendment No. 2 dated December 1, 2010 (collectively, the "Agreement"); and

WHEREAS, Air2Web and Company hereby desire to amend the Agreement as set forth herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      The preamble and recitals above are incorporated herein by this reference. This Amendment No. 3 is made a part of, and shall be subject to the terms and conditions set forth in, the Agreement as further set forth herein. Any terms not defined herein shall have the meanings set forth in the Agreement.

2.      The current Renewal Term shall be extended through and include July 31, 2014. Notwithstanding anything contrary in Amendment No. 3 or the Agreement, the Renewal Term shall automatically terminate on August 1, 2014 unless extended by mutual written agreement.

3.      Section 1 of Schedule A to the Agreement is hereby deleted in its entirety and replaced with the following:

> "1.      Definition of Application. The "Application" is a server-based, messaging-related software application owned by Air2Web (and/or its affiliates) known as Communicate Pro™."

4.      Effective as of August 1, 2013, Schedule D to the Agreement is hereby deleted in its entirety and replaced with Schedule D attached hereto and incorporated herein by this reference.

5.      Except as otherwise expressly modified or amended herein, all terms and conditions contained in the Agreement are hereby ratified and reaffirmed and shall remain in full force and effect and shall not be altered or changed by this Amendment No. 3. Furthermore, unless otherwise expressly stated herein, the terms set forth in this Amendment No. 3 shall control to the extent there is any conflicts or inconsistencies between such terms and the terms set forth in the Agreement. This Amendment No. 3 may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

**[SIGNATURES COMMENCE ON FOLLOWING PAGE]**

CONFIDENTIAL                      bebe000023

**[SIGNATURE PAGE TO AMENDMENT NO. 3]**

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Amendment No. 3 as of the Amendment No. 3 Effective Date set forth above.

**AIR2WEB, INC.**                                    **bebe STORES, INC.**

By: _____                    By: _____
(signature)                                          (signature)

Name: Harvey Scholl                              Name: FEI YE

Title: CTO                                        Title: Director, CRM

[Schedule D commences on following page]

2
Air2Web, Inc. – Confidential Information

CONFIDENTIAL                                      bebe000024

## SCHEDULE D

## AIR2WEB FEES

1. **Communicate Pro™ Subscription and United States SMS Messaging Fees.**

   Table 1

   | Communicate Pro Fee Schedule | | |
   |---|---|---|
   | Monthly Subscription Fee | Number of Standard SMS Messages in Monthly Messaging Allowance | Overage Rate per Standard SMS Message |
   | $5,000.00 | 700,000 | $0.01 |

   Notes for Table 1:

   1. Monthly Subscription Fees. Company shall pay the "Monthly Subscription Fee" as set forth in Table 1 above throughout the Term. Air2Web will invoice Company for the applicable Monthly Subscription Fees monthly in advance commencing upon the Amendment No. 3 Effective Date.

   2. SMS Messages.

      (a) Included SMS Messages. The Monthly Subscription Fee includes the respective amount of non-premium (standard) domestic SMS messages (each a "Standard SMS Message") per calendar month (the "Monthly Messaging Allowance") as set forth in Table 1 above; provided that any unused Standard SMS Messages within the Monthly Messaging Allowance shall expire at the end of the applicable month and not roll over to the subsequent month.

      (b) Message Overages. Air2Web will charge Company, on a monthly basis, for each Standard SMS Message sent or received beyond the applicable Monthly Messaging Allowance (i.e., each Standard SMS Message after full decrement of the applicable Monthly Messaging Allowance) at the applicable Overage Rate per Standard SMS Message as set forth in Table 1 above.

      (c) Certain Additional Fees. Air2Web will charge Company, on a monthly basis, (i) an additional $0.005 for each mobile terminated ("MT") Standard SMS Message and for each mobile originated ("MO") Standard SMS Message related to Sprint and/or its affiliates, (ii) an additional $0.0025 for each MT Standard SMS Message and for each MO Standard SMS Message related to T-Mobile and/or its affiliates, (iii) an additional $0.0075 for each MT Standard SMS Message and for each MO Standard SMS Message related to MetroPCS and/or its affiliates, (iv) an additional $0.0025 for each MT Standard SMS Message related to Cricket and/or its affiliates, and (v) an additional $0.0035 for each MT Standard SMS Message related to US Cellular and/or its affiliates, and (vi) an additional $0.0015 for each MT Standard SMS Message for CNS services. The foregoing fees shall apply to all Standard SMS Messages related to Sprint, T-Mobile, MetroPCS, Cricket, US Cellular and/or their affiliates (and to all Standard SMS Messages for CNS services) including without limitation Standard SMS Messages within any Monthly Messaging Allowance. For clarity, the foregoing fees are in addition to any other fees set forth in this Agreement.

   [Schedule D continues on following page]

3
Air2Web, Inc. – Confidential Information

CONFIDENTIAL

bebe000025

2.      **United States Short Code Fees.**

Table 2

| United States Short Code Lease Fees | |
|---|---|
| Short Code Type | Price Per Month |
| Random | $500.00 |
| Vanity | $1,000.00 |

Notes for Table 2:

1.  Lease. Company will continue to lease the short codes applicable as of the Amendment No. 3 Effective Date and Air2Web will continue to invoice Company for same. If requested by Company, Air2Web will acquire additional short codes on behalf of Company and will invoice Company for same. The fees for all short codes are set forth in Table 2 above.

2.  Lease Terms. All short codes leases have a minimum commitment of three (3) months (both for initial acquisition and for each renewal and irrespective of whether this Agreement expires or terminates during any such period) (each such three (3) month period a "Lease Term") and must be paid quarterly in advance. The Lease Terms for all short codes shall automatically renew for successive additional three (3) month lease terms (also a "Lease Term") upon expiration of each Lease Term unless either Party hereto provides notice to the other Party of its intent not to renew such Lease Term at least thirty (30) days in advance of the scheduled expiration of the Lease Term, but in no event shall Velti renew the Lease Term after July 31, 2014 unless by mutual written agreement. Company acknowledges that Air2Web, at its sole option, will not acquire or renew any short code unless and until Company pays for same. Short code lease fees do not include CAF (as defined below) filing service fees.

3.      **Set-up Fees for United States Short Codes.**

Table 3

| Short Code Set-up Fees | |
|---|---|
| Tier 1, 2 and 3 Covered Carriers (simultaneously) | $2,500.00 per CAF filing |

Table 4

| Certain Additional Carrier Fees | |
|---|---|
| T-Mobile and its affiliates | $500.00 per submitted program |
| Sprint and its affiliates | $150.00 per provisioned short code |
| Virgin Mobile and its affiliates | $200.00 per submitted program |

Notes for Tables 3 and 4:

1.  Payment. Air2Web will invoice Company for the set-up fees for Carrier Application Form ("CAF") filings in advance upon purchase at the rates set forth in Table 3 above.

2.  Included and Excluded Items. The fees set forth in Table 3: (a) relate solely to work performed by Air2Web personnel (*i.e.*, Air2Web Professional Services) in connection with Air2Web's standard United States CAF filing services, and (b) DO NOT INCLUDE THE CARRIER-SPECIFIC FEES SET FORTH IN TABLE 4 ABOVE OR ANY OTHER INITIAL AND/OR ADDITIONAL CARRIER-SPECIFIC FEES ARISING AFTER THE EFFECTIVE DATE, ALL OF WHICH (I) AIR2WEB WILL PASS THROUGH TO COMPANY AT COST, (II) ARE SUBJECT TO CHANGE FROM TIME TO TIME INCLUDING WITHOUT ADVANCED NOTICE, AND (III) AIR2WEB WILL INVOICE COMPANY FOR IN ADVANCE UPON PURCHASE.

CONFIDENTIAL                                    bebe000026

[Schedule D continues on following page]

Air2Web, Inc. – Confidential Information

CONFIDENTIAL

bebe000027

4.   **Canada-Specific Fees.**

(a)   Implementation Services. Air2Web has the right to charge Company for implementation services for each additional campaign/program beyond Company's initial Canadian campaign/program.

(b)   Monthly Communicate Pro Subscription. $675.00 per month during the Term; Air2Web will invoice Company for such fees monthly in advance beginning upon the Amendment No. 3 Effective Date. The Canadian Communicate Pro subscription fee is in addition to the subscription fees set forth in Section 1 of this Schedule D and includes (i) the monthly lease fee for one (1) Canadian Random Short Code, and (ii) up to 1,000 non-premium (standard) Canadian SMS messages (each a "Canadian SMS message") per month (the "Monthly Canadian Messaging Allowance"); any unused Canadian SMS messages within the Monthly Canadian Messaging Allowance shall roll over to the subsequent month and be an addition to such month's Monthly Canadian Messaging Allowance; provided, however, any unused Canadian SMS messages within the Monthly Canadian Messaging Allowance (including all roll over amounts) shall expire at the end of the then current Renewal Term and not roll over to the subsequent period. Air2Web shall have no obligation to refund any amounts related to unused Canadian SMS messages in any Monthly Canadian Messaging Allowance at the time of their expiration. Company acknowledges and agrees that it must maintain at least one (1) Canadian Short Code, separate and apart from any United States Short Code, for delivery of SMS messages into Canada.

(c)   STANDARD SMS MESSAGING: Air2Web will charge Company, on a monthly basis, for each Canadian SMS message sent or received beyond the Monthly Canadian Messaging Allowance (*i.e.*, each Canadian SMS message after full decrement of the applicable Monthly Canadian Messaging Allowance) as follows: (i) $0.04 per mobile terminated Canadian SMS message, and (ii) $0.005 per mobile originated Canadian SMS message.

5.   **Professional Services.** Air2Web will bill Company for Professional Services (including custom development, campaign execution, application store submissions, short code provisioning and other professional services not stated herein) as provided (billable in quarter-hour increments at $200.00 per hour. Air2Web to provide Professional Services only upon receiving the Company's prior written specific consent.

[End of Schedule D]

Air2Web, Inc. – Confidential Information

CONFIDENTIAL

bebe000028

## AMENDMENT NO. 4
## TO AIR2WEB APPLICATION AND SERVICES AGREEMENT

This AMENDMENT NO. 4 ("Amendment No. 4") is made and entered into effective as of July 31, 2014 ("Amendment No. 4 Effective Date") by and between mGage, LLC via assignment from Air2Web, Inc. ("mGage") and bebe Stores Inc. ("Company").

WHEREAS, mGage and Company are parties to that certain mGage Application and Services Agreement with an Effective Date of April 2, 2007, as amended by Amendment No. 1 dated April 1, 2009, by Amendment No. 2 dated December 1, 2010 and by Amendment No. 3 dated September 13, 2013 (collectively, the "Agreement"); and

WHEREAS, mGage and Company hereby desire to amend the Agreement as set forth herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

    1.    The preamble and recitals above are incorporated herein by this reference. This Amendment No. 4 is made a part of, and shall be subject to the terms and conditions set forth in, the Agreement as further set forth herein. Any terms not defined herein shall have the meanings set forth in the Agreement.

    2.    The current Renewal Term is hereby extended through and include January 31, 2015. Notwithstanding anything contrary in Amendment No. 4 or the Agreement, the Renewal Term shall automatically terminate on February 1, 2015 unless extended by mutual written agreement.

    3.    All references to "Air2Web, Inc." and "Air2Web" in the Agreement are hereby replaced with "mGage, LLC" and "mGage", respectively.

    4.    The address for all notices to mGage is hereby revised to be:  mGage, LLC, Attention:  Legal Department, 3424 Peachtree Road, N.E., Suite 400, Atlanta, Georgia 30326.

    5.    Except as otherwise expressly modified or amended herein, all terms and conditions contained in the Agreement are hereby ratified and reaffirmed and shall remain in full force and effect and shall not be altered or changed by this Amendment No. 4. Furthermore, unless otherwise expressly stated herein, the terms set forth in this Amendment No. 4 shall control to the extent there are any conflicts or inconsistencies between such terms and the terms set forth in the Agreement. This Amendment No. 4 may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Amendment No. 4 as of the Amendment No. 4 Effective Date set forth above.

mGage, LLC

By: _____
   (signature)
Name: __Harvey Scholl__
Title: __COO__

bebe STORES, INC.

By: _____
   (signature)
Name: __Erik Lautier__
Title: __EVP + CDO__

[End of Amendment No. 4]

CONFIDENTIAL

# EXHIBIT I

# bebe
# 2b

| | |
|---|---|
| **DATE:** | March 9, 2012 |
| **TO:** | All Stores |
| **FROM:** | Store Communications |
| **CC:** | Field Managers and Store Operations |
| **RE:** | **Cell Phone Capture/Text Program Offer – Effective Immediately** |

| | |
|---|---|
| **OVERVIEW** | Starting today, entice more Clients to join our Cell Phone Capture/Text Program with an offer to sweeten the deal.  Not only will they be the first to know about our exciting events and promotions by receiving exclusive text messages, but they'll also receive a 10% discount just for joining!<br><br>■  The offer is valid for 10% off their next in-store purchase of regular price merchandise<br>■  The offer cannot be redeemed on bebe.com or 2bstores.com<br>■  The offer is valid for one time use only<br>■  The offer expires within 30 days (expiration date is included in the discount text message the Client receives) |
| **HOW IT WORKS** | ❏  Introduce Clients to the Text Program benefits and the exciting discount that they'll receive if they add or update their cell phone number.<br><br>❏  Associates must ensure that they capture the Client's accurate cell phone number by repeating it to the Client prior to completing the transaction.<br><br>❏  Explain to the Client that in order to receive the discount code, they must respond to the initial text to opt-in to the program.<br><br>❏  Once the Client's cell phone number is captured, they will receive an initial opt-in text message: |

| bebe | *Style on the go! Reply "YES" to join bebe text program. Get 10% OFF a reg-price in-store purch (restrictions apply) + about 3-4 messages per mo w/latest offers.* |
|---|---|
| **bebe CANADA** | *Reply "STYLE" to join bebe text program! Get 10% OFF a reg-price in-store purch (restrictions apply) + 3-4 messages per mo.* |
| **2b** | *2b texted! Reply "2bME" to join 2b text program. Get 10% OFF a reg-price in-store purch (restrictions apply) + about 3-4 texts per mo w/latest offers & more.* |

❏  The Client must text the appropriate response to receive the discount text message:

| bebe | *bebe: Welcome! Abt 3-4 msg/mo. 10%OFF reg-price in-store pur thru Apr 8, 2012. DC:BH. Restrictions app. Txt STOP 2 quit, HELP 4 info. Msg&data rates may app.* |
|---|---|
| **bebe CANADA** | *bebe:Welcome! 3-4 msg/mo. 10%OFF rg-prc in-str thru Apr 8, 2012.  DC:BH.Rstrctns app. Txt STOP 2optout, HELP 4info. Stndrd msg rates app.* |
| **2b** | *2b: Welcome! Abt 3-4 msg/mo. 10%OFF reg-price in-store pur thru Apr 8, 2012. DC:BH. Restrictions app. Txt 2bMESTOP 2 quit, HELP 4 info. Msg&data rates may app.* |

| | |
|---|---|
| | ❏  Discount Code: B12BH (10% Off Text Sign Up) will remain active in the POS on an ongoing basis until further notice, however the client's text message will feature an expiration date 30 days after the day that they opt-in.  Please double check the expiration date has not passed prior to applying the discount.  Managers should use their best judgment if a potential Client Service Issue arises regarding the offer expiration date. |
| **QUESTIONS** | Contact your District Manager |

| **MANAGER SIGN OFF** | X | X | X | X |
|---|---|---|---|---|

CONFIDENTIAL

# bebe stores inc.

February 7, 2011

## Cell Phone Capture/Text Program

1) **When signing up new Clients and confirming contact information for existing Clients, be sure to ask them for their cell phone numbers!**
2) **If a Client provides her cell phone number, let her know that she will receive a text message where she can opt in to our NEW text messaging promotion program!**
3) **Our new text messaging program will allow Clients to receive special discounts, promotions and exclusive invites.  Read below to offer this special deal to your Clients!**

Keeping the Phone Numbers Straight!



Keep Client's **home phone number** in this field. If a Client doesn't wish to provide their home number, enter their cell number in both fields.

Only Client's **cell phone number** should go in this field.  This is the number where Clients will receive their special promotion texts.

**Who can take advantage of this program? Any Client adding a cell phone number will get a text!**
- Every new Client that provides a cell phone number
- Every existing Client that would like to add a cell phone number to their account.
  (So every time an existing Client wants to make a purchase, you should confirm their existing number, make sure it's in the correct field, and allow them to take advantage of the offer!)
- Every time an existing Client changes her cell phone number on file, she will receive an opt in message to her new cell phone.

**The Details:**
- Upon receipt of this opt in message, Clients can either opt in or decline being a part of the text promotion program.
- The text promotion program applies at both retail and 2b stores in the US and only retail stores in Canada. However, make sure that at the US stores you are entering a US cell phone number, and Canadian stores are entering a Canadian number, or the Client will not be included in the text program.
- If your Client doesn't have a home number, use her cell phone number in both fields so she can receive our texts, be called for events, and also be quickly found in Client Lookup.
- Check your numbers carefully! Accuracy is critical. Validity of phone numbers will be closely monitored by corporate. Any manipulation will result in corrective action.

| X | X | X | X |
|---|---|---|---|

CONFIDENTIAL

bebe000033

# CLUBBEBE INFORMATION GUIDE & POS PROCEDURES

## WELCOME TO THE CLUB

clubbebe is our exclusive Loyalty program that not only recognizes our Clients and rewards them for shopping, but offers every member the inside scoop on new merchandise! clubbebe members will also be invited to special in-store events, shopping nights, and will have access to the clubbebe Lounge on bebe.com where they can obtain exclusive information and offers! Members will earn points when applying clubbebe to any purchase made in-store and on bebe.com.  clubbebe is valid in stores located in the U.S., Puerto Rico and USVI only.



## JOINING CLUBBEBE & BENEFITS

Clients can enroll at any store in the U.S., Puerto Rico and USVI and will receive a loyalty card immediately upon enrollment in the POS.

| POINTS | BENEFITS |
|---|---|
| Enrollment | 1 Point for every dollar spent<br>50 Points upon registration of a valid email address on bebe.com<br>Invitations to special in-store events<br>Exclusive online offers |
| 250 Points | All of the above, plus<br>$10 Reward Coupon for every 250 Points<br>Double Points shopping events |
| 1000 Points | All of the above, plus<br>Free standard shipping on every in-store and online purchase for one year |

Inform your Client that if they activate their clubbebe account at bebe.com, they not only receive 50 points, but can also receive electronic statements, view point balance, history and rewards status.

bebe000034

# CLUBBEBE IN/OUTS OF POINTS & REWARDS

## CLUBBEBE POINTS

- clubbebe points are not available on previous purchases
- clubbebe points are earned on net dollars. Earning of points does not include tax, shipping, returns, Gift Cards or value of clubbebe rewards
- clubbebe points are non-transferable
- A photo ID is required for all in-store clubbebe purchases, when the clubbebe card is not present
- 50 points will be credited within 24 hours of activation of a clubbebe account online. This is a one-time credit. **(Note: Activation is different than signing up. Activation is how a clubbebe account is tied to online activity.)**
- clubbebe points may take up to 24 hours to be credited to a clubbebe account for in-store purchases
- clubbebe points will be credited to a clubbebe account within 24 hours, after the merchandise has shipped, for purchases made on bebe.com
- clubbebe accounts can be activated by logging onto bebe.com. A valid email address is required.
- clubbebe points can be checked by visiting any bebe or 2b bebe store in the U.S., Puerto Rico and USVI or by logging onto bebe.com.
- Only if the clubbebe account has been activated on bebe.com prior to purchase, then clubbebe points can be earned for purchases on bebe.com using the clubbebe membership number

## CLUBBEBE REWARDS

- Clients will receive a $10 reward for every 250 points earned
- Clients will receive an email each time a reward is earned
- clubbebe rewards are redeemable at all bebe and 2b bebe stores in the U.S., Puerto Rico and USVI and on bebe.com
- clubbebe rewards are valid for 60 days from issuance
- clubbebe rewards can be applied to purchases in any increment within the 60 day validation period. Any unused rewards will be banked and will be available for purchases within 60 days from reward issuance.
- clubbebe reward returns will be returned for actual amount paid, less any clubbebe rewards, on the returned merchandise
- An Expiring Rewards Report is available on storenet. This report will allow Stores to contact Clients that have clubbebe rewards that are expiring. Before notifying Client's of an expiring reward, it is recommended that Stores look up the Client's clubbebe number in the POS and confirm the reward is still valid.
- The value of the clubbebe rewards will be applied towards the pre-tax merchandise total, excluding Gift Card purchases, shipping and tax.
- clubbebe rewards are:
    - not valid towards previous purchases, price adjustments or combinable with any other offer
    - non-transferable
    - not redeemable for cash
    - not eligible for associate use

## CLUBBEBE BIRTHDAY REWARDS

Clients who have registered their birthday and have accumulated at least 250 points will receive a special clubbebe Happy Birthday email valid for $10 off one purchase of regular priced merchandise.

### Coupon Disclaimers:

- Select Discount Code "clubbebe Birthday" at the Point of Sale
- Valid on full price merchandise only
- Not combinable with clubbebe Rewards
- Expires 6 weeks from beginning of Client's birth month (or the 15th of the next month)
- Client must have given us their birth date information at least 10 business days prior to the start of their birthday month to receive the discount email

# CLUBBEBE CLIENTELING AT THE POS

## JOINING THE CLUB...

To ensure consistency in how we communicate with our Clients, use the following script each time you process a sale/exchange transaction:

**Stylist:   Are you a clubbebe member?**
*If the Client is a member of clubbebe, scan her card or look her up. Verify her e-mail address and physical address in the system is correct.*

**Client:** No, I am not.  What is clubbebe?
**Stylist:** You should sign up today! It's a free rewards program that allows you to earn points toward coupons and give you access to exclusive offers. You get a point for every dollar you spend and earn a $10 reward for every 250 points you accumulate. All I need is your e-mail address to get started.
**Client:** Why do you need my e-mail address?
**Stylist:** So that you can access our online clubbebe lounge which gives you the ability to access new product before it arrives in-store or on bebe.com. You'll also receive invitations to double point shopping events! And, bebe does not share email addresses with any other companies, so there's no need to worry.

*If the Client continues to show resistance, continue the dialog with:*
**Stylist:** Other amazing benefits include invitations to special shopping nights and special events.

*If the Client continues to show resistance, finish the transaction with:*
**Stylist:** Thank you for shopping with us today.  Should you change your mind about joining clubbebe, you can join on your next visit to any bebe or 2b bebe store.

Review and role play the above with each associate.  To ensure consistency, continue practicing until each associate can comfortably recite the dialogue.  Listen to the first few transactions where the associate uses this approach and coach afterwards. Enrolling Clients in clubbebe is just another way we offer World Class Service.

bebe000036

# ENROLLING A NEW CLIENT INTO CLUBBEBE AT THE POINT OF SALE

## POS PROCEDURES

1. Search for the Client in the POS by entering any of the below criteria:
    a. Phone Number only
    b. Last and First Name. Note: If the Client has a common first and last name, search with additional information like Zip Code and/or State to narrow the search results.
2. Once you have entered in the search information select "Search"
3. At the Search Results Screen select "Add New"
4. A message prompt will appear asking if the Client would like to signup for clubbebe. Select "Yes" to enroll the Client into clubbebe.
5. Scan the new loyalty card at the clubbebe registration screen.
6. Enter the following information in the Address and Contact screen:
    a. **Phone #:** Required for all clubbebe members. Must be entered in the (XXX) XXX-XXXX format
    b. **Cell #:** Must be entered in the (XXX) XXX-XXXX format
    c. **Email:** This is a great way to reach out to Clients! Let Her know that giving us Her email address, she will receive information about promotions, invitations to double point shopping events, exclusive access to new product launches before they arrive in-store or on bebe.com. Also, let Clients know that bebe does not share email addresses with any other companies.
    d. **First Name:** Required for all clubbebe members
    e. **Last Name:** Required for all clubbebe members
    f. **Address (1st line):** Required for clubbebe members. This field should contain the street address.
    g. **Address (2nd line):** This field should contain an apartment number if applicable.
    h. **Zip Code:** Required for clubbebe members
    i. **City:** Required for clubbebe members
    j. **State:** Required for clubbebe members
    k. **Birthday Month and Day:** Must be entered in numeric format. Example; Enter 10/28 for birthday October 28th. NOTE: The birth year will auto default to the current year.
7. Select "Save Changes" to continue
8. At this point, the Client's Address is validated through the POS system. Continue with the transaction as you normally would.



| 1-2. Client Lookup Screen | 3. Search Results Screen | 4. clubbebe Signup Prompt | 5. clubbebe Registration Screen | 6. Address and Contact Screen |

9. Hand the Client her new clubbebe card presented in the card holder along with her receipt.
   *Note: Inform the Client that the full T&Cs are available on bebe.com, but if she would like a copy you could provide one for her.*

bebe000037

# ENROLLING AN EXISTING CLIENT INTO CLUBBEBE AT THE POINT OF SALE

## POS PROCEDURES

1. Search for the Client in the POS by entering any of the below criteria:
   a. Phone Number only
   b. b. Last and First Name. Note: If the Client has a common first and last name, search with additional information like Zip Code and/or State to narrow the search results.
2. Once you have entered in the search information select "Search"
3. If more than one Client appears, use the arrow keys to scroll up or down to highlight the Client
4. Choose "Select and View" to proceed
5. If the Client is not clubbebe, a pop up window will appear asking if the Client would like to signup for clubbebe.  Select "Yes" to enroll the Client in clubbebe.
6. Scan the new loyalty card at the clubbebe registration screen.
7. Verify that the Client's contact information is up to date and correct in the Contact info screen. Note: Any missing required information needs to be entered by the cashier in order to continue.
8. Select "Assign Client To Transaction " to continue
9. At this point, the Client's Address is validated through the POS system. Continue with the transaction as you normally would.

2.

| 1-2. Client Lookup Screen | 3-4. Search Results Screen | 5. clubbebe Signup Prompt | 6. clubbebe Registration Screen | 7. Address and Contact Screen |



10. Hand the Client her new clubbebe card presented in the card holder along with her receipt.
    Note: Inform the Client that the full T&Cs are available on bebe.com, but if she would like a copy you could provide one for her.

bebe000038

# ENROLLING A CLIENT INTO CLUBBEBE USING NO CARD AVAILABLE

## NO CARD AVAILABLE FUNCTION

Should your store run out of new clubbebe cards, you may use the "No Card Available" option from the clubbebe Registration Screen. The POS system will auto generate a clubbebe number for the Client so that points can still be earned at the time of purchase. The clubbebe loyalty # will print on the receipt header and footer. Inform the Client that they will not be issued or mailed a loyalty card and therefore will need to be searched in the POS using her/his phone number for future purchases.

## POS PROCEDURES

1. Search for the Client in the POS by entering any of the below criteria:
    a. Phone Number only
    b. Last and First Name. Note: If the Client has a common first and last name, search with additional information like Zip Code and/or State to narrow the search results.
2. Once you have entered in the search information select "Search"
3. At the Search Results Screen select "Add New". **Note:** if the Client is already in the system choose "Select And Continue"
4. A message prompt will appear asking if the Client would like to signup for clubbebe. Select "Yes" to enroll the Client into clubbebe.
5. From the clubbebe registration screen, select "No Card Available". **Note:** The "No Card Available" option will require a Manager's override when a non management Associate is logged in as the cashier.
6. Enter the following information in the Address and Contact screen:
    a. **Phone #:** Required for all clubbebe members. Must be entered in the (XXX) XXX-XXXX format
    b. **Cell #:** Must be entered in the (XXX) XXX-XXXX format
    c. **Email:** This is a great way to reach out to Clients! Let Her know that giving us Her email address, she will receive information about promotions, invitations to double point shopping events, exclusive access to new product launches before they arrive in-store or on bebe.com. Also, let Clients know that bebe does not share email addresses with any other companies.
    d. **First Name:** Required for all clubbebe members
    e. **Last Name:** Required for all clubbebe members
    f. **Address (1st line):** Required for clubbebe members. This field should contain the street address.
    g. **Address (2nd line):** This field should contain an apartment number if applicable.
    h. **Zip Code:** Required for clubbebe members
    i. **City:** Required for clubbebe members
    j. **State:** Required for clubbebe members
    k. **Birthday Month and Day:** Must be entered in numeric format. Example: Enter 10/28 for birthday October 28th. NOTE: The birth year will auto default to the current year.
7. Select "Save Changes" to continue. **Note:** if this is an existing Client choose " Assign Client To Transaction"
8. At this point, the Client's Address is validated through the POS system. Continue with the transaction as you normally would.

| 1-2. Client Lookup Screen | 3. Search Results Screen | 4. clubbebe Signup Prompt | 5. clubbebe Registration Screen | 6. Address and Contact Screen |
|---|---|---|---|---|









bebe000039

# FAQs

**Q: What if you issue a clubbebe card that is already assigned to a Client?**
A: The POS will show the following error message: "The clubbebe card is invalid. Please scan a different clubbebe card."

**Q: Do I still need to open a ticket with Store Support if a client has multiple clubbebe accounts that she/he would like to merge?**
A: Yes.

**Q: When does a clubbebe account become de-activated?**
A: All clubbebe accounts without activity for more than one calendar year will become inactive and any point balance will reflect zero points.

**Q: Where does a Client update their contact information?**
A: Changes to clubbebe accounts are required to be updated both in-store and online.

**Q: What happens if a Client's card is lost?**
A: You may send the Client a replacement card by:
1. Assign the Client to the transaction
2. From the transaction screen, select the "Non Merch" function key.
3. From the Non Merch list select "Loyalty Replacement Card" and select "OK". **Note:** Corporate Office will mail the Client a replacement card.
4. Complete the transaction as you normally would

**Q: Do existing clubbebe loyalty members need to re-enroll and be issued a new card?**
A: No. Existing clubbebe members can continue to use their current clubebe card and can be found in the POS by searching with their clubbebe number, phone number, and/or first and last name.

# SUPPLY ORDERING

clubbebe supplies can be reordered on DDS. Below are the reorder numbers:
- clubbebe Card in holder
  - ☑ item #01262
  - ☑ 50 per package
- clubbebe T&Cs
  - ☑ item #01263
  - ☑ 100 per pad

CONFIDENTIAL

bebe000040

# EXHIBIT J

# In The Matter Of:

*Melita Meyer v.*
*Bebe Stores Inc.*

---

*Christaine Grando*
*January 07, 2016*

---



NorthStar
Deposition Services

103 Eisenhower Parkway
Roseland, New Jersey 07068
800.973.9270
scheduling@northstardepos.com

*Original File 010716Grando.txt*
*Min-U-Script® with Word Index*

Melita Meyer v.
Bebe Stores Inc.

Christaine Grando
January 07, 2016

Page 25

1 there originally was an applet at the bottom of the
2 website. And that was just basically a little field
3 that would send the information directly to our vendor
4 when you signed up. Later that became a form field,
5 and that was also a sign up, and there was information
6 about, you know, "You are agreeing to sign up to
7 receive text messages from Bebe." And that would go
8 into our database and be attached to your account.
9     Q.   Okay. So you're saying that there are
10 -- let's just focus on POS.
11     A.   Oh, and you can also -- sorry. You
12 can also -- there was a code that you could text in
13 order to sign up.
14     Q.   Okay.
15     A.   Sorry. About that.
16     Q.   It's okay. So let's focus on the POS
17 for a second. So you're saying that when somebody
18 approached or registered with --let's say a product to
19 buy, they could enroll -- or they could provide their
20 cell phone number without providing any additional
21 information?
22     A.   They would have to at least give their
23 first name. That is my understanding. Angela would
24 be the better person to talk about clienteling, but
25 they are not forced to sign up for Club Bebe. They

Page 26

1 don't have to sign up for any other program. They had
2 the option of saying, "Yes, I would like to receive
3 text messages." They also had the option of saying,
4 "Yes, I'd like to receive e-mails, but I don't want to
5 receive text messages." There are all of those
6 difference options for figuring out how you'd like to
7 be communicated to.
8     Q.   And is all the information that can be
9 collected at the point of sale, whether or not it
10 actually is, stored in one central database?
11     MS. PIERCE: If you know the answer to
12 that, you're welcome to testify to that. Sheela will
13 be able to -- sorry. I just want to remind you we do
14 have a person most knowledgeable who will be able to
15 tell you about the hardware and software that may give
16 you more complete answers.
17     MR. MENDELSOHN: Okay.
18     THE WITNESS: But my understanding,
19 yes. It all goes to Relate which is our CRM database.
20 BY MR. MENDELSOHN:
21     Q.   Okay. So when somebody is -- chooses
22 to just provide their cell phone number, not any
23 additional information, not sign up for Club Bebe, are
24 they considered being signed up for -- is there a
25 name, a program that they're being signed up for?

Page 27

1     A.   Just the text message program.
2     Q.   Just the text message --
3     A.   Just texting.
4     Q.   And then if they provide the
5 additional information, they can be enrolled in Club
6 Bebe?
7     A.   If they choose to, yes.
8     Q.   And what information is required to be
9 enrolled into Club Bebe?
10     A.   I am not sure actually.
11     Q.   Okay.
12     A.   They changed it a little while ago.
13     Q.   Do you know on a percentage basis how
14 many -- with regard to all the cell phone numbers that
15 are contained in Bebe's database, what percentage were
16 also members of Club Bebe versus which -- what
17 percentage of people just provided only their cell
18 phone number?
19     A.   I don't know.
20     Q.   Is that information that can be
21 gleaned somewhere in your system?
22     A.   You'll have to ask Sheela. As far as
23 I know, there is no -- we're not able to say that the
24 phone number that we're given is a cell phone or a
25 landline specifically. So you'll have to ask Sheela.

Page 28

1     Q.   Can you explain what you mean by that?
2     A.   That if we were to do a query and pull
3 out people with phone numbers who are in Club Bebe, it
4 could be that some of them are cell phone number and
5 some of them are landlines. There's no specific field
6 for cell phone. That's my understanding. So we'll
7 have to ask Sheela.
8     Q.   Okay. And general information about
9 these databases where things are stored should be
10 directed to Sheela?
11     A.   Yes.
12     Q.   Not to you. I just want to make sure
13 that --
14     A.   There's overlap. She's also the
15 director of CRM, but she's the director of CRM
16 operations. I'm the business side; she's the tech
17 side, but there's a lot of overlap.
18     Q.   So I'm just going to -- you know,
19 everything kind of overlaps when I ask you questions,
20 and if, again, it's not something that you can speak
21 to, just let me know.
22     A.   Okay.
23     Q.   Now, I understand that at the POS,
24 Bebe uses MICROS Xstore; is that correct?
25     A.   Yes.

Melita Meyer v.
Bebe Stores Inc.

Christaine Grando
January 07, 2016

---

Page 41

1   list compared to any of the other lists we would have,
2   like for e-mail or catalogue.
3         And, again, it's just part of our
4   omni-channel strategy. It's not what we're doing to
5   drive huge amounts of business or ROI. It's not
6   something where we're pounding people and saying,
7   "Give me your cell phone number because we have a text
8   messaging program." Over time, you understand what
9   works better in your channels, and even though it's
10  very difficult to understand how text messaging works
11  and whether or not there is an ROI, you can look at
12  the other channels that you can track and see which
13  are more productive. And since it was such a small
14  number of people that were enrolled in the text
15  message program, a lot of our emphasis has been placed
16  on programs that are more trackable, that we know
17  work, and that are easier to execute. And so that's
18  where we spent our time and effort.
19        When I came in, the text messaging
20  program was just sort of on autopilot. Every few
21  weeks we would have some content. It was given to one
22  of the girls who is -- was on my team for about three
23  months. When I got there, she had been there for a
24  little while. She would go in and set them up into
25  this interface that our vendor had, and then they

Page 42

1   would execute. That's the only time that we would
2   touch anything that had to do with any of the text
3   messaging program. Just going into this where we were
4   restricted. They have obviously security levels and
5   things that you can do in this interface.
6         A couple of times during the time that
7   I was there, even if I wanted to get to the
8   information about how many cell phone numbers we had,
9   I couldn't. I had to ask my account team at Air2Web.
10  I had absolutely no access to these phone numbers. I
11  had absolutely no access to those people. I didn't
12  interact with the people who were in the program.
13       Q.   Okay. You started off your answer by
14  saying that Nate wasn't required to pull reporting or
15  reports from Air2Web, but do you know whether he
16  actually did?
17       A.   I do not know whether he did. I do
18  know from some of the research that I did that Air2Web
19  did provide him reporting. And from what I
20  understand, and being a marketing person, I think that
21  reporting is just basically for understanding the
22  program.
23       Q.   Okay. Another thing that you
24  mentioned in your answer was that, to use your words,
25  the text messaging list was "a very, very small list."

Page 43

1        A.   Yes.
2        Q.   Can you quantify that for me?
3        A.   I don't know the exact number. The
4   number that I had seen in some of the documents was
5   well under a hundred thousand.
6        Q.   And when you say "well under a hundred
7   thousand," is that the number you're referring to is
8   unique cell phone numbers?
9        A.   I would assume they were unique.
10            MS. PIERCE: We don't want to assume.
11  Sorry.
12            THE WITNESS: I don't know.
13  BY MR. MENDELSOHN:
14       Q.   What I'm saying is you're referring to
15  cell phone numbers as opposed to, like, number of text
16  messages?
17       A.   Cell phone numbers, yes. People on
18  the list. And if you compare that to catalogue or
19  e-mail, I mean, it's -- I don't know if I can say how
20  many people we have on our list, but...
21       Q.   "Well under a hundred thousand." More
22  than 50,000?
23       A.   I think it was a little bit more than
24  50,000.
25       Q.   Now, you said you talked about the

Page 44

1   limited user interface that you had, but there is a
2   user interface that Air2Web allowed you to go and
3   basically insert the text -- the text of the text
4   message that would be sent; correct?
5        A.   Correct.
6        Q.   And it would also allow you to add
7   things like a start date and end date; correct?
8        A.   I don't know because I never used it.
9   I've never seen it.
10       Q.   Okay.
11           MS. PIERCE: Sorry. I'm thinking --
12  I'm not sure where you came up with the start and end
13  date.
14           MR. MENDELSOHN: Just based on my
15  understanding of how these types of scripts run. I
16  mean, they may -- I don't know.
17           MS. PIERCE: Sorry. I apologize. I
18  just want to make sure that I wasn't missing something
19  in...
20           MR. MENDELSOHN: There may not be in
21  this case. It may just be one -- one thing that goes
22  out. It depends on the way I think the script is
23  written, but...
24  BY MR. MENDELSOHN:
25       Q.   So if -- if the information regarding

# EXHIBIT K

**In The Matter Of:**

*Melita Meyer v.*
*Bebe Stores Inc.*

---

*Angela Kourtoglou*
*January 7, 2016*

---



NorthStar
Deposition Services

103 Eisenhower Parkway
Roseland, New Jersey 07068
800.973.9270
scheduling@northstardepos.com

*Original File 010716Kourtoglou.txt*
*Min-U-Script® with Word Index*

Melita Meyer v.
Bebe Stores Inc.

Angela Kourtoglou
January 7, 2016

Page 25

1    A.   Can you rephrase that?
2    Q.   Yeah.  I just want to know -- you
3  mentioned the term clienteling and what that was
4  specifically.  Well, strike that.  Let me take a step
5  back.
6         Between January 2011 and January 2014,
7  when the cell phone capture campaign at the POS was
8  going on, would every customer who walked up to the
9  cash register be asked for their cell phone number?
10   A.   If the customer's making a purchase
11  and they -- when they pulled up the client's account,
12  if they didn't have a cell phone number in there, part
13  of the training was the stores would go through that
14  scripting with them of, "Oh, I notice you didn't have
15  your cell phone number.  We now have a new text
16  program campaign.  Would you like to join it?  Here
17  are the features and benefits of it."  And the client
18  would say no; or, again, they can say yes, and they
19  give the verbal consent to input that number.
20  Imputing that number, though, didn't mean that you
21  were automatically opted in because there was a double
22  opt-in process after that.
23   Q.   Okay.  When you say "pull up the
24  client's account," how is that done?
25   A.   When a client comes into the store,

Page 26

1  they'll say, "Oh" -- and if I don't know them by name;
2  and, again, because we are a strong client business,
3  most stores know their clients by name so they are
4  able to type in their first name, last name, city in
5  the system.  But if you didn't, or even if you did,
6  you can say, you know, "What is your first name, last
7  name again?  May I have your phone number, your
8  e-mail?"  So there's a couple different vehicles in
9  which you can search for them.  They would search for
10  that client.  If it's a one-to-one match, one would
11  show up.  If not, they would choose that client from a
12  list of similar names, confirm that information, and
13  then proceed with the sale from there.
14   Q.   Okay.  And prior to any sale or return
15  at a POS, is it ascertained by the Bebe employee
16  whether or not they are in Bebe's system?
17   A.   When a client comes up to the point of
18  sale, they will say, "Oh, are you a member of Club
19  Bebe?  Have we clienteled you before?"  And the client
20  would say, "yes."  In many cases if the client is,
21  she'll actually present her Club Bebe card, and we'll
22  scan that to go through.  So it's generally the first
23  question that's typically asked at the point of sale.
24   Q.   Do customers have to provide that
25  information in order to complete the sale or return?

Page 27

1    A.   Absolutely not.
2    Q.   And are customers told that?  Is that
3  a disclosure that's made to all customers?
4    A.   Yes.  If the client says, "No, I'm not
5  interested in joining the club" or not to be
6  clienteled, no problem.  They continue on with the
7  sale.
8    Q.   And if it's determined that Bebe
9  doesn't have that customer's information in the
10  system, what happens next?
11   A.   Just any other sale like if you're
12  walking into a Gap store.  We're going to ring you
13  through, we'll tender your payment options, and give
14  you the same expectation and level of client service
15  that we would if you weren't clienteled in our system.
16   Q.   But if somebody walks up to the POS,
17  and they ask whether you're a part of their system
18  and, you know, maybe they look up, and you're not in
19  there, what happens next?  How is it that the
20  information is obtained from the customer?
21   A.   They would ask the customer, one, if
22  the customer said, "Yes, I would like to join Club
23  Bebe" and be clienteled, they would then input the
24  customer's first and last name, and then if you're
25  joining Club Bebe, it requires a phone number and full

Page 28

1  mailing address, and they'd repeat that back to the
2  client and save the information.
3    Q.   So when somebody is provided --
4  provides their information at the POS, in addition to
5  their phone number, their name is collected?
6    A.   First name and last name.
7    Q.   And their full address is collected?
8    A.   Mailing address, yes.
9    Q.   And how about a home phone number?
10   A.   It's a phone field, and that phone
11  field could be any phone number they provide you --
12  home, work, office, cell.  It doesn't go anywhere
13  other than a saved database.
14   Q.   Okay.  And that phone field, is there
15  a drop down or selection to select what type of phone
16  number's being provided?
17   A.   It's indicated as home only; so it
18  doesn't.
19   Q.   So if -- you mentioned some
20  disclosures that were given to customers regarding
21  joining Club Bebe and receiving text messages.
22  Wouldn't it be important to make sure that the phone
23  number that's being given is the cell phone number?
24   A.   There's a separate field called
25  "cell," and that's where they would input the cell

Melita Meyer v.
Bebe Stores Inc.

Angela Kourtoglou
January 7, 2016

---

Page 45

1    Q.   Is there any age restrictions
2  regarding who was allowed to provide information to
3  Bebe?
4         MS. PIERCE: I'm going to object.
5  This question is outside the scope of this complaint.
6         MR. MENDELSOHN: Are you directing the
7  witness not to answer the question?
8         MS. PIERCE: Yes.  I am going to
9  direct her not to answer it.  It's outside the scope
10 of this kind of complaint.  It's phishing
11        MR. MENDELSOHN: It's what?
12        MS. PIERCE: You're phishing on
13 something that is not relevant.
14        MR. MENDELSOHN: I disagree with your
15 characterization.
16        MS. PIERCE: If you think it's
17 relevant, please rephrase your question and ask it.
18 BY MR. MENDELSOHN:
19    Q.   I want to know who is entitled to
20 provide information at the point of sale, including
21 cell phone numbers.  So I asked -- just trying to get
22 specific.  Is there -- are there age restrictions
23 regarding who was allowed to provide that information?
24 For instance, if somebody comes in there and they're
25 12 years old and they're buying something, are they

---

Page 46

1  permitted to enroll in Club Bebe?
2     A.   Honestly, I have to look the TNC's of
3  Club Bebe on an age restriction on there.  If there is
4  one that exists, I have to go back and look at that.
5     Q.   Okay.  This may be better directed at
6  one of the other witnesses, but do you know whether
7  Bebe can identify those customers that provided their
8  cell phone numbers at the point of sale as opposed to
9  some other method?
10    A.   It's not my area of knowledge.
11    Q.   Okay.  Can information that is already
12 in Bebe's systems.  Somebody had previously provided,
13 you know, their name, address, phone number, and cell
14 phone number, can that information be deleted from
15 Bebe's database from the point of sale?  Do you know?
16    A.   It can.
17    Q.   So after a customer provides their
18 cell phone number at the point of sale and it's
19 entered into the system, they'll be sent an initial
20 text message by Bebe; correct?
21    A.   Correct.
22    Q.   When will that occur?
23    A.   Again, it's something that Christiane
24 or Sheela can probably speak more to because it did go
25 through third parties that deliver that message, but

---

Page 47

1  it was generally within -- if it was delivered, within
2  a few hours of the transaction.
3     Q.   And that would be that initial -- I
4  think what you referred to as a confirmatory opt-in
5  text message?
6     A.   Correct.
7     Q.   Was it sent to, or attempted to be
8  sent to, every person who provided their cell phone
9  number at the point of sale?
10    A.   To my understanding, yes.  And, again,
11 it's something that Sheela and Christiane could speak
12 better to because they managed the vendors.
13    Q.   Do you have an understanding of what
14 the content of that first text message is?
15    A.   Yes.
16    Q.   Okay.  Can you tell me what the
17 content is?
18    A.   Generally speaking it was "welcome" --
19 some sort of a welcome, and I don't know exactly what
20 the verbiage was.  "Respond yes to receive your 10
21 percent discount on your next purchase by joining the
22 text program," and I had to say yes in order to be
23 opted in.  If I did nothing, I'm good to go and I'm
24 never going to receive a text from Bebe.
25    Q.   So unless somebody replied yes to the

---

Page 48

1  initial text message that they receive, they will
2  never receive another text message from Bebe?
3     A.   To my knowledge, that is correct.
4     Q.   And despite, perhaps, minor changes to
5  the format of the message or the wording, were all of
6  those message -- initial text messages generally the
7  same during that cell phone capture period?
8     A.   I'd have to defer to Christiane on
9  that.  I'm not CRM.  They did the messaging.
10    Q.   You keep saying -- and I apologize.
11 What is CRM?  What does CRM stand for?
12    A.   Customer relations management.  It's
13 basically what the databases are referred to that
14 stores the client information.
15    Q.   Should I ask Christiane what happens
16 if the customer does reply yes?
17    A.   Yes.
18    Q.   Okay.  Why don't we go off the record.
19 Just take a couple minute break.
20        MS. PIERCE: That'd be great.
21        VIDEOGRAPHER: Going off the record.
22 The time is 10:58 a.m.
23        (Off the record.)
24        VIDEOGRAPHER: We are back on the
25 record.  The time is 11:19 a.m.

---

# EXHIBIT L

**In The Matter Of:**

*Melita Meyer v.*
*Bebe Stores Inc.*

*Sheela Agarwal*
*January 08, 2016*



103 Eisenhower Parkway
Roseland, New Jersey 07068
800.973.9270
scheduling@northstardepos.com

*Original File 010816Agarwal.TXT*
*Min-U-Script® with Word Index*

Melita Meyer v.
Bebe Stores Inc.

---

1  case -- let me know.  I'm certainly probably -- I will
2  ask you a question that may not make sense to you.
3      A.  Okay.
4      Q.  Let me know that, and I'll try to
5  rephrase it.
6      A.  Okay.
7      Q.  I want to make sure that we're on the
8  same page today.
9      A.  Okay.
10     THE REPORTER:  And also, please, wait
11  until he's finished before you answer.  I can't keep
12  hitting "okay" every time.  I'm sorry.
13  BY MR. MENDELSOHN:
14     Q.  I don't want to you guess at anything.
15  So if you don't know the answer to one of my
16  questions, just tell me you don't know.  Okay?
17     A.  Okay.
18     Q.  By the same token, if I ask you a
19  date, a time, a number, and you can estimate or
20  approximate, you can go ahead and do so.  Just let me
21  know that's what you're doing.  Okay?
22     A.  Got it.
23     Q.  Did you review any documents in
24  preparation for the deposition today?
25     A.  Can you clarify -- if you're asking

---

1  did I review documents today?
2      Q.  Before you came in here to start your
3  deposition, at any time, whether that was last week or
4  whether that was five minutes ago, did you review
5  documents in preparation for your -- to your testimony
6  today?
7      A.  Yes.
8      Q.  Can you tell me what documents you
9  reviewed?
10     A.  We reviewed -- I reviewed the notice,
11  I believe it's the deposition notice, and also our
12  internal IT documents.
13     Q.  And those internal IT documents, is it
14  your understanding that they've been produced to the
15  plaintiffs as part of the discovery process?
16     A.  Yes.
17     Q.  I see that you have a couple documents
18  in front of you there today.
19     A.  Yes.  This was provided but may not
20  have been included; so they are printed out.
21     MS. PIERCE:  There's three copies
22  there, Counsel.
23     MR. MENDELSOHN:  Three copies of --
24     THE WITNESS:  The same --
25     MS. PIERCE:  One can be marked, and it

---

1  can be used by the witness, and then there's a copy
2  for each of you to look at while she's testifying.
3      MR. LITTLEFIELD:  Thank you.
4      MR. MENDELSOHN:  You know, why don't
5  we mark this.  We're on Exhibit 9?
6      MS. PIERCE:  Go ahead and have her
7  mark this copy.  That way, we can --
8      MR. MENDELSOHN:  Yeah.  Can you pass
9  that to the court reporter, please, and have that
10  marked as Exhibit 9?
11     MS. PIERCE:  I'd also like to note
12  that this is a confidential document.  We just
13  realized this morning that we may not have produced
14  this, and we thought it would be helpful to have it
15  available to counsel for this particular deposition.
16  So we have provided a copy.  It does not have a Bates
17  number on it, and it is not marked confidential, but
18  is it, in fact, confidential information.
19     (Exhibit 9 was marked for identification.)
20  BY MR. MENDELSOHN:
21     Q.  So the court reporter has just handed
22  you what we've marked as Exhibit 9, which is a
23  four-page document that you brought to the deposition
24  today.  Can you identify this document?
25     A.  Sure.  This is the details of the

---

1  scripting in the database, our CRM database.
2      Q.  And what does the scripting do?
3      A.  This takes the information from our
4  CRM database and sends it to the SMS vendor.
5      Q.  Okay.  So this is the script
6  essentially pulling the cell phone numbers out of
7  Bebe's system and sending them to Air2Web?
8      A.  That's correct.
9      Q.  Okay.  I believe some dot XML files
10  were produced in discovery that I thought were
11  scripts.  Did you review those in preparation for your
12  deposition today?
13     A.  Not that I remember.
14     Q.  Okay.  So other than -- and we'll go
15  through this in a little bit more detail later, but
16  other than the notice of deposition, the document we
17  just marked as Exhibit 9, and what you refer to as
18  internal IT documents, is there anything else that you
19  looked at?
20     A.  No.
21     Q.  When you say, "internal IT documents,"
22  can you give me an explanation of what you mean by
23  that?
24     A.  Sure.  So I looked at our server
25  structure to get a picture of how many servers we

---